IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI


STEVE KNOX                                                        PETITIONER


V.                                              CIVIL ACTION NO.5:13-CV-241-KHJ

BURL CAIN, Commissioner, Mississippi
        Department of Corrections;
TIMOTHY MORRIS, Mississippi State
        Penitentiary Superintendent; and
LYNN FITCH, Attorney General of the
        State of Mississippi                                    RESPONDENTS

_____

***AMENDED PETITION FOR HABEAS CORPUS UNDER 28 U.S.C. § 2254 BY A PERSON
IN STATE CUSTODY UNDER SENTENCE OF DEATH INCORPORATING
AUTHORITIES RELIED UPON IN SUPPORT THEREOF, WITH LEGAL
ARGUMENTS, REFERENCES TO RELEVANT RECORD EXCERPTS AND EXHIBITS***
_____

   Steve Knox, Petitioner (hereinafter "Petitioner," "Steve," or "Mr. Knox") currently

confined on death row at the Mississippi State Penitentiary in Parchman, comes through counsel

and makes this his *Amended Petition for Habeas Corpus under 28 U.S.C. § 2254 by a Person in*

*State Custody Under Sentence of Death Incorporating Authorities Relied upon in Support*

*Thereof, with Legal  Arguments, References to Relevant Record Excerpts and Exhibits*

(hereinafter "*Amended Petition* ") against Respondents, Burl Cain, Commissioner, Mississippi

Department of Corrections; Timothy Morris, Mississippi State Penitentiary Superintendent; and

Lynn Fitch, Attorney General of the State of Mississippi  (hereinafter "Respondents" or "the

State") asking that Petitioner's convictions for capital murder and sentence of death be vacated,

and in support thereof respectfully shows and states, upon information and belief, the following

matters and facts, to-wit:

## I. JURISDICTION, VENUE, REQUIRED RECITATIONS

1. **Subject Matter Jurisdiction** of this *Amended Petition* is proper in that it is brought " . . . in behalf of a person in custody pursuant to a judgment of a State Court." Title 28 U.S.C. § 2254(a). Knox is in the custody of the Mississippi Department of Corrections under sentence of death pursuant to a judgment of the Circuit Court of Amite County, Mississippi.

2. **Venue** is proper by Title 28 U.S.C. § 2241(a) which allows the granting of a writ by "the district courts . . . within their respective jurisdictions." Additionally, Title 28 U.S.C. § 2241(d) permits application for such a writ "in the district court for the district within which the State court was held which convicted and sentenced him."

3. **Place of confinement**: Mississippi State Penitentiary, Unit 29, Parchman, Mississippi.

4. **Name and location of court** which entered the judgment under attack: Amite County on change of venue to Franklin County, Mississippi, Honorable Forest Johnson, presiding. Amite County Circuit Court Cause No. 99-12KR-J. (No. 98-09J)

5. **The substance requirement** is met because Knox challenges the legality of said sentence on the ground that it is "in violation of the Constitution or laws . . . of the United States." Title 28 U.S.C. § 2241(c)(3)

6. **Date of judgment of conviction**. The guilty verdict and death sentence were returned on September 29, 1999; (the guilt phase verdict was delivered before a lunch break recess, the death sentence followed the sentencing phase the same day, at about 6:17 p.m., and the trial court's Sentencing Order on Jury Verdict was entered that same day.) This sentence was affirmed on appeal. *See infra*

2

7.    **Nature of Sentence**. The challenged sentence is that Knox be put to death by lethal injection.

8.    **Nature of the offenses involved:** An *Indictment* charging Mr. Knox with Capital Murder was returned by a grand jury in the Circuit Court of Amite County, Mississippi, during the October 1998 term in cause No. 98-09J.  Petitioner was convicted of one count of capital murder in violation of Miss. Code Ann. § 97-3-19(e) (1972), said to have occurred on October 22, 1998.

9.    **Plea.** At his trial, Mr. Knox pleaded not guilty.

10.   **Jury.**  The trial of the issue of guilt or innocence and the issue of sentence was heard before a jury.

11.   **Did Petitioner testify.** Mr. Knox did not testify during the trial of the issue of his guilt or innocence or during the trial on the issue of his sentence.

12.   **Did Petitioner appeal from the judgment of conviction?**  Mr. Knox appealed his convictions and sentence of death to the Supreme Court of Mississippi by that Notice of Appeal filed on October 21, 1999.

   a.    **Name of court appealed to and date filed:** Mississippi Supreme Court, Case No. 1999–DP–01812.[1]

   b.    **Result:** Capital murder conviction and death sentence were affirmed.

---

[1] True and complete copies of the Petitioner's direct appeal pleadings were submitted as exhibits to the initial state petition for post-conviction relief and therefore are part of the record before this Honorable Court.  They include the Brief of Appellant and Record Excerpts. Trial counsel failed to submit a reply brief on behalf of Petitioner. and Appellant's Motion for Rehearing.

c.     **Date of result:** On January 24, 2002, the Supreme Court of Mississippi affirmed Petitioner's conviction and sentence on direct appeal. The decision is published as *Knox v. State,* 805 So.2d 527 (Miss. 2002) (*"Knox I"*). The United States Supreme Court denied *certiorari* on June 28, 2002. *Knox v. Mississippi*, 536 U.S. 965 (2002).

d.     **Grounds raised on Direct Appeal:** Three (3) assignments of error were presented for appellate review, *i.e.*, that the trial court erred by: I. Denying Knox's Motion for Directed Verdict or Judgment Notwithstanding the Verdict as to the Capital Murder and the Underlying Felony of Robbery; II. Granting Instruction S-8 Regarding the "Especially Heinous, Atrocious or Cruel" Aggravating Factor; III. Failing to find the Sentence of Death a Disproportionate Penalty in this Case.

13.     **In addition to the direct appeal from the judgment of conviction and the sentence, the following petitions, applications, and/or motions with respect to these judgments and sentence have been made.**

a.     Relief under Mississippi's Uniform Post-Conviction Relief Act, Miss. Code Ann. § 99-39-101 *et seq.* ("the MPCCA" or "the Act") was pursued in the Mississippi Supreme Court by the timely filing, on February 14, 2003, of an initial *Petition for Post-Conviction Relief* in the Mississippi Supreme Court, by Robert Ryan, then Director, of the Office of Capital Post-Conviction Counsel, hereinafter "The Office.) [2]

_____

[2] Copies of those pleadings deemed significant that were filed on behalf of the Petitioner in his application for state post-conviction review are referenced herein as exhibits.

b.    Subsequently, on June 19, 2003, Knox filed his *Supplement/Amendment to Petition for Post-Conviction Relief* with that Court. The State filed its *Response*, and on or about December 16, 2004, Knox his *Rebuttal to the State's Response to Application for Leave to File Petition for Post-Conviction Relief in the Trial Court and Supplement/Amendment to Application for Post-Conviction Relief*, "*Rebuttal*."

c.    Knox raised the following contentions in his *Petition for Post-Conviction Relief*:

    i.    The Trial Court's Limiting Instructions on the Statutory Aggravator Especially Heinous, Atrocious and Cruel Was Not Supported by the Evidence Adduced at Trial and Further, the Instruction Was Constitutionally Infirm in That it Was Vague and Overbroad.

    ii.    Knox Was Denied His Sixth Amendment Right to the Effective Assistance of Counsel Within the Meaning of *Strickland v. Washington*.

    iii.    The Trial Court Should Have Directed a Verdict in Favor of Knox on the Charge of Capital Murder at the Close of the State's Case-in-chief and after the State Finally Rested in the Guilt-innocence Phase of the Trial as the Evidence Was Insufficient to Sustain a Verdict of Guilty to the Underlying Felony of Robbery.

    iv.    Mississippi's Death Penalty Statutes Are Unconstitutional as Applied to the Petitioner and as a Result, His Eighth Amendment Rights under the United States Constitution and the Corresponding Portions of the Mississippi Constitution Were Violated.

v.      The Sentence Rendered Against Knox Is Disproportionate in Violation of the Eighth and Fourteenth Amendments to the United States Constitution and the Corresponding Portions of the Mississippi Constitution.

vi.     Knox Was Denied His Rights Guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the Federal Constitution and Mississippi Law Due to the Cumulative Effect of the Errors at His Capital Trial.

Knox's *Supplement/Amendment to Petition for Post-Conviction Relief* went on to allege:

vii.    Mr. Knox Was Denied His Sixth Amendment Right to the Effective Assistance of Counsel at the Guilt and Sentencing Phases of the Trial Within the Meaning of *Strickland v. Washington*, and Corresponding Portions of the Mississippi Constitution.

viii.   The Aggravating Factors Elevating the Charge to a Capital Offense Were Not Included in Knox's Indictment and Therefore His Death Penalty must Be Vacated.

ix.     The Death Sentence Violates the Sixth and Eighth Amendments as the Jury Found the Aggravating Circumstances in the Disjunctive.

x.      The Sentencing Jury Was Improperly Instructed.

xi.     Admission of the Photograph of the Deceased Taken Prior to Her Death Was Error.

xii.    Knox's Death Sentence Was Disproportionately Imposed.

d.   Following the State's response in opposition, on or about December 16, 2004, a *Rebuttal*, was filed on Petitioner's behalf.

e.   Relief was denied on March 24, 2005. *Knox v. State*, 901 So. 2d 1257 (Miss. 2005) ("*Knox II*"). Rehearing was denied on June 2, 2005, clarification was granted on that same date and a *Mandate* issued June 9, 2005.

f.   *Certiorari* was denied in the initial post-conviction proceedings on December 5, 2005. *Knox v. Mississippi*, 546 U.S. 1063 (2005).

g.   Litigation brought pursuant to 28 U.S.C. § 2254 commenced on June 9, 2005, when Mr. Knox filed in this Court, through the Mississippi Office of Capital Post-Conviction Counsel, an *Application for Appointment of Counsel in Death Penalty Federal Habeas Corpus Proceeding* [Doc. # 1] in 3:05 CV 360[3].

h.   Counsel were appointed and an *Application for a Writ of Habeas Corpus* was filed on October 13, 2005, with thirty (30) exhibits. Subsequently, on November 30, 2007, Mr. Knox briefed his application.

i.   There followed a period of litigation which included the filing of on May 27, 2008, an *Answer to Petition for Writ of Habeas Corpus by a Prisoner in State Custody* [Doc. # 39], and a *Memorandum in Support of Answer to Petition for Writ of Habeas Corpus by a Prisoner in State Custody* [Doc. # 40] were filed. Mr. Knox responded on July 18, 2008. Doc. # 39. A roughly four year period of docket inactivity followed until March 19, 2013, when upon Petitioner's motion, this Court stayed proceedings pending clarification of evolving law. *Order Staying Case,* Doc. # 44.

---

[3] The instant docket number, 5:13-CV-00241, is reflected on all filings in this case, and is noticed by that certain *Text Only Order of Transfer* noted by the Clerk on December 26, 2013, memorializing its transfer from the Jackson Division to the Western Division.

j.      Following the United States Supreme Court's holding in *Trevino v. Thaler*, 133 S. Ct. 1911 (2013) and Mr. Knox's *Stipulation to Seek Review in State Court* [Doc. #46], this Court continued its stay to allow his seeking relief in state court based[4] on the ineffectiveness of his prior post-conviction counsel. *Order* of October 15, 2013, Doc. # 47[5]

k.      Mr. Knox promptly sought leave to file a successor Petition in the Mississippi Supreme Court based on the principles it set forth in *Grayson* v. *State,* 118 So.3d 118 (Miss. 2013) and *Walker v. State,* 131 So.3d 562 (Miss.2013). On June 24, 2014, with the assistance of David L. Calder, one of the undersigned attorneys, he filed *Steve Knox's Motion for Leave to File Successive Petition for Post-Conviction Relief,* with exhibits in the Supreme Court of Mississippi. 2014-DR-0849-SCT. There followed a period of state court litigation after which, an *Amended Motion for Leave to File Successive Petition for Post-Conviction Relief* was filed on July 10, 2020, with 69 exhibits.

l.      In a five-to-four decision, the Mississippi Supreme Court refused to allow Petitioner to proceed with his new claims, and on March 10, 2022, the Court denied relief solely on procedural grounds, without addressing the merits of any of Petitioner's new claims. Knox v. State, 2014-DR-0849-SCT, Order #240960.

---

[4] This Court stayed this and three other cases similarly situated pending *Trevino*'s outcome. Docs. ## 44, 47.

[5] The filing next following the October 15, 2013, *Order* in this case was on September 26, 2019, a motion wherein Allen Freedman moved to allow his withdrawal and the substitution of David Calder. Doc. #48.

Rehearing was requested and denied, and an Amended Mandate was issued on June 16, 2022, in 2014-DR-0849-SCT.

m.     Petitioner's state court counsel then promptly filed with this Court a *Notice of Termination of Successive State Post-conviction Proceedings*, Doc.# 52, on July 14, 2022. Soon after, on August 5, 2022, David Calder filed a *Motion for Appointment of Counsel*. Doc.# 53. On September 26, 2022, another *Motion for Appointment of Counsel* [Doc. #55] was filed. Shortly afterward, by this Court's *Order* [Doc. #56] of September 13, 2022, new counsel was appointed for Petitioner, and a scheduling order was entered.

14.    **Timeliness/Petitioner's Present Posture:** Mr. Knox is before this Court, within the time allotted by the Court's *Order*, of September 13, 2022, as amended January 30, 2023, seeking leave to file an amended petition.[6]

## II. FACTUAL BACKGROUND

15.    In digest form, as provided in the direct appeal opinion, *Knox I*, 805 So.2d 527 (Miss. 2002), the events giving rise to the conviction and sentence forming the basis for the instant litigation are summarized as follows:

16.    On October 22, 1998, Ella Mae Spears was scheduled to travel approximately fifty miles from Liberty, Mississippi, to Fayette, Mississippi, to babysit Guy Alice Spears Green's

---

[6] In addition to the litigation described with respect to his convictions and death sentence Mr. Knox was lead plaintiff in a Hinds Chancery Court, First Judicial District, action regarding the performance of the Mississippi Office of Capital Post-Conviction Counsel (MOCPCC). The *Complaint* in G201-799 was filed May 6, 2010, relief was denied, and an appeal was perfected in the Supreme Court of Mississippi in 2010CA-814. The trial court decision was affirmed by the Mississippi Supreme Court on December 1, 2011.

children. When Ms. Spears failed to arrive in Fayette as scheduled, Green, a niece, contacted Spears's son, Albert McKnight.  He, in turn, contacted Amite County Sheriff Gene McClendon.  Mr. McKnight and McClendon then went to Ms. Spears's residence.

17.     When they arrived at approximately 2:00 p.m., they found the back door of Ms. Spears' house leading to the carport closed but not locked.  Ms. Spears could not be found, although her purse was on a table inside the house, and her car was in the carport. McClendon discovered dark stains on the floor of the carport which appeared to be a blood trail leading to the rear of Ms. Spears's car. When he could not locate the car keys, McClendon obtained a duplicate key from a local car dealer, and the trunk was opened. Inside was Ms. Spears' deceased body, covered with a quilt.  Autopsy results subsequently indicated that Spears's death was consistent with manual strangulation.

18.     After discovering the body, Chief Deputy Sheriff Donald Butler left the scene to interview people in the community.  Phillip Brown gave him information that Steve Knox was involved in Ms. Spears's death. Butler and McClendon then began searching for Mr. Knox based on the description given to them.

19.     The officers found Mr. Knox walking on the side of a road approximately one-quarter of a mile from his parents' house, where Knox lived and which is located across a field from Spears's house. Deputy Butler questioned Mr. Knox about Ms. Spears, and Mr. Knox denied knowing her.  Deputy Butler testified that he then noticed some small "brownish reddish" spots on Mr. Knox's left thigh and decided to take Knox to the sheriff's station. While he was being "frisked," Mr. Knox broke away attempting (unsuccessfully) to flee.

20.     In the patrol car Mr. Knox proclaimed his innocence and refused to speak to the

investigators. At the station, Deputy Butler found a set of keys in Mr. Knox's back pocket, which were later determined to be Ms. Spears' missing house and car keys.

21.     At approximately 6:00 p.m. on October 22, 1998, investigators went to Mr. Knox's parents' house and were given consent to search. There they found clothing belonging to Mr. Knox, including a shirt and a pair of jogging pants, which were stained with wet, "reddish brown" spots. The next day, Deputy Butler confronted Mr. Knox with the clothing.

22.     Mr. Knox admitted that he owned the clothes, and he gave the following account. Knox said he woke up at approximately 7:00 a.m. on October 22nd and went outside in a field to relieve himself. He said the next thing he remembered was waking up in the field about mid-morning with blood on his clothes. He then went to his grandfather's house nearby and went to the bathroom, where he became nauseated and then saw blood on his shirt, which he attempted to wash off. Knox said he could not remember how the blood got on his shirt. He then went to his own residence where he changed clothes.

23.     When Butler asked Knox about the keys in his pocket, Knox said he did not remember how he got them, but that the jogging pants did not have pockets. He admitted to remembering putting the keys in the pocket of the blue jeans he was wearing at the time he was taken into custody. He continued to deny knowing Ms. Spears.

24.     The Amite County Grand Jury returned an indictment against Mr. Knox in October, 1998, charging him with capital murder while in the commission of a robbery pursuant to Miss. Code Ann. § 97-3-19. Following a change of venue, Mr. Knox was tried September 27-29, 1999, in the Franklin County Circuit Court. The jury found that Mr. Knox killed Ella

Mae Spears, without justification, while in the act of robbing her on October 22, 1998, and sentenced him to death.

### III.  SUMMARY OF CLAIMS, ARGUMENT, AND AUTHORITIES

25.     Gus Sermos was the lead counsel appointed by the trial court on December 10, 1998 to represent Mr. Knox is this capital proceeding. He had graduated from law school in May 1997, and was first admitted to practice law on September 30, 1997.  Mr. Sermos was totally inexperienced in capital murder litigation (this was his first), and he was unqualified to act as lead counsel in this case.  Leonard Rosenthal was appointed as co-counsel with Mr. Sermos.  Mr. Rosenthal is now deceased and his files in this case have never been obtained. A Westlaw search of Mississippi cases does not reveal a single capital murder case where Mr. Rosenthal acted as counsel for the defendant.[7]

26.     Prior to and during Mr. Knox's trial, numerous errors were made by trial counsel, and inadequate investigations were conducted at both the guilt and sentencing phases, as more fully discussed herein.  The ineffective assistance of counsel that Mr. Knox received so undermined the proper functioning of the adversarial process in this case that Mr. Knox's constitutional right to counsel under the Sixth Amendment and his Due process and Equal Protection rights under the Fourteenth Amendment were violated. As a result, the judgments rendered in both the guilt phase and the penalty phase of this trial are not

_____

[7]Mr. Rosenthal was briefly added to Joseph Patrick Brown's defense team in 1993, but he was replaced before engaging in any substantive legal representation. *Brown v. State*, 306 So.3d 719, 742 (¶¶86-88) (Miss. 2020). He also was appointed to represent Charles Glen Pickett in a non-capital murder case on March 30, 1999, and Mr. Pickett entered a guilty plea on April 6, 1999. *Pickett v. State*, 861 So.2d 1049, 1050-52 (¶¶ 3 & 10) (Miss. Ct. App. 2003).

reliable, and failed to produce a just result.

27.     No meaningful, professionally adequate, investigation was undertaken by counsel prior to trial in the guilt/innocence phase.  Petitioner's trial attorneys admitted that on the record at the pretrial motion hearing conducted on June 7, 1999, that they were not prepared for trial that was scheduled for June 15, 1999, because they had expected Petitioner to enter a guilty plea. Supp. Transcript 88. Counsel admitted that they were "unprepared at the present time to go further with this case as a capital murder case and that the defendant's attorneys has failed to do certain things which should be done in every capital murder case." Supp. Transcript 88.

28.     The lack of investigation in the guilt phase is reflected in the fact that trial counsel failed to investigate the break-ins that had occurred at Ms. Spears' home just a few weeks before the murder, even though law enforcement had identified a suspected in that incident. Counsel also failed to contact the individuals that Mr. Knox was with on the day in question, in order to develop a possible alibi defense. Finally, an anonymous letter delivered to Petitioner's trial counsel exculpated Mr. Knox and, in fact, identified the true perpetrator.  Proper pre-trial investigation, including the services of independent experts, almost certainly, would have produced a different result.

29.     The State offered fingerprint and DNA evidence against Mr. Knox at trial.  However, Petitioner's counsel failed to ask for funding for expert witnesses to assist in challenging the fingerprint and DNA evidence.  In his supplemental State Post-Conviction proceedings, Petitioner presented affidavits from expert witnesses pointing out the deficiencies in the State's evidence, and why defense expert witnesses likely would have

produced a different result.

30. Likewise, no meaningful, professionally adequate, investigation was undertaken by Mr. Knox's trial counsel with respect to the sentencing phase and the issue of mitigation of punishment. There existed a veritable wealth of information, free for the asking, regarding Mr. Knox's brutal and dysfunctional childhood, his low I.Q. and episodes of blackouts and seizure-like episodes, and his organic brain disorder that resulted from numerous head injuries that he suffered. Dr. Shaffer Neuropsychological Evaluation, at pages 5-8.

31. There is reliable, indeed incontrovertible, evidence that the Petitioner, who suffered a serious work-related head injury, may be neurologically-compromised; and possesses substantially less than average intelligence. That evidence was available, indeed obvious, to anyone willing to undertake the investigation professional norms require of all lawyers who demonstrate minimal competence in death penalty cases. Trial counsel should have had the Petitioner fully evaluated, and presented evidence of his mental deficiency to the jury. Indeed, Petitioner may be barred from execution by *Atkins v. Virginia*, 536 U.S. 304 (2002). At a minimum, the available evidence of Petitioner's traumatic personal history, mental deficiency, and organic brain injury was clearly relevant for the mitigation/ sentencing issues at Petitioner's trial.

32. Taking into consideration the crime's specifics and the defendant's personal characteristics, his sentence is both excessive and disproportionate. Indeed, if presented with the facts of Mr. Knox's personal history, his head/brain injuries, his functioning at subnormal intelligence, his other-worldly pretrial letters to counsel, even if he were

14

convicted, it is likely a properly informed jury would not have sentenced him to death. Trial counsel's failure in this regard, along with numerous other errors, individually and collectively, resulted in the undermining of the adversarial process and produced an unjust result.

33.   What is more, Mr. Knox's initial post-conviction counsel, in his bid for state *habeas corpus* relief likewise failed to provide minimally competent representation. In Mississippi, post-conviction proceedings are an essential part of the appellate process in death penalty cases, and the Mississippi Supreme Court has held that defendants have a fundamental right to counsel at this stage. Petitioners right to counsel under the Sixth and Fourteenth Amendments were violated by the deficient representation provided by his initial post-conviction counsel.

34.   Petitioner further asserts that there was a systemic deficiency in the system used for the appointment of Petitioner's counsel that failed to provide adequate compensation and resources for competent trial counsel, and in the manner in which the newly created Office of Capital Post-Conviction Counsel was under-staffed and under-funded.  This resulted in a violation of Petitioner's constitutional right to competent counsel at every critical stage of the legal proceedings.

35.   Each ground in the instant *Amended Petition* is detailed *infra*.

36.   Although presented in slightly different order than in previous filings, Petitioner's claims are in outline form, as follows:

**CLAIM ONE:**        **INEFFECTIVE ASSISTANCE OF CAPITAL POST-CONVICTION COUNSEL, "PCCR-IAC"**

    A.    Counsel's Shortcomings

        (1)    No investigation

        (2)    No exhibits

        (3)    No meaningful Brief supported by competent evidence

        (4)    Virtually nothing was done

    B.    Systemic Faults

        (1)    No funding and inadequate staffing

        (2)    Questionable supervision

        (3)    System worked according to its design

**CLAIM TWO:**        **GUILT PHASE INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL, HEREINAFTER, "GP-IAC"**

    A.    No defense, investigation, or expert witnesses requested. (GP-IAC)

    B.    Failure to obtain the State Prosecutor's file and raise clear factual issues in support of the *Batson* claims. (GP-IAC)

**CLAIM THREE:**        **PENALTY PHASE INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL, "PP-IAC"**

    A.    No investigation even though trial counsel was advised of Petitioner's personal history and family members in New York

    B.    No experts

    C.    Only called two witnesses who merely begged for mercy, and failed to offer any testimony about Petitioner's personal history and traumatic

childhood, and medical conditions

    D.    Offered Petitioner's social security records into evidence without offering a medical expert to explain the significance of those records, and Petitioner's history of brain injuries, blackouts, and seizure-like activity

**CLAIM FOUR:**    **BATSON/J.E.B. CLAIMS BASED ON THE IMPROPER EXCLUSION OF POTENTIAL JURORS ON THE BASIS OF RACE AND GENDER**

    A.    The District Attorney identified all potential jurors by race and sex, and ranked them according those who should be excluded

    B.    The District Attorney excluded black and female jurors for pretextual reasons that were equally applicable to white male jurors who were not excluded

**CLAIM FIVE:**    **DEFECTIVE JURY INSTRUCTIONS/SUFFICIENCY OF PROOF**

    A.    Jury instructions for aggravating circumstance were vague, over-broad.

    B.    Aggravating factors were not included in indictment

    C.    Jury found the aggravating circumstances in the disjunctive

    D.    Sentence based on findings no rational finder of fact could have found

## IV. CLAIMS FOR RELIEF

**CLAIM ONE:**    **INEFFECTIVE ASSISTANCE OF CAPITAL POST-CONVICTION COUNSEL**

37.    In Mississippi, it has been clearly established that if a criminal defendant's conviction is affirmed on direct appeal, that holding must be "without prejudice to the defendant's right to raise the ineffective assistance of counsel issue via appropriate post-conviction

proceedings." *Read v. State*, 430 So.2d 832, 841 (Miss. 1983).

38.    The post-conviction stage of capital murder proceedings is an essential part of the appellate process in Mississippi, because that is the forum where claims of ineffective assistance of trial counsel must be presented. *See, e.g., Sandlin v. State*, 156 So.3d 813, 819 (¶ 20) (Miss. 2013); *Parker v. State*, 30 So.3d 1222, 1232 (¶ 36) (Miss. 2010). Petitioner had a right to effective assistance of counsel at this critical stage of his legal proceedings.

39.    The Ineffective Assistance of Mr. Knox's initial post-conviction counsel ("PCCR-IAC"), *i.e*., The Mississippi Office of Capital Post-Conviction Counsel, or, "The Office," in his initial attempt at state *habeas corpus* relief, provides a complete and independent ground for granting the relief sought by the instant *Amended Petition*.

40.    Mr. Knox's initial post-conviction counsel was ineffective at this stage of his case. Specifically, the Office failed to adequately investigate, obtain, and present witnesses or other evidence supporting Petitioner's claims for relief. Likewise, counsel failed to submit a legally-sufficient brief, or otherwise to properly litigate the case evidenced by failing to obtain discovery, to retain independent mental health, fingerprint, and DNA experts, or, to obtain an evidentiary hearing on these issues and requests for adequate funding.

41.    In *Knox* v. *State,* 901 So. 2d 1257 (Miss. 2005), the Mississippi Supreme Court denied Mr. Knox's initial post-conviction petition. *Id*., at 1272.

42.    As detailed *supra*, although the Office filed Mr. Knox's *Petition for Post-Conviction Relief* and a *Supplement/Amendment to Petition for Post-Conviction Relief* and, following

the State's response, a *Rebuttal*, these pleadings[8] did not include affidavits from any fact witnesses who had knowledge of Mr. Knox's personal history, organic brain injuries, and traumatic childhood, or from any psychologist, doctor, or mental health professional stating that Mr. Knox had mental impairments, which was one of the grounds raised.

43.    Indeed, only a one page Social Security Administration "Certification of True Copy," was attached to the Supplement/Amendment[9] and three (3) affidavits are referenced in the *Rebuttal*.

44.    None of the pleadings contained any indicia that the Office had made any attempt to obtain trial counsels' files, to interview those lawyers, or otherwise independently investigate the facts or procedural history giving rise to Mr. Knox's conviction and death sentence.

45.    Subsequent investigation has revealed a veritable treasure trove of evidence with respect to each of the areas described immediately above. This evidence was available and required only the time and effort to discover, develop and present in Mr. Knox's initial petition.

## THE APPLICABLE LEGAL STANDARD

46.    This case is largely about attorney performance. Accordingly, we cannot get very far from the standard of care. No less an authority than Justice Sandra Day O'Connor opined

---

[8] The *Rebuttal* to the State's Reply did contain 3 affidavits, one from trial counsel, and two from family members. There was no expert opinion, testing, or other evidence offered.

[9] Interestingly, the *Supplement/Amendment* contains a reference to an affidavit, "*See Harris Aff. Exhibit 3 to Petition/or Post-Conviction Relief*," which seems unrelated to any litigation involving Mr. Knox. *Id.*, at page 20, ¶ 121.

in *Strickland v. Washington*, 466 U.S. 668 (1984):

Prevailing norms of practice as reflected in American Bar Association standards and the like, *e. g.*, ABA Standards for Criminal Justice 4-1.1 to 4-8.6 (2d ed. 1980) ("The Defense Function"), are guides to determining what is reasonable, but they are only guides. No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant.

*Id*., at 688-689.

47.    The *ABA Standards for Criminal Justice* squarely address post-appellate counsel's duties:

Post-appellate counsel should seek the cooperation of the client's prior counsel in the evaluation and briefing of potential post-conviction issues. Prior counsel should provide such assistance as is possible, including providing the file or copies of the file to post-appellate counsel.

Standard 4- 9.5, "Post-Appellate Remedies," at (c).

48.    Turning to the  *ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases* (hereafter "*ABA Guidelines*") we see the "Duties of Post-Conviction Counsel" include especially Guideline 10.15.1 (Duties of Post-Conviction Counsel.  31 HOFSTRA LAW REV. 913 (2003) at 1079-1087.

49.    Guideline 10.7, of the "Duties of Post-Conviction Counsel" is particularly significant, where under the heading "Investigation," it provides:

A. Counsel at every stage have an obligation to conduct thorough and independent investigations relating to the issues of both guilt and penalty.

1. The investigation regarding guilt should be conducted regardless of any admission or statement by the client concerning the facts of the alleged crime, or overwhelming evidence of guilt, or any statement by the client that evidence bearing upon guilt is not to be collected or presented.

2. The investigation regarding penalty should be conducted regardless of any statement by the client that evidence bearing upon penalty is not to be collected or

presented.

B. 1. Counsel at every stage have an obligation to conduct a full examination of the defense provided to the client at all prior phases of the case. This obligation includes at minimum interviewing prior counsel and members of the defense team and examining the files of prior counsel.

2. Counsel at every stage have an obligation to satisfy themselves independently that the official record of the proceedings is complete and to supplement it as appropriate

*Id*.

50.    Counsel is not suggesting that the ABA Guidelines provide a dispositive checklist.  We

know from Director Ryan's Affidavit, quoted immediately below, that his efforts "fell

below an objective standard of reasonableness . . . under prevailing professional norms."

We know because he tells us as much.  *Cf*., *Smith v. Davis*, 927 F.3d 313 (5th Cir. 2019)

at 334. (Citing *Wiggins v. Smith* , 539 U.S. 510, 521, 123 S.Ct.2527, 156 L.Ed.2d 471

(2003) (quoting *Strickland v. Washington*,  466 U.S. at 688, 104 S.Ct. 2052 ).

### CAPITAL POST-CONVICTION COUNSEL'S DEFICIENT PERFORMANCE

51.    The Mississippi Office of Capital Post-Conviction Counsel owed the duty of minimal

competence to Mr. Knox, specifically including "thorough and independent

investigation," and "interviewing prior counsel and members of the defense team and

examining [those persons'] files."  *Id*., Guideline 10.7A and B1.

52.    This failure of Post-Conviction Counsel to trial counsels' records falls beneath the

standard of care.

53.    Former MOCPCC Director Robert Ryan provided an Affidavit, earlier included as

Exhibit 29, to Doc. #9,  filed in the instant federal litigation.  With particular respect to

Mr. Knox's case[10], Mr. Ryan swore, "I also did not have time to file funding requests, conduct a full investigation, or adequately research the issues." *Id*., at page 4, ¶ 17.

54.     Subsequently, one of the undersigned, who did have time to conduct a full investigation, contacted the surviving of Mr. Knox's trial counsel[11] and obtained that lawyer's entire file. The materials were there merely for the asking.

55.     A box containing those records, weighing something over seven (7) pounds, arrived on or about October 27, 2022, four days prior to this Honorable Court's Order, Doc. #58, approving the *ex parte* Budget in the instant litigation.

56.     These were easily obtainable, and required writing one single page letter request. Mr. Sermos' promptly responded by telephone, and sent the materials. The total cost was reimbursement of $17.05 postage.

57.     What is more, it appears that Mr. Sermos took *unusually detailed notes at every stage of his representation* which reveal exactly how the effort expended on various tasks, including, for example mitigation investigation.

58.     Mr. Sermos also kept letters from Mr. Knox and others, including an anonymous letter[12] exculpating Mr. Knox by naming Ms. Spears' actual killer.

59.     On which topic, as a separate issue, and of huge importance, is that the gummed flap on the envelope containing that letter remains intact and therefore provides a potential source

---

[10] It bears particular note that Mr. Knox's was only one of three such cases, filed on the same day, February 14, 2003, wherein an extension of time had been requested but denied. *Bob Ryan Affidavit*, at page 4, ¶ 18.

[11] Gus Grable Sermos. The other trial lawyer, Leonard Rosenblatt, is deceased.

[12] About which more *infra* at "The Letter."

of its author's DNA, and therefore, evidence of Mr. Knox's actual innocence.

60.    Again, this evidence was readily available to the Office and required only requesting it.

61.    Additionally, review of the papers provided by Mr. Sermos,  reveal other, relevant evidence that goes to trial counsels' effectiveness, or lack thereof.

## TRIAL COUNSEL IMPROPERLY ACCEPTED A FLAT FEE

62.    As another example, it appears that Mr. Sermos, but not his co-counsel, agreed to take this case for a flat fee of five thousand dollars ($5,000) plus out-of-pocket expenses totaling nine hundred fifty-six dollars and seven cents ($956.07).  These expenses included copies and mileage reimbursement for Mr. Sermos to travel between his office in Summit, and the county jail in Liberty, and other destinations, including co-counsel's office in Natchez and the site of the trial in Meadville.

63.    This billing violated the requirements for court-appointed counsel in criminal cases as provided in Miss. Code Ann. § 99-15-17 (1999) which provides: "The attorney or attorneys so appointed shall itemize the time spent in defending said indigents together with an itemized statement of expenses of such defense, and shall present same to the appropriate judge."

64.    In addition, Mr. Sermos only billed $1,000.00 for services rendered as of June 21, 1999, which showed the relatively small amount of time he had devoted to this case prior to that date. This is consistent with Mr. Rosenthal's statements in support of their motion for a continuance at the pretrial hearing on June 7, 1999 (with the trial scheduled for June 15, 1991), because he admitted they were not prepared for a capital murder trial. Supp. Transcript 88.

65.     No investigation was had, and no exhibits were submitted, although readily available.

These might have included the original letter to Gus Sermos, with its intact gummed flap,

both potential sources[13] of exculpatory evidence.  Recall, that letter related an purported

confession to its anonymous author by the actual murderer, and therefore was proof of

Mr. Knox's actual innocence.

66.     Finally, in regard to the *Batson* claims that were asserted in the direct appeal and in the

initial state post-conviction petition, the transcript of the trial court proceedings

conducted in chambers during the trial, where the attorneys for the parties exercised their

peremptory challenges for the selection of the petit jurors, was not prepared until this was

requested by Mr. Knox's prior habeas counsel in this case.  See Supp. Transcript 72-83.

Counsels' failure to obtain this portion of the trial transcript also fell below the standard

required for effective legal representation.

67.     Accordingly, no adequate post-conviction petition was submitted.  The petition filed

February 14, 2003, with those of two other death-sentenced convicts, contained virtually

nothing meaningful to support the six claims for relief that were alleged.  Likewise, in a

supplement/amendment to the Petition, filed September 7, 2004, it appears that at least

one issue[14] *was merely a restatement of one of the direct appeal issues.  Cf.*, Direct

Appeal Ground I, adequacy of proof with respect to the underlying felony of robbery.

68.     The Fifth Circuit in the case of *Ayestas v. Davis*, 933 F.3d 384 (5th Cir. 2019) discussed

---

[13]  Potential evidence includes fingerprint analysis of the actual letter and envelope as well as DNA collection from the intact gummed flap and postage stamp gummed area.

[14]  Issue III of Petition for Post-Conviction Relief.

the type of effective representation expected of defense counsel in a capital proceeding, stating:

> [Counsel] did not merely repeat claims raised in the direct appeal. In fact, there is virtually no overlap between them. [Counsel]'s independent efforts are also represented in the extra-record evidence that he developed and attached to the initial state-habeas application, which included affidavits from a forensic pathologist, Ayestas himself, three of Ayestas's family members, and one of the jurors that sentenced Ayestas to death, as well as documents from the Honduran government and a letter from an independent fingerprint examiner.

*Id.*, at 391.

69.     No such "independent efforts" were represented in Mr. Knox's Petition. *Au contraire*, there was simple overlap and repetition between the claims asserted in his direct appeal and in the initial post-conviction proceeding, as criticized in *Ayestas*. There were no affidavits from experts, no "extra-record" evidence. In short, although materials were available, including the aforementioned letter and envelope, they were not properly investigated.

70.     Director Ryan's investigation was not reasonable, it was deficient on its face, and by his own admission fell below any reasonable standard of legal representation. Petitioner suffered actual prejudice because of this deficient representation because his meritorious legitimate claims were not presented or supported in the initial post-conviction proceedings.

71.     This failure, expressed in constitutional terms, denied Mr. Knox his right to effective assistance of counsel as secured to him by the Sixth, Eighth, and Fourteenth Amendments to the Constitution of the United States and analogous provisions of the Mississippi Constitution.

72.    Post-conviction counsel failed to properly investigate trial counsel's failures, to uncover and develop information about Mr. Knox's personal history, mental deficiencies, organic brain injury, and other psychological issues, and to otherwise to investigate grounds necessary for preparing and presenting a minimally competent post-conviction case.

73.    The Record clearly shows that Mr. Knox received deficient performance of counsel in his initial post-conviction proceedings, and that he did not receive minimally competent, reasonable post-conviction assistance that caused him to suffer actual prejudice.

## SYSTEMIC FAULTS IN THE OFFICE OF
## CAPITAL POST-CONVICTION COUNSEL

74.    As a second issue, independent of initial post-conviction counsel's failures, are systemic faults, *i.e.*, structural defects in the funding, staffing, and management of the Mississippi Office of Capital Post-Conviction Counsel at the time that Mr. Knox's initial petition was filed.

75.    Pursuant to the Mississippi Uniform Post-Conviction Collateral Relief Act, Miss. Code Ann. § 99-39-1 *et seq.,* death-sentenced prisoners must raise all claims for relief, not on the record, in state post-conviction proceedings. Meritorious claims in post-conviction proceedings might include evidence of government misconduct, ineffective assistance of counsel, and jury issues. Such claims could not have been raised on direct appeal. Consequently, the trial record and pretrial filings would not contain evidence of these.

76.    In Mississippi, by statute and relevant case law, post-conviction collateral relief is an integral part of the appeal process:

>      Direct appeal shall be the principal means of reviewing all criminal
>      convictions and sentences, and the purpose of this article is to

> provide prisoners with a procedure, limited in nature, to review
> those objections, defenses, claims, questions, issues or errors
> which in practical reality could not be or should not have been
> raised at trial or on direct appeal.

Miss. Code Ann. § 99-39-3(2) (West 2022).

77.     The investigation of the facts of a death-sentenced prisoner's case and life history, which

is necessary to develop and plead meritorious post-conviction claims, requires hundreds

of hours, if done properly, by competent and conscientious counsel, with the assistance of

properly trained investigators and experts.

78.     Mr. Knox, indeed all death-sentenced prisoners, have a right to receive the assistance of

competent and conscientious counsel and meaningful access to the court system in their

state post-conviction proceedings pursuant to the Mississippi Constitution of 1890,

Article III, sections 14 and 26, and the Uniform Post-Conviction Collateral Relief Act,

"MPCCA."

79.     Mr. Knox was denied his right to effective assistance of counsel, in large measure due to

systemic faults that were so egregious that the American Bar Association intervened.  Mr.

Knox was the lead plaintiff in the case of *Knox et al, vs. State of Mississippi*, 2010-CA-

0814, an action wherein equitable, including injunctive, relief was sought first in

chancery court and later in the appellate system.

### SYSTEMIC INEFFECTIVE ASSISTANCE OF COUNSEL

80.     "Systemic IAC" in this context means three things:

a.      Inadequate Funding: Which is just another way of saying a case-load impossible

to properly manage, given the limited resources provided.  John Holdridge, a

nationally-known capital defense lawyer provided an affidavit that in December 2002, approximately two months prior to his filing three (3) petitions for relief on one day (February 14, 2003), stating that Bob Ryan told him, with respect to caseloads, that he was *"not going to lose this job over caseloads."* (Appellant's Record Excerpts, "K," in Knox, *et al*. v. State of Mississippi, 2010-CA-0814.) *Cf.*, Mr. Ryan stated in his Affidavit, *"I also did not have time to file funding requests . . . ."* "Funding requests" is just another way of saying "caseloads per attorney," and Mr. Ryan has told us he was "not going to lose this job over caseloads."

b.  Questionable Supervision: Who was in charge? The Director, or the Supreme Court? Why does it matter? Can an appellate court whose function is to adjudicate, properly manage an office whose design is adversarial? During the time frame in question, the Chief Justice of the Supreme Court of Mississippi, with the approval of a majority of voting members of the Supreme Court, had the statutory obligation to appoint the Director of the Office of Capital Post-Conviction Counsel, Miss. Code Ann. § 99-39-103 (2002).[15] Moreover, the Chief Justice had the authority to remove the Director "upon finding that the director is not qualified under law to serve as post-conviction counsel for persons under sentences of death, has failed to perform the duties of the office or has acted beyond the scope of the authority granted by law for the office." *Id.* It is

_____

[15] "The director shall be appointed by the Chief Justice of the Supreme Court with the approval of a majority of the justices voting . . . ." *Id.*

noteworthy that the statute has since been changed to give this authority to the Governor and Senate.[16]  If the statutory scheme had not been broken there would have been no need to "fix" it. This conflict in the provision of court-appointed counsel split the Director's loyalties and violated Petitioner's Constitutional rights under the Sixth and Fourteenth Amendments.

c.    The system, the Office, could not, by design, work effectively for its stated purpose, of "providing representation to indigent parties under sentences of death in post-conviction proceedings." We know this because it attracted the attention of the American Bar Association, which became involved in litigation, largely based upon inadequacies of the Office.[17]  "Representation" means, by definition, competent representation, *i.e.*, within "[p]revailing norms of practice." *Strickland*, *supra*, at 466 U.S. 688-689.

### "SPECIAL RELATIONSHIP"

81.    "Action without a name, a 'who' attached to it, is meaningless."[18]  If a statement is true, logic requires that its inverse is also true.  It follows that a name without action is likewise meaningless.  Here, the "name" is the Mississippi's Uniform Post-Conviction Collateral Relief Act, "UPCCRA," or, "the Act."

82.    The case of *Jackson v. State*, 732 So. 2d 187 (Miss. 1999),  recognized that the state

---

[16] "The director shall be appointed by the Governor with the advice and consent of the Senate . . ." § 99-39-103,  Effective July 1, 2011.

[17]  A more cynical view might be that the system worked exactly as designed.

[18]  Hannah Arendt,"The Human Condition," University of Chicago Press (1958),  at 180.

Capital Post-Conviction "system [was] flawed," because the death-sentenced inmates were "in effect denied meaningful access to the courts." *Id.* at 190.

> We further find that in capital cases, state post-conviction efforts, though collateral, have become part of the death penalty appeal process at the state level. We therefore find that Jackson, as a death row inmate, is entitled to appointed and compensated counsel to represent him in his state post-conviction efforts.

*Id.* at 191.

83.    Shortly afterward, during 2000, the Legislature amended the UPCCRA to include creation of the Mississippi Office of Capital Post-Conviction Counsel, "the Office." Miss. Code Ann. § 99-39-103. Effective from July 1, 2001.

84.    The legislature's intent was unambiguous.

> The Office of Capital Post-Conviction Counsel is created for the purpose of ***providing representation to indigent parties under sentences of death in post-conviction proceedings***, and to perform such other duties as set forth by law.

§ 99-39-105, at " Legislative purposes." (Emphasis added)

85.    The words "providing representation" create a *substantive* expectation, specifically, the expectation of legal representation of a particular type. Adequacy and competence are presumed. It would make no sense for the legislature to create a right without the implication that it would be addressed in a competent and professional manner.

86.    Its plain reading reveals the Act creates a "special relationship," or, more precisely, a substantive due process right, *i.e.*, "representation to indigent parties under sentences of death in post-conviction proceedings." Without the necessary action to effectuate its intent the Act is meaningless.

87.    States are under no obligation to provide a mechanism for direct appeals of criminal

convicions, but if they do, the procedures used in deciding appeals must comport with the demands of the Due Process and Equal Protection Clauses of the Constitution. *Evitts v. Lucey*, 469 U.S. 387, 393, 105 S.Ct. 830, 834 (1985). In Mississippi the post-conviction proceedings in death penalty cases are an essential part of the direct appeal process, as that is the first opportunity for a defendant to assert claims of ineffective assistance of trial counsel. Therefore, the fundamental principles of Due Process and Equal Protection apply to the post-conviction proceedings in Mr. Knox's case.

88.    A criminal defendant can assert Due Process and Equal Protection claims if the State erroneously interprets, or refuses to comply with its own law. *See Skinner v. Switzer*, 562 U. S. 521, 530, 131 S.Ct. 1289, 1296 (2011) (recognizing that prisoner's due process claim was viable, based on state court's interpretation of Texas post-conviction act which held that DNA testing was procedurally barred if the prisoner failed to request such testing at trial). Mr. Knox's Due Process claim is viable under the facts and circumstances presented.

**A FLAW**

89.    The Act was flawed *ab initio* because, while it allowed for an office with three lawyers, one of which would be its Director, that person would be hired by and subject to removal by the Chief Justice of the Mississippi Supreme Court.

90.    Its first Director, C. Jackson Williams, assumed the position September 1, 2000, and left sixteen (16) months later, at the end of 2001.

91.    It took not long, some few months, for Chief Justice Pittman's Administrative Order, of

January 26, 2001, to remind Director Williams, who was really in charge.[19]  The

Administrative Order advised Director Williams that, regardless of his statutory authority

and the provisions in MRAP 22 allowing for out-of-state counsel, he should not employ

such "foreign" counsel.  He was also summoned to a hearing on February 15, 2001. In

December 2001, Justice Pittman issued a show cause Order to Director Williams

accusing him of misfeasance of his official duties by contracting with outside counsel,

and exceeding his authority because he informed the Supreme Court that the Office could

not accept any new cases given its crushing caseload. At that point, Director Williams

elected to resign.

92.    On January 1, 2002, Bob Ryan replaced Mr. Williams.  Soon enough, during a conference

in Jackson during December of 2002, we learn[20] that Director Ryan was "not going to

lose this job" because of  an overwhelming caseload.  In light of his predecessor's short

tenure, Mr. Ryan was not unreasonably apprehensive.

93.    Roughly contemporaneous with Ryan's appointment, on April 4, 2002, the Mississippi

*Code of Judicial Conduct*, "*Code*," was adopted.[21]  The *Code* provides in pertinent part,

"[a] judge must avoid all impropriety and *appearance of impropriety*. *Id*., Commentary to

---

[19]  Keep in mind that the Office did not have its own physical location and did not hire its first associate lawyer, David Voisin, until November 15, 2000.  Therefore, Justice Pittman's January 26, 2001 Administrative Order gave Mr. Williams closer to two months to figure out who was really n charge.

[20]  From John Holdridge's Affidavit, ¶ 4, discussed *supra* at ¶ 80.

[21]  "The Code of Judicial Conduct is not intended as an exhaustive guide for the conduct of judges. They should also be governed in their judicial and personal conduct by general ethical standards . . ."

Canon 2A.

94.     The flaw in the Office's creation, was simple.  It just did not *look* right. The Chief Justice

and a "majority of the juices voting" of the tribunal hearing the cases, indeed, granting or

denying the opportunity to even go forward in seeking post-conviction relief hired[22] the

Director.  The Chief Justice had complete authority to remove him or her, or lead counsel

for one of the parties involved, in every case.  Miss. Code Ann. § 99-39-7, § 99-39-

27(7)(a), (b). The Chief Justice did just that in numerous cases.

95.     In effect, the Chief Justice had authority to fire one, but not both, of the lawyers for the

litigants in his Court.

96.     It looked so wrong that the legislation was soon changed to provide for the Director's

appointment by the Governor.  Miss. Code Ann. § 99-39-103 (as amended 2009, effective

from July 1, 2011).  The phrase, "if it ain't broke, don't fix it" comes to mind.  If it

wasn't a flawed system, did not look so awfully bad, why bother changing it.

97.     Mr. Knox's problem is that the Office was broken during the pendency of his first attempt

at post-conviction relief, *circa* February, 2003.

**COLLATERAL LITIGATION**

98.     On May 6, 2010, Mr. Knox was the lead plaintiff in the case of Steve Knox, *et al*., vs.

State of Mississippi, G2010-799 S/2, in the Chancery Court of Hind County, Second

Judicial District.

---

[22] Miss. Code Ann. § 99-39-103. ". . .appointed by the Chief Justice of the Supreme
Court with the approval of a majority of the justices voting." *Id.*   Although the consent of other
justices was required for appointment, the Chief Justice had sole authority to remove that person.
*Id. Cf.*  2003 ABA Guidelines, at 3.1(B),  The agency designated for selection of counsel must
be "independent of the judiciary."

99.    Its stated purpose was:

Plaintiffs, fifteen death-sentenced men and one death-sentenced woman, bring this civil action against Defendant, State of Mississippi, to remedy its systematic destruction of the ability to obtain meaningful post-conviction judicial review of their convictions and death sentences in state court. Defendant's conduct also eliminated Plaintiffs' opportunity for meaningful judicial review in a habeas corpus proceeding in federal court. As a consequence, Plaintiffs face execution because Defendant violated their statutory and state constitutional rights and disregarded the clear direction of the Mississippi Supreme Court and the Mississippi Legislature to provide them with competent and conscientious counsel.

Complaint at page 1, paragraph 1, "Preliminary Statement."

100.   The litigation was designed to provide assistance to those death row inmates who had been represented by the Office while under the direction of Mr. Ryan. It was based on the perception of systemic deficiencies in the representation that they received in their state post-conviction proceedings.

101.   The undersigned have been able to obtain an internal Memorandum, of April 27, 2009, to Robin Maher, then-Director of the ABA Death Penalty Representation Project, from her staff attorney, David Grossman, designated "Privileged and Confidential Attorney Work Product" which provides as follows:

More specifically, the state-appointed post-conviction counsel for the affected death row inmates failed to develop numerous claims, resulting in the likelihood that their claims will be procedurally barred in federal court due to a failure to exhaust the claims in state court. The lawsuit would seek declaratory and/or injunctive relief that would enable each of the affected death row inmates to file successive state post-conviction proceedings with the assistance of competent counsel and/or require the Mississippi Attorney General to expressly waive the exhaustion requirement in federal habeas proceedings, so that any federal law claims that the affected death row inmates did not present in their state post-conviction proceedings will not be procedurally barred.

*Id***.**

102. Some might say that was a prescient statement because here we are in that exact situation.

103. The lawsuit was dismissed for want of jurisdiction. The Mississippi Supreme Court considered the claims raised and denied the appeal, concluding that the Petitioners could challenge the ineffective assistance of counsel rendered by the Office by filing individual successive petitions for state post-conviction relief. However, the state court denied Petitioner's request for leave to file a successive petition by holding that the claims were procedurally barred. The state court refused to consider the merits of any of Petitioner's claims, even though some of the claims were based on new evidence.

104. Information about the deficiencies in the Office was made available to Mr. Knox shortly before Christmas 2022, through his undersigned counsel. This information included ten (10) bankers boxes containing investigation, research, and pleadings related to his claims that the Office was doomed to fail because of the way it was structured.

**CLAIM TWO:       TRIAL COUNSEL GUILT PHASE INEFFECTIVE ASSISTANCE**

105. The issue presented here is Guilt Phase Ineffective Assistance of Counsel ("GP-IAC"). "(A)ppointed counsel is required to provide active and zealous representation rather than engage in a pro forma exercise which is not according legal representation in any substantial sense." *Berry v. State*, 345 So.2d 613, 615 (Miss. 1977).

106. The GP-IAC of trial counsel in preparation for and during the guilt phase of Mr. Knox's trial provides a complete ground for granting the relief sought. Trial counsels' failings prejudiced Mr. Knox's defense efforts.

   **A.       THE LETTER**

107. An anonymous letter, written to and received by trial counsel Gus G. Sermos, "Sermos,"

seven months prior to trial provided valuable information with respect to Mr. Knox's actual innocence.

108. A letter from Mr. Sermos to his co-counsel reveals the letter's actual receipt was February 23, 1999, seven months before trial. Sermos shared his receipt of the letter with co-counsel but for whatever reason, neither lawyer followed-up on its potential importance.

109. This point and its significance with respect to guilt phase IAC of trial counsel has been raised earlier in filings before the Mississippi Supreme Court.

110. However, the letter's actual physical existence, was not previously known to the undersigned attorneys, indeed there was information to the contrary, *i.e.*, it had not been preserved. *See* Declaration of David L. Calder, at page 1, ¶ 5.

111. Subsequently, as mentioned above, and previously disclosed to this Court in Mr. Knox's *Unopposed Motion for Enlargement of Time*, Doc. # 59, counsel learned that Sermos' papers did in fact exist, and on October 27, 2022, the undersigned Levidiotis received a box containing Mr. Sermos' trial preparation and other materials, including the said letter.

112. The original letter and its envelope[23] are newly discovered physical evidence with respect to the instant petition, "a factual predicate that could not have been previously discovered through the exercise of due diligence." *Cf.*, 28 U.S.C. § 2254(e)(2)(A)(ii).

113. Which brings us to:

[T]he facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable fact finder would have found the applicant guilty of the underlying offense.

---

[23] Including their physical characteristics and evidentiary value, such as hand-writing, fingerprints, and DNA contained thereon or, for example, in or on the gummed seal of the envelope flap or the gummed rear surface of its postage stamp.

*Id*., at (e)(2)(B)

114. The letters purports to contain a confession by the actual killer, offered to defense counsel before trial, but was not acted upon in any respect or for any purpose. No hand-writing analysis, no fingerprint investigation, no DNA from its intact gummed flap or gummed surface of its postage stamp. What reasonable fact finder would convict in the face of credible confession? That is not "reasonable" investigation for trial preparation purposes.

**B.     FAILURE TO REQUEST FUNDING FOR EXPERT WITNESSES TO ASSIST IN FINGERPRINT ANALYSIS, HANDWRITING ANALYSIS, AND DNA EVIDENCE**

115. Trial counsel was provided with numerous motions by expert habeas counsel, Deborah Sabah and Charles Press, but he unreasonably failed to file any of these motions in this case. Mr. Sermos failed to request funding to retain expert witnesses to assist in the defense of this case, and funding to assist out-of-state witnesses with travel expenses so they could testify at trial at the sentencing phase, if necessary.

116. The State offered expert witnesses who testified concerning analysis of fingerprints recovered from the crime scene, and DNA evidence extracted from various sources. This evidence was critical to the State's case against Mr. Knox.

117. The DNA evidence and fingerprint evidence produced by the State lacked the normal indicia of scientific reliability such as testing standards, basis, and support for conclusions including test data and laboratory notes. The DNA report stated mere conclusions, and contained four out of fourteen DNA samples that were reported as "non-conclusive" because the samples were contaminated or degraded. The results of the DNA report were ambiguous, and this cast doubt on its scientific validity. However, no defense DNA

expert ever examined the "results," and trial counsel never requested the original testing data and laboratory notes typically kept and used to analyze DNA samples. This is especially significant scientifically, because almost a quarter of the samples could not be tested. A defense expert was essential in this case, and trial counsel was ineffective in failing to request funding for an expert.

118. In the successive state post-conviction petition, Mr. Knox presented the affidavit of Dr. Peter D'Eustachio, a recognized forensic DNA expert, who stated that he had reviewed the six-page report from ReliaGene Technologies, dated May 24, 1999, and the transcript of the trial testimony of the State's witnesses, Amy Winters, a forensic scientist at the Mississippi Crime Laboratory, and Gina Pineda, a forensic scientist at ReliaGene technologies, the DNA testing performed.

119. Dr. D'Eustachio stated that a reliable scientific conclusion about these tests could not be derived without the actual test results, laboratory notes, and other records that should have been generated in the course of performing the DNA test. In his opinion, critical examination of this material would be essential to correctly interpret the test results. The Mississippi Supreme Court refused to address the merits of this claim, and held that it was procedurally barred.

120. The State's fingerprint analysis likewise lacked the normal indicia required to satisfy scientific standards, comparison basis, and support, and the report simply contained "conclusions." No defense fingerprint expert has ever examined the "results" and Petitioner's trial counsel failed to request the original data and notes typically prepared and used to compare fingerprint samples. This casts doubt on the scientific validity of this

report, and the opinions offered by the State's witness at trial. Petitioner's trial counsel provided ineffective assistance by failing to request discovery of this underlying evidence for this report, and funding for a defense expert to assist in challenging the opinions offered by the State's witness.

121.  Trial counsel unreasonably failed to request or investigate the underlying basis for the DNA and Fingerprint Reports, and meaningfully request funding for a DNA expert and a fingerprint expert evidence assist in the defense, even though motions were prepared for these requests.

122.  Lead Trial Counsel, Gus Sermos, was provided a Motion to request funding for a fingerprint expert, but he never filed the motion. The State's fingerprint evidence included several unknown fingerprints, and it was critical to have a defense expert review all fingerprint evidence recovered from the scene.

123.  Petitioner's trial counsel failed to retain an expert witness to assist in the examination of the fingerprints and provide assistance in the cross-examination of the State's fingerprint experts. This fell below any reasonable standard of care that any criminal defense attorney would exercise, and this failure clearly prejudiced Petitioner's defense.

124.  In the successive post-conviction Petition, Mr. Knox's attorneys relied on the opinions offered by Robert Whritenour, and expert in fingerprint analysis, who stated that the unknown fingerprints recovered from the scene could be compared against those contained in the FBI Automated Fingerprint Identification System (AFIS) in an attempt to identify other persons who were at the scene.  Mr. Whritenour listed the information he would need in order to formulate a reliable expert opinion in this case, including

photographs of each and every latent print that was found or lifted at the crime scene, photographs of the fingerprint card of the person who made the prints that they identified, photographs of the crime scene, and photographs of the latent prints at the crime scene.

125.　Mr. Sermos provided ineffective assistance by failing to request funding for an expert who would conduct that investigation for the defense and assist in preparing for the cross-examination of the State's witnesses concerning the weaknesses in their investigation and testimony.

126.　Petitioner's trial counsel also knew the strategic importance of obtaining the assistance of a DNA expert in order to present a reasonable defense on behalf of Petitioner. This is evidenced by the fact that in July 1999, he filed under seal an Ex Parte Motion for the appointment of an expert witness to assist the defense on the DNA issues. That Motion was scheduled to be addressed by the trial judge at the Motion hearing conducted on September 9, 1999. However, Mr. Sermos never requested ruling from the trial court on that motion. Supp. Transcript 14-15.

127.　Significantly, the June 1999 trial setting in this case was continued because of delays in obtaining the DNA analysis and serology report from the Mississippi Crime Lab. The information contained in the District Attorney's files (which was obtained by successive state post-conviction counsel) indicated that this Report was not sent to Petitioner's trial attorneys until Friday, September 24, 1999 at 10:21 a.m., before the trial was scheduled to begin on Monday, September 27, 1999. Petitioner's trial attorneys violated any reasonable professional standard by failing to ask for a continuance based on the untimely production of this critical evidence that would be offered against Mr. Knox, so that a

defense expert could be retain to assist in challenging this critical evidence.

128.    On Friday and Saturday, September 24 & 25, 1999, Mr. Sermos attended a training

seminar on representing defendants charged with capital murder, instead of preparing for

this trial, which was scheduled to begin on Monday, September 27, 1999.  In his

application to attend this seminar, Mr. Sermos indicated that he had *"no prior capital

litigation experience."*

129.    The experienced capital attorneys, Deborah Sabah and Charles Press, who were

conducting the seminar reviewed Mr. Sermos's file, and saw first-hand his lack of

preparation for this capital trial. In her affidavit, Ms. Sabah stated that drafted numerous

Motions for Mr. Sermos to file in Mr. Knox's case, but he was dismissive of their efforts.

They also strongly urged Mr. Knox to request a continuance of the trial so he could make

some preparation, but he rejected their advice.

130.    Mr. Sermos was not qualified to represent a capital murder defendant. He unreasonably

refused to file any of the Motions that were prepared for him, and he unreasonably

refused to ask the trial court for a continuance so he could prepare for this trial.

### C.    FAILURE TO INVESTIGATE OTHER PERPETRATORS

131.    Trial counsel also failed to conduct a reasonable investigation as to other perpetrators in

this case. This decision was not rooted in any reasoned trial strategy, because Petitioner's

trial counsel conducted no investigation in the guilt phase, and he presented no witnesses

at trial.

132.    In the investigation of fingerprints at the crime scene, the State recovered numerous

fingerprints on the victim's car and on a beer can in her carport that were never identified.

41

Petitioner may no effort to have these fingerprints checked against those on file with the local or federal law enforcement agencies to identify others who were are the scene.

133. In addition, trial counsel had received an anonymous letter well before trial which asserted that someone else – the author's cousin – committed the murder, and did so to silence the victim who had been speaking out publicly against local drug dealers. The letter also described two instances in which the author observed petitioner in a blackout state in which he had no memory of events occurring in this state, and also describing an incident in which the author's cousin went to the victim's home intending to kill her - - and would have done so had she been home.

134. Trial counsel conducted no investigation based on the information in this letter, and failed to request funding for a handwriting expert to identify the author of the letter. In addition, trial counsel failed to request DNA testing of that envelope, which could have been referred to appropriate law enforcement agencies to check against other DNA profiles that were on file.

135. Significantly, a newspaper article published the day after the homicide quoted the Chief Deputy of the Amite County Sheriff's Department, Donald Butler, who stated that shortly before the murder, a man attempted to break into the victim's home. Her phone line had been severed, and her electricity had been disconnected, but she was able to flee the scene in her car. Deputy Butler stated in the article that a man had been arrested for that incident, and he was *out on bond at the time of the murder*. Finally, the article mentioned that the victim had recently been speaking out against drugs at PTA and NAACP meetings, and suggested that the attempted break-in was an earlier attempt to retaliate

against and silence the victim in regard to her actions against local drug dealers.

**CLAIM THREE:  PENALTY PHASE IAC, "PP-IAC:" FAILURE TO INVESTIGATE MITIGATION CASE**

136.  The unique, bifurcated nature of a capital murder trial requires extensive investigation into a defendant's personal history and background, and this makes capital cases more costly and difficult to litigate than ordinary criminal trials. In spite of the clearly-defined duty to conduct a thorough investigation of Mr. Knox's family background, his social, medical history, neuropsychological problems, employment record, and criminal history, Mr. Knox's trial counsel failed to adequately investigate any of these areas.

137.  The duty to investigate and present a mitigation case was well-established at the time of Mr. Knox's trial.  Counsel had a duty of investigation "to explore all avenues leading to facts relevant to . . . the penalty." 1 ABA Standards 4-4.1 (2d ed. 1982 Supp.), quoted in *Rompilla v. Beard*, 545 U.S. 374 (2005) at 387.

138.  The *Rompilla* decision goes on to include, "[W]e long have referred [to these ABA Standards] as 'guides to determining what is reasonable.'" citing *Wiggins* v. *Smith,* 539 U. S., at 524 (quoting *Strickland* v. *Washington,* 466 U. S., at 688).  *Id.*

139.  "Reasonable" defines the inquiry and its conclusion is obvious indeed.  Despite readily available, powerful mitigation evidence that almost certainly would have altered the outcome of the penalty phase trial counsel did not even investigate its existence. Counsel's efforts, such as they might have been, were not reasonable.

140.  "Readily available," describes the plethora of resources listed in Mr. Knox's *First Federal Habeas Petition* Doc. #9, in this case.  These include documentation that Mr.

Knox had limited intelligence and a history of emotional problems; school records from the Poughkeepsie, New York City Schools, the Affidavit of Dr. Fern Aefsky, Assistant Superintendent for Pupil Personnel Services in the Poughkeepsie schools where Mr. Knox attended elementary and high school, evidence of his borderline intellectual functioning, his subnormal (84) IQ.

141.    Evidence of Steve Knox's Special Education placement and Behavioral Management classes was there for the asking.  As was his referral to the Committee on Handicapped in May 27, 1980, and October 6,1981; the fact that he repeated third grade, failed reading arithmetic, science and health in fifth grade and "very weak ability to apply the concepts he learned in school."

142.    No attempt was made to obtain adult probation records evidencing "emotional problems which may hamper his ability to act though he seems to have good intentions." These records also demonstrated that Mr. Knox did not know his phone number, and that he attended mental health counseling.

143.    By merely investigating their client's social, medical, educational and criminal history, as required by prevailing professional norms in effect[24] at the time, trial counsel could have presented evidence of his brutal, dysfunctional childhood, and disordered home life.

144.    Juvenile probation records were available to counsel merely for the asking which describe a youth whose home life was so disturbed that he requested placement in the New York State Boys Home.  Those documents were included as Exhibit 19 to Doc. #9.

---

[24] "Duty to Investigate"  1 ABA Standards 4-4.1 (2d ed. 1982 Supp.).  *Cf*., 4th ed. (2017) at 4-4.1(c).

145. Mildred Knox, Steve's mother, provided prior *habeas* counsel evidence of an unenviable home life. He was the 9th of 14 children. He "always seemed slow." He did not speak until he was 3 years old; and could not be understood until he was over 5 years of age. He did not learn things as easily or quickly as his siblings. Mildred Knox Affidavit.

146. Mrs. Knox could not afford to take her son to the doctor. We are told his father who, apparently, did not like his son, whipped the youth using an electrical extension cord and "it seemed like he was trying to kill." *Id*. Steve complained to his mother about having "black outs," especially in the morning. *Id*.

147. This is supported by the Affidavit of Vera Knox, a sister. Ronald Knox, a brother, related that their father "singled out Steven for more frequent and more intense beatings than the other children . . . whipping him with an electric cord . . . ." Ronald Knox Affidavit

148. Ronald Knox also observed Steve Knox having a black-out, and described it:

I observed Steven walk through my sister, Joyce's hallway, fall back onto the floor as if in a faint, and start shaking for about 30 seconds. I thought Steve was having a seizure.

*Id*.

149. Vera Knox and Willie Knox, a younger brother, provided evidence that Steve was sexually molested by a man in the housing project where they lived in Poughkeepsie, when he was about 10-12 years old. Vera Knox related that the same sexual predator also abused another brother.

150. Competent counsel would have obtained, it was there for the asking, strong evidence that Mr. Knox suffered from organic brain damage and dysfunction. This information was contained in school records, family affidavits, juvenile and adult probation records.

151. We know this because a thorough investigation of records and documentary evidence including the above-described school records, social security[25] records, juvenile and adult probation records and interviews with Mildred Knox, indicate that he suffers from organic brain damage/dysfunction.

152. Marc L. Zimmerman, Ph.D., a clinical and forensic psychologist with specialization in the field of Neuropsychology and Forensic Psychology, concluded that this evidence is consistent with brain damage/dysfunction. Dr. Zimmerman's CV and Affidavit were included with Doc. #9.

153. Dr. Zimmerman reviewed this information, and provided in his Affidavit that these records and documents contain an abundance of signs and symptoms consistent with neuropsychological dysfunction, which included the following:

1. Lack of academic achievement.
     a  Poor grades.
     b  Low scores on standardized tests.
2. Placement in Special Education and Behavior Management classes.
3. Weak ability to apply concepts learned in school.
4. Referral to Committee on the Handicapped.
5. Measured IQ in the Borderline range.
6. Note in Adult Probation records "doesn't know phone the #"
7. Note in Adult Probation records "Not good follow thru. Has emotional problems which may hamper his ability to act though he seems to have good intentions."
8. Note in Adult Probation records attended mental health counseling.
9. Affidavit hospitalized for three days for high fever.
10. Wet his pants until 10 years old.
11. "Slow child."
12. Hobby was boxing.
13. Problems holding a job.

---

[25]  Social security disability records were placed in evidence but without introduction or necessary explanation during the penalty phase of trial, with the advice, "you may examine them to the extent that you wish and want to . . ."  Transcript page 426.

14. Black outs.
15. Hit in head with backhoe.
16. SSI evaluation scheduled for Affective/mood disorders and intracranial injury.
17. Head pain.
18. Duke University CT scan bleed/subdural hematoma.

*Id*., Dr. Zimmerman Affidavit.

154. Dr. Zimmerman concluded in his affidavit as follows:

Given the plethora of signs and symptoms consistent with neuropsychological dysfunction, neuropsychological assessment is appropriate and warranted. If a patient presented in my clinical practice with the above-listed symptoms, to not conduct neuropsychological evaluation would fall below the accepted standard of practice in Neuropsychology.

*Id*.

155. Additional evidence in the form of affidavits of Mr. Knox's family corroborate the documents reviewed by Dr. Zimmerman. This corroboration is evidenced in aforementioned affidavits of Mr. Knox's mother, sister, and two brothers, which were submitted with Document 9, as previously noted.

156. Petitioner has also presented a complete neuropsychological evaluation performed by Dr. Robert Shaffer. This evaluation provides a comprehensive overview of Mr. Knox's traumatic childhood, and objective evidence of his organic brain injury and mental defects that have affected his behavior. This evidence would have provided the sentencing jury with a basis to impose a sentence less than death. *See*: Dr. Shaffer Neuropsychological Evaluation.

157. Trial counsel's failure to develop similar mitigation evidence clearly shows that Mr. Sermos and Mr. Rosenthal had no idea about the type of evidence that could be offered at the sentencing hearing in this death penalty case. This was clearly revealed in Mr.

Sermos's case file, where he noted that Mr. Rosenthal instructed him to only locate

mitigation witnesses who lived in Amite County, because that was all that they needed to

call. In addition, he had no medical information about Mr. Knox, other that the Social

Security documents that he introduced without providing an expert witness who could

interpret those records for the jury.

158.   This is also reflected in the trial judge's incredulous reaction when Mr. Sermos concluded

his presentation of mitigation evidence at the sentencing hearing.  The trial court urged

Mr. Sermos to confer with Mr. Rosenthal about presenting more testimony, but Mr.

Rosenthal stated: "I wanted him to do exactly what he did." Transcript 417.

159.   Trial counsel, through lack of training and experience, failed to develop evidence of Mr.

Knox's horribly dysfunctional and brutal childhood, his deficient intellect, medical

history, educational and juvenile records, that would have offered the jury a basis for

leniency, and trial counsel presented a wholly inadequate penalty phase case.

### PENALTY PHASE AS PRESENTED

160.   While the trial transcript of the defense penalty phase occupies fourteen[26] (14) pages, the

defense team actually called only two witnesses, each of whose direct testimony was three

(3) pages long, followed by two (2) pages of cross-examination each.

161.   Mildred Knox, Steve's mother, was called and asked by trial counsel where she and her

children had lived, what her son meant to her, and what sentence she would ask of the

jury on his behalf. She answered she did not want him to die. No further questions were

asked of her. Transcript 414-417.

---

[26] Fourteen pages is 3% of a 460 page trial transcript.

162. Next, Pearlene Knox, an aunt was called, and asked how long she knew Steve, whether she loved him, and if she would like to see him stay alive. She answered she knew him all her live, loved him, and did not want to see him get the death penalty, but rather prison. Transcript 420-421.

163. Pearlene Knox has provided an affidavit stating that she was never interviewed by trial counsel with the exception of literally two minutes before counsel put her on as a witness. In that affidavit, Pearlene Knox says that in the brief time, she informed counsel that she did not have knowledge of her nephew because he moved away to Poughkeepsie, New York, when he was 4 or 5 years of age. Affidavit of Pearlene Knox, Doc. #9, Exhibit 28.

164. Finally, Mr. Sermos introduced into evidence a certified copy of social security records of Steve Knox and briefly said[27] the records indicated Mr. Knox was hit in the head with a backhoe bucket in March of 1998, and suffered headaches and nausea:

> [Y]ou may examine them to the extent that you wish and want to and we want to point out certain things that we hope you will look at in those records . . . . You can read it. We ask you to read it because we believe it will be valuable in understanding him.

> Transcript 426.

165. One wonders what counsel was hoping when he told the jury, "you can read it?"

> Assuming they made it to the brain scan portion of the bolus, they would have learned:

> There is no evidence of mass effect, midline shift, extra-axial collection, or intracranial hemorrhage. No acute cortical infarction. Ventricles, cisterns, and sulci are normal. Orbits and paranasal sinuses are normal. Incidentally, there is a pin point focus of increased attenuation on the center of multiple images which

---

[27] It is hard to reconcile Mr. Sermos' comments with the judge's preliminary instruction,"but keep in mind, what the attorneys tell you is not evidence in this case." Transcript page 143, lines l-2.

overlies the left pons, left cerebral peduncle, and left thalamus, which represents
an artifact.

Exhibit 30, Clerk's Papers 79.

166. No other mitigation evidence or explanation was presented.

167. "Left cerebral peduncle?" This was a brain scan. The jury would arguably have been able

to read the words but, like the Ethiopian servant in Acts of the Apostles, they may have

needed expert guidance to understand what they were reading. *Id*., Acts, 8:31.

168. We will never know what, if anything, the jury read during their penalty phase

deliberation. Whatever it was it did not take very long. After one hour and fifty-two

minutes, barely long enough for twelve people to select a foreperson and use the rest

room facilities, the jury returned with a death sentence. Transcript 456, lines 23-24.

169. The powerful mitigation evidence that could have been, but was not, presented may have

altered the outcome. Counsel's inartful presentation of medical records with an off-hand

"you can read it" did nothing to put Mr. Knox in a sympathetic light as a damaged human

being worthy of a sentence less than death.

## PP-IAC: CONCLUSION

170. This evidence gathered after trial, was in existence, and available by minimally competent

investigation. It could have been obtained, reviewed by a suitable expert witness and

presented to the jury during the penalty phase. It was not.

171. Presented to the jury this powerful mitigating evidence of subnormal intelligence, history

of emotional problems, brutal and dysfunctional childhood and home life, and organic

brain damage there is a reasonable probability the outcome of the sentencing phase would

have been different.

**CLAIM FOUR:     BATSON/J.E.B. CLAIMS BASED ON IMPROPER EXCLUSION OF POTENTIAL JURORS ON THE BASIS OF RACE AND GENDER**

**A.     APPLICABLE LEGAL STANDARDS**

172.   Petitioner asserts that the prosecution discriminated against Blacks and females in the jury selection process, and violated the standards established by the U.S. Supreme Court in *Batson v. Kentucky*, 476 U.S. 79, 86-87, 106 S.Ct. 1712, 1717-18 (1986) ("Racial discrimination in selection of jurors harms not only the accused whose life or liberty they are summoned to try ... [but also, by] denying a person participation in jury service on account of his race, the State unconstitutionally discriminated against the excluded juror."); *Georgia v. McCollum,* 505 U.S. 42, 48, 112 S.Ct. 2348, 2353, 120 L.Ed.2d 33 (1992) (recognizing that the principles announced in *Batson* established that discrimination in the selection of jurors focuses not only on the injury to the litigants, but on the harm done to the excluded jurors and the community at large); *J.E.B. v. Alabama ex rel. T.B.*, U.S. 127, 129, 114 S.Ct. 1419, 1421 (1994) ("We hold that gender, like race, is an unconstitutional proxy for juror competence and impartiality."); and *Flowers v. Mississippi*, ___ U.S. ___, 139 S.Ct. 2228, 2244 (U.S. Miss. 2019) ("The Constitution forbids striking even a single prospective juror for a discriminatory purpose.").

173.   The standards articulated in *Batson* and *J.E.B.* were recognized and well-established under Mississippi law at the time of Petitioner's trial in 1999. *Randall v. State*, 716 So.2d 584, 586-87 (¶¶ 8 & 11) (Miss. 1998) ("the pivotal question is whether the opponent of the strike has met the burden of showing that proponent has engaged in a pattern of

strikes based on race or gender, or in other words 'the totality of the relevant facts gives rise to an inference of discriminatory purpose'").

174. Petitioner's claims are based on the prosecution's jury selection notes that were obtained for the first time by Petitioner's state successor post-conviction counsel. These notes show that the prosecutors identified each prospective juror by race ("b" or "w") and by gender ("m" or "f"), and ranked the panelists with plus or minus signs to indicate their preference based on these characteristics.

175. In *Foster v. Chatman*, 578 U.S. 488, 136 S.Ct. 1737 (2016) the defendant asserted a *Batson* claim in state habeas proceedings after his attorneys were able to obtain the prosecutor's trial file which included jury selection notations that showed racial motivations for excluding black jurors. 136 S.Ct. at 1740, 1744. The Georgia state court found that the new evidence was barred by res judicata, but proceeded to address the issue on the merits, and held that there was no *Batson* violation. 136 S.Ct. at 1745-46. The Supreme Court held that the *Batson* issues presented a federal question, and that the newly discovered evidence sufficiently showed that the prosecution's strikes were motivated by improper discriminatory intent. *Id*. at 1742. The Court stated: "We have 'made it clear that in considering a *Batson* objection, *or in reviewing a ruling claimed to be Batson error,* all of the circumstances that bear upon the issue of racial animosity must be consulted.'" *Id*. at 1748 (*emphasis added*).

176. In spite of this clearly established federal law, the Mississippi Supreme Court held that Petitioner's *Batson* claims were barred by res judicata, even though the claims are based on newly discovered evidence. Therefore, the state court refused to grant an evidentiary

hearing on this issue, and refused to address the merits of Petitioner's *Batson* claims. Under these circumstances, Petitioner respectfully submits that this issue has been exhausted, and is now ripe for this Court consideration on the merits. Petitioner requests an evidentiary hearing on this issue.

177. One of Mr. Knox's trial attorneys, Leonard Rosenthal, was primarily responsible for jury selection, and he made the only arguments on Petitioner's behalf at the *Batson* hearing that the trial court conducted. Mr. Rosenthal failed to file a formal *Batson* motion, but raised the issue of race by motion *ore tenus* after the parties exercised their peremptory challenges and selected the petit jurors. Transcript 134-135.

178. Petitioner's attorneys provided ineffective assistance of counsel by failing to raise the gender discrimination issue at the *Batson* hearing, and by failing to articulate disparities in the way the prosecutors exercised their peremptory challenges to exclude Black and female jurors.

179. At the beginning of the *Batson* hearing, the trial court noted that the State exercised eight peremptory challenges against Black jurors, and three challenges against White jurors. Transcript 135. The Record reflects that the three White jurors were all females, and that the State did not exclude any White males from the jury.

180. The trial court only required the State to articulate race neutral reasons for the exclusion of the Black jurors, but did not require the State to articulate any legitimate reasons for excluding the White female jurors, as required by *J.E.B.*

181. In the *Batson* hearing, Mr. Rosenthal provided ineffective assistance by failing to offer any substantive arguments to rebut the reasons the State articulated to justify the

exclusion of Black jurors. After the State articulated reasons to justify why Black panelists were excluded from the jury, the trial court asked defense counsel: "Does the defense have anything it wishes to present in opposition to the reasons given by the State?" Transcript 139. Mr. Rosenthal, responded by stating: "I cannot dispute any of the things that Ronnie [the district attorney] has set forth. He was pretty weak on identifying with the defendant. Other than that, how the hair fixed up, a whole lot to do with anything (*sic*)." *Id.*, 139.

182.    Significantly, in a separate case that was also tried in this same jurisdiction (Franklin County Circuit Court) prior to Petitioner's trial, the Mississippi Court of Appeals found that Petitioner's attorney, Mr. Rosenthal, (who represented the defendant in the related case) had an "informal agreement" with the same District Attorney who prosecuted Petitioner's case that *"neither would object to the other's exercise of its peremptory challenges." Wardley v. State*, 760 So.2d 774, 777 (¶ 12) (Miss. Ct. App., decided September 7, 1999) (emphasis added).

183.    The inadequacy and lack of substance in Mr. Rosenthal's arguments to rebut the prosecutor's articulated reasons to justify the manner in which peremptory challenges were used clearly shows that the substance of Mr. Rosenthal's *"informal agreement" not to challenge the prosecutor's use of peremptory challenges* was operative in Petitioner's case.

184.    In this case, the evidence of discriminatory intent is clear. No White males were excluded by the prosecutor from the petit jury. However, the Record, the juror questionnaires, the Prosecutor's juror selection notes, and  Petitioner's comparative juror analysis clearly

show that the State excluded Black male and female jurors, and White female jurors were for reasons that were equally applicable to White male jurors.

185.    The Mississippi Supreme Court failed to consider the new evidence supporting Petitioner's *Batson* claim on the grounds that any *Batson* claim was procedurally barred, apparently because a *Batson* claim had been nominally asserted on direct appeal and in the initial post-conviction proceedings. Therefore, the state court never addressed the merits of Petitioner's *Batson* claims based on the prosecutor's juror selection notes and comparative juror analysis. The Supreme Court's holding in *Foster v. Chatman, supra*, is directly applicable to this case.

186.    Petitioner asserts that the State's articulated reasons for the exclusion of Blacks from the petit jury were a pretext for discrimination. In addition, Petitioner asserts that the prosecutor excluded certain female jurors, even though they had characteristics and responses that were substantially similar to those from White male panelists who were not excluded by the State. This constituted a structural defect in Petitioner's state court trial, that renders those proceedings defective.

187.    The U.S. Supreme Court has approved the use of a detailed comparative analysis of jurors of different races and genders, and the Court has emphasized that an accepted White juror need not have the identical characteristics of a single excluded Black juror for the comparative juror analysis to show purposeful discrimination.

**B.     FACTS SUPPORTING PETITIONER'S BATSON/J.E.B. CLAIMS BASED ON COMPARATIVE JUROR ANALYSIS**

188.    Steve Knox was a thirty-one year old African American male at the time of his trial in

September 1999. This case originated in Amite County, Mississippi, but the trial was conducted in the adjacent Franklin County based on Defendant's Motion for Change of Venue.

189.    According to the 1990 Census, Amite County had 13,328 residents, and 6,038 (45.3% ) were African American. The gender ratio in Amite County was 48% male and 52% female. In contrast, Franklin County had a much smaller population, with only 8,377 residents, with only 3,079 (36.8%) African American. The gender ratio in Franklin County was the same as Amite County, 48% male, and 52% female. [1990 Mississippi Census, General Population Characteristics, at 4 & 20.]

190.    The trial court failed to transfer this case to a county that had a population of African Americans similar to Amite County, and this constituted a violation of Petitioner's Constitutional rights.  The transfer to Franklin County substantially reduced the number of African Americans who could be summoned for jury duty in Petitioner's case. Trial Counsel failed to object to this change of venue, and Initial Post-Conviction counsel failed to raise this issue. This issue has been exhausted before the Mississippi Supreme Court.

191.    The Circuit Clerk of Franklin County summoned over 120 individuals for jury duty in this case. [*Cf.*, Prosecutors' Juror Notes listing prospective jurors.]

192.    The trial court began voir dire by reading the "qualifications" for jury service, and the trial court initially *excluded eleven black panelists "for cause,"* after finding that they were either unqualified to serve, or entitled to a statutory exemption. Transcript 3-30.

193.    The trial court qualified 74 venire panelists and declared that they were eligible to serve

56

as jurors. The Venire panelists were randomly numbered 1 to 74, and they were administered the oath required for all potential jurors.

194. As seated, the venire consisted of 47 white panelists (63.5%) and 27 black panelists (36.5%). This closely matched the overall racial composition of Franklin County, which was 37% black, but not that of Amite County where the crime was committed, which was 45% black.

195. The venire consisted of 30 males (40.5%) and 44 females (59.5%). Proportionally, there were more females on this jury panel than the general population in either county, as both were 52% female.

196. In voir dire, forty jurors was actively considered for service on the petit jury in this case, including two alternates. Three of these jurors were excused by the trial court "for cause," and this left 37 potential jurors who were the subject of the peremptory strikes exercised by the State in the *Batson* hearing.

197. The final 37 members of the jury pool included 23 White panelists (62.2%) and 14 black panelists (37.8%). This was comparable to Franklin County's racial makeup, but not the racial makeup of Amite County, which was 45.3% Black. There were 24 female panelists (64.9% ) and 13 male panelists (35.1%).

198. The parties exercised their peremptory challenges within this group of 37 panelists until 12 jurors and 2 alternates were selected, with the last being Juror No. 40, Tiffany Burros. Transcript 134.

199. Petitioner's *Batson* claims are based on information contained in the prosecuting attorneys' trial notes that showed that they had identified all the potential jurors by race

and sex, and expressed preferences for each juror based on these characteristics. This has been held to show evidence of possible discriminatory intent in the selection of the jury. *See Foster v. Chatman*, 136 S.Ct. 1737 (2016).

200. The prosecutor's juror selection notes only became discoverable in Petitioner's state post-conviction proceedings. However, due to the ineffective assistance of counsel rendered by Petitioner's initial state post-conviction counsel, who conducted no discovery and failed to submit a simple request for access to the prosecutor's file, these documents were not discovered until Petitioner's successive post-conviction counsel obtained these records.

201. Petitioner respectfully submits that a *Batson* violation would require reversal of Petitioner's conviction, if only a single juror was excluded for a discriminatory purpose. *Weaver v. Massachusetts*, 137 S.Ct. 1899, 1911-12 (2017). In *Weaver*, the U.S. Supreme Court explained that even though it had not previously labeled *Batson* claims as "structural errors," a *Batson* violation warrants "automatic relief." The Court stated that:

> . . . certain errors are deemed structural and require reversal because they cause fundamental unfairness, either to the defendant in the specific case or by pervasive undermining of the systemic requirements of a fair and open judicial process. . . **This Court . . . has granted automatic relief to defendants who prevailed on claims alleging race or gender discrimination in the selection of the petit jury**, see *Batson v. Kentucky*, 476 U.S. 79, 100, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986); *J.E.B. v. Alabama ex rel. T. B.*, 511 U.S. 127, 145-146, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994), though the Court has yet to label those errors structural in express terms. The errors in those cases necessitated automatic reversal after they were preserved and then raised on direct appeal. And this opinion does not address whether the result should be any different if the errors were raised instead in an ineffective-assistance claim on collateral review. (emphasis added).

> *Weaver*, 137 S.Ct. at 1911-12 (emphasis added).

202. "The Constitution forbids striking even a single prospective juror for a discriminatory

purpose." *Flowers v. Mississippi*, 139 S.Ct. 2228, 2244 (U.S. Miss. 2019). "A single

invidiously discriminatory governmental act is not immunized by the absence of such

discrimination in the making of other comparable decisions." *Batson*, 476 U.S. at 95. The

U.S. Supreme Court has ". . . stressed a basic equal protection point: *In the eyes of the*

*Constitution, one racially [or gender-based] discriminatory peremptory strike is one too*

*many.*" *Flowers*, 139 S.Ct. at 2241 (*emphasis added*).

203.    Each party had 12 strikes to use for the petit jury and two strikes for alternates. The State

used 11 of its 12 peremptory challenges to exclude Black and Female panelists from the

petit jury.  The State excluded 8 Black jurors (6 Black females and 2 Black males), and 3

White female jurors.  The State also excluded 2 Black panelists (one male and one

female) as alternate jurors.

204.    The Record shows that the State used 13 of its 14 total peremptory challenges to exclude

10 black panelists. This included 7 out of 8 black females, and 3 out of 4 black males

who were considered.   The State also excluded 3 White female panelists who were

considered for the jury.

205.    The final breakdown for the petit jury shows that the State used eight of its strikes against

females (five Black and three White) and three of its strikes against males (all Black).

The State excluded eight Black panelists and three White females from the petit jury, and

two Black females from the alternate jurors.

206.    The State did not exclude a single White male from the petit jury, even though many of

the males exhibited characteristics and responses in voir dire that were comparable to the

Black and female panelists who were excluded.

207.     The petit jury as seated consisted of five White females, five White males, one Black

         female and one Black male. The two alternate jurors were White females.

208.     The fact that the State accepted three black panelists in voir dire, two of whom served on

         the petit jury,[28] does not excuse the State's discriminatory motive in excluding 8 Black

         panelists. In addition, the fact that the State accepted some females for the jury does not

         excuse striking three females who were comparable to White males, without any

         legitimate justification.

209.     Petitioner contends that the State violated his Constitutional rights and the Equal

         Protection Clause of the Fourteenth Amendment in the juror selection process, because

         black and female jurors were excluded based on the pretext of certain reasons that the

         prosecutor articulated that were equally applicable to a similarly situated white or male

         jurors who were not excluded by the State.

210.     To justify these juror strikes the State relied on pretextual reasons that were articulated as

         a pretext to conceal its discriminatory motives. The State's exclusion of black and female

         jurors from the petit jury violated the prohibitions against discrimination established in

         *Batson v. Kentucky*, 476 U.S. 79, 86-87, 106 S.Ct. 1712, 1717-18 (1986) ("Racial

         discrimination in selection of jurors harms not only the accused whose life or liberty they

         are summoned to try . . . [but also, by] denying a person participation in jury service on

         account of his race, the State unconstitutionally discriminated against the excluded

         juror."); and *J.E.B. v. Alabama ex rel. T.B.*, U.S. 127, 129, 114 S.Ct. 1419, 1421 (1994)

_____

[28]The defense excluded one of the black females, Sharon Middletown, because she was
the wife of Franklin County Deputy Sheriff Cedric Middleton. Supp. Transcript 73.

("We hold that gender, like race, is an unconstitutional proxy for juror competence and impartiality.")

211.    "Equal justice under law requires a criminal trial free of racial discrimination in the jury selection process." *Flowers v. Mississippi*, 588 U.S. ___, 139 S.Ct. 2228 (U.S. Miss., 2019). "The Constitution forbids striking even a single prospective juror for a discriminatory purpose." *Foster v. Chatman*, 578 U.S. 488, 136 S.Ct. 1737, 1747 (2016) (citing *Snyder v. Louisiana*, 552 U.S. 472, 478 (2008); internal quotations omitted). This standard extends to trial court judges who are equally obligated to ensure that discriminatory practices are excluded from the juror selection process. *Snyder v. Louisiana*, 128 S.Ct. 1203, 1208, 552 U.S. 472, 477 (U.S. La. 2008) ("The trial court has a pivotal role in evaluating Batson claims.")

212.    At the time Petitioner's case was decided, the applicable law in Mississippi was set forth in *Rowland v. State*, 42 So. 3d 503, 507 (¶¶11-12) (Miss. 2010), where the state supreme court had held: "[N]o discretion is afforded when deciding whether to except a claim involving a fundamental constitutional right from procedural bars."

213.    In the case at bar, the Mississippi Supreme Court failed to follow its own clearly established precedent that required the state courts to consider the merits of a successive post-conviction claim that presents a substantial basis to support claims of violations of a defendant's Constitutional rights.

214.    This rule applied to a successive state post-conviction petition. *Smith v. State*, 149 So. 3d 1027, 1031 (¶9) (Miss. 2014), overruled on other grounds by *Pitchford v. State*, 240 So. 3d 1061, 1068 (¶¶37-38) (Miss. 2017); *Higginbotham v. State*, ___ So.3d ___, 2020 WL

1271602, at *2 (¶12) (Miss. Ct. App. 2020), *cert. denied* by *Higginbotham v. State,* 299 So.3d 797 (Miss. 2020).

215. Petitioner asserts that his conviction and death sentence were impermissibly influenced by discrimination in the selection of the jury based on the race and/or gender of some venire panelists in violation of the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution. Federal law sets certain minimum requirements that Mississippi must meet in addressing Constitutional claims based on discrimination in the jury selection process.

216. Petitioner respectfully submits that his *Batson* claims were fairly presented to the Mississippi Supreme Court in the Successive Petition for Post-Conviction Relief that Petitioner filed. Petitioner exhausted his available state-court remedies before bringing this federal petition challenging his state conviction by allowing the state court the opportunity to address his federal constitutional claims in the first instance before the claims were raised in the instant federal habeas proceedings. *Coleman v. Thompson*, 501 U.S. 722, 732, 111 S.Ct. 2546 (1991); 28 U.S.C. § 2254(b), (c).

217. The Mississippi Supreme Court's finding of procedural bar is not dispositive, and is not entitled to deferential review, because the state court did not follow its own clearly established precedent and issue a ruling on the merits of Petitioner's claims. Therefore, the state court's decision does not bar this Court's consideration of Petitioner's federal habeas claims. *Teague v. Lane,* 489 U.S. 288, 298, 109 S.Ct. 1060, 1068 (U.S. Ill.,1989); *see Lambrix v. Singletary*, 520 U.S. 518, 524, 117 S.Ct. 1517 (1997).

218. Inadequate assistance of counsel at initial-review collateral proceedings may establish

cause for a prisoner's procedural default of a claim of ineffective assistance at trial. *Martinez v. Ryan*, 566 U.S. 1, 9, 132 S.Ct. 1309, 1315 (2012). Petitioner asserts that he received ineffective assistance from his initial post-conviction counsel, and that those proceedings were an integral part of his appeal under the standards and procedures that have been established in Mississippi for capital murder convictions.

219.    Prior to Petitioner's trial in September 1999, Mississippi courts had clearly recognized that *Batson* prohibited the use of peremptory strikes to remove persons from a jury panel based on their race or gender, because such actions violated the Constitution. *Randall v. State*, 716 So.2d 584, 586 (¶ 8) (Miss. 1998) (recognizing that peremptory challenges must be exercised according to constitutional standards as established by the U.S. Supreme Court in *Batson* and *J.E.B.*)

220.    The Mississippi Supreme Court's reliance on the principle of *res judicata* to procedurally bar consideration on the merits of the claims and evidence presented in Petitioner's Successive Petition for State Post-Conviction Relief, does not bar federal review of these claims on the merits. *Foster v. Chatman*, 136 S.Ct. 1737, 1746-47 (2016) (A state "court's invocation of res judicata therefore poses no impediment to our review of [the defendant's] *Batson* claim.")

221.    The claims presented in the Petitioner's Successive Petition for Post-Conviction Relief were fairly presented to the Mississippi Supreme Court, and therefore, these claims have been properly exhausted, so that the merits of these claims may be considered by this Court on federal habeas review under 28 U.S.C. §2254.

222.    It would be a fundamental miscarriage of justice for the State of Mississippi to carry out

the execution of Mr. Knox without allowing him the opportunity for an adjudication on the merits of his substantial claims that his death sentence was unlawfully tainted by racial and gender discrimination in the selection of his jury. *Miller-El v. Dretke*, 545 U.S. 231, 237 (2005).

223. Equal protection under the law is a fundamental principle of the criminal justice system, and a miscarriage of justice in this case led to Petitioner's conviction based on the race-based and gender-based discrimination that occurred in the jury selection process, which corrupted the trial proceedings.

224. "Racial minorities are harmed more generally, for prosecutors drawing racial lines in picking juries establish 'state-sponsored group stereotypes rooted in, and reflective of, historical prejudice.'" *Miller-El v. Dretke*, 545 U.S. 231, 237-38 (2005). There would also be serious injury to the rule of law itself, because ". . . the very integrity of the courts is jeopardized when a prosecutor's discrimination invites cynicism respecting the jury's neutrality." *Miller-El v. Dretke*, 545 U.S. 231, 238 (2005). Petitioner respectfully submits that the evidence in this capital proceeding was tainted by racial and gender discrimination, and the harm extends beyond Mr. Knox, because it shows state-sponsored prejudice and undermines the rule of law.

225. In this case, Mr. Knox's trial counsel failed to challenge the merits of the State's reasons for excluding Black jurors, and failed to assert any gender discrimination claim at all. Prior post-conviction counsel failed by doing exactly the same thing, and he failed also to offer the factual evidence contained in the State's juror selection notes that showed, that the State ranked jurors by race and gender. Petitioner was represented by his trial attorney

in his direct appeal, and the *Batson* issue was not raised or addressed. *Knox v. State*, 805 So.2d 527, 529 (Miss. 2002) (*Knox I*). In his initial State post-conviction proceedings, the Batson issue was raised, but prior counsel failed to provided substantive evidence in support of the claims. *Knox v. State*, 901 So.2d 1257, 1262-63 (Miss. 2005) (*Knox II*).

226.    As the "gate-keeper" of the juror selection process, the trial court also erred in failing to require the State to articulate reasons for excluding females from the jury without some justification.

## C.    PANELISTS CONSIDERED FOR JURY SERVICE IN THIS CASE

227.    The facts supporting Petitioner's *Batson* claims were compiled from Transcript 3-134 (Juror Qualifications and voir dire by the Court and trial counsel); The supplemental transcript that contained pretrial motion hearings and the juror selection proceedings in chambers, Supp. Transcript 72-91 (this transcript was first obtained by former federal habeas counsel in these proceedings); Juror selection and *Batson* peremptory strike arguments in chambers, Transcript 134-142; the exhibits presented in the successive state post-conviction petition; Prosecutors' Juror Selection Notes which were first obtained by current counsel in the successive state court petition; Comparative Juror Analysis; Juror Questionnaires and summary; and Jury Venire summary.

228.    **Venire Panelist No.1, Richard Freeman (Petit No. 1):** Mr. Freeman was a White male, age 59. Mr. Freeman stated in voir dire that his stepson was a city policeman in Vicksburg, and his stepson-in-law was a deputy sheriff in Vicksburg. Transcript 124. He also stated that he was good friends with two Mississippi Highway Patrol officers, Charles Tidwell and Charlie Case. Transcript 126. He was accepted by the State and by

the Defense as Petit Juror No. 1. The Stated also accepted the White panelists, No. 1, Mr. Freeman and No. 5, Lonnie Priest, who disclosed that they had family or close friends who were connected to law enforcement. However, the State excluded the Black panelist, No. 20, Robert McCoy, because of his connection to law enforcement, even though he knew the same highway patrolman that Mr. Freeman knew. Transcript 138.

229.   **Venire Panelist No. 2, (Mrs. Henry) Margaret Palmer:** Ms. Palmer was a White female age 63. She stated in voir dire that she "vaguely" recalled reading something in the about the case, but that would not influence her decision, and she could be fair. Transcript 40-41. She was excluded by the State using peremptory challenge S-1. Supp. Transcript 74.  No reason was offered by the State for her exclusion because she was White, and the issue of gender discrimination was not raised by defense counsel or by the trial court. Supp. Transcript 74; Transcript 136. However, the State accepted No. 26, Mrs. Thomas (Clarece) Dier, even though she had also read newspaper articles about the case.

230.   **Venire Panelist No. 3, Hilda Spring (Petit No. 2):** Ms. Spring was a White female age 51. Her race and gender are not specifically identified in the Record. She did not respond individually to any questions asked during voir dire, and she was not directly questioned by prosecutors. She was Accepted by the State and by the Defense, and seated as Petit Juror No. 2. This White panelist was accepted by the State even though she was "nonresponsive" individually in voir dire.  The State accepted numerous White panelists, who were "nonresponsive" individually in voir dire, including No. 3, Hilda Spring; No. 10, Ronald Ellsworth; No. 11, Mrs. William Scott; No. 21, Richard Cummins; No. 22, Mr. Douglas McMillian; No. 29, Shelby Jean Waldon; No. 35, Mrs. J.M. Gilbert; and No.

36, Patricia Watts. However, the State used the "nonresponsive" justification as a pretext to exclude Black panelists, including No. 7, Lenora Snyder, No. 28, Henry Jones, and No. 30, Theresa Williams. Transcript 136-137 & 138-39.

231. **Venire Panelist No. 4, Jeanette Hunt:** Ms. Hunt was a Black female age 43. She was excused by trial court "for cause" based on her opposition to the death penalty.

232. **Venire Panelist No. 5, Lonnie Priest:** Mr. Priest was a White male age 38. He disclosed that he was connected to law enforcement because his brother-in-law was a game warden in Lincoln County, Mississippi. Transcript 124. Mr. Priest also indicated that he had previously served on a jury, and that *he did not want to serve on this jury*. However, the court determined that his prior service was in justice court, so he was required to serve. Transcript 14. Mr. Priest was accepted by the State, but excluded by the Defense using peremptory challenge D-1. However, the State excluded No. 25, Ms. Cynthia Richardson, a Black female age 27, who responded to the court's question about prior jury service by stating that she had served in circuit court "about two years ago." Transcript 29-30 & 138. The court determined that she was not eligible to be excused because her prior service had been two years and one month before this trial. Ms. Richardson clearly indicated that she was not trying to avoid jury duty in this case. In regard to connections to law enforcement, the State accepted the White panelists, No. 5, Mr. Priest, No. 1, Mr. Freeman, and No. 15, Grace Oliver after they disclosed connections to law enforcement. However, the State excluded the Black panelist No. 20, Robert McCoy, because he disclosed a connection to law enforcement. Transcript 138.

233. **Venire Panelist No. 6, Lisa Hunt:** Ms. Hunt was a Black female age 29. She was

excused by the trial court "for cause" based on her opposition to the death penalty.

234.    **Venire Panelist No. 7, Lenora Snyder:** Ms. Snyder was a Black female age 32. (Her name is also spelled "Schneider" at different places in the Record. Transcript 136.) Ms. Snyder was excluded by the State using peremptory challenge S-2. Supp. Transcript 75. The State's justification was that she had a "drastic reaction" to the announcement that this case involved the death penalty, and she "rolled her eyes, became rather pained in her appearance." In addition, the State argued that she "did not raise her hand on any questions pertaining to the death penalty." Transcript 136-137. However, this was a pretext to conceal discrimination, because Ms. Snyder did respond affirmatively to the collective questions posed by the trial court and by counsel to the entire jury panel, which indicated that she was not opposed to the death penalty, and that she could impose that sentence if it was warranted in this case. Transcript 45-46, 47-48, 97, 103-104, 117. In addition, the State did not exclude the White panelists, No. 3, Hilda Spring; No. 10, Ronald Ellsworth; No. 11, Mrs. William Scott; No. 21, Richard Cummins; No. 29, Shelby Jean Waldon; No. 22, Mr. Douglas McMillian; No. 35, Mrs. J.M. Gilbert; and No. 36, Patricia Watts, even though they were also "nonresponsive" to questions about the death penalty in voir dire.

235.    **Venire Panelist No. 8, Telishia Hickingbottom:** Ms. Hickingbottom was a Black female age 22. Ms. Hickingbottom was excluded by the State using peremptory challenge S-3. (Her name is also spelled "Higgonbottham" at various places in the Record, but her juror questionnaire card has the correct spelling.) The State attempted to justify the Exclusion of Ms. Hickingbottom by arguing that she was sitting next to Mrs. Snyder (Venire

Panelist No. 7), and when the trial court announced that this case involved the death penalty, she "made eye contact with [Ms. Snyder] and also reacted to it. Supp. Transcript 75; Transcript 136-137. However, Ms. Hickingbottom responded affirmatively to the collective questions posed by the trial court and by counsel to the entire jury panel, and indicated that she was not opposed to the death penalty, and that she could impose that sentence if it was warranted in this case Transcript 45-46, 47-48, 97, 103-104, 117. The State asked whether *"anyone who either themselves, a close personal friend, or a family member has ever been charged with a crime."* Transcript 118-119. The State contended that Telishia failed to disclose that she was related to "Kirsten Higgonbottham." Transcript 137. The prosecutor stated that his office had recently presented aggravated assault charges against Kirsten to a grand jury, but the grand jury had refused to return an indictment. Transcript 136-137. The State never clarified that Telishia "Hickingbottom" was in fact related to Kirsten "Higgonbottham." Transcript 137. The prosecutor failed to directly ask Telishia if she was in fact related to Kirsten, and if she knew that Kirsten had been charged with aggravated assault. The State also excluded the Black panelist, No. 20, Robert McCoy, because he indicated that they had a family member or close friend who had been charged with a crime. Transcript 118-119, 138. However, this was a pretext for discrimination because the White panelists, No. 16, Margaret Buie and No. 33, Sally Wallace were accepted by the State, even though they disclosed that they, or a close friend or family member had been charged with a crime. Transcript 118-119.

236. **Venire Panelist No. 9, Denver Goodson (Petit No. 3):** Mr. Goodson was a White male age 40. He and (apparently) his son, No. 55, Phillip Goodson, were both on the venire

panel.[29] Denver Goodson stated that he was the brother-in-law of Mr. Graves, who was assisting the defense in jury selection. However, he said that would not influence his service as a juror in this case. Transcript 51. Denver was accepted by the State and by the Defense, and seated as Petit Juror No. 3. The State also accepted the White panelists No. 39, Johnny Allred and No. 33, Sally Wallace, even though they had previously been represented by Mr. Graves. Transcript 52-53. However, the State excluded the Black panelists, No. 17, Wetter Joyce Williams and No. 38, James Griffith, because they had previously been represented by Mr. Graves. Transcript 137-138 & 141.

237.   **Venire Panelist No. 10, Ronald Ellsworth (Petit No. 4):** Mr. Ellsworth was a White male age 36. He did not individually respond to any questions posed during voir dire, and he was not directly questioned by prosecutors. He was accepted by the State and by the Defense, and seated as Petit Juror No. 4, even though he was "nonresponsive" to the questions posed in voir dire. The State accepted the White panelists, No. 3, Hilda Spring, No. 5, Mrs. William Scott, No. 8, Richard Cummins, No. 10, Ronald Ellsworth; No. 22, Mr. Douglas McMillan;  No. 29, Shelby Jean Waldon; Venire No. 35, Mrs. J.M. Gilbert; and No. 36, Patricia Watts, even though they were also "nonresponsive" during voir dire. However, the State justified the exclusion of two Black panelists, No. 28, Henry Jones, and No. 30, Theresa Williams, by using the pretext that they were "pretty nonresponsive to any of the questioning." Transcript 138-39.

238.   **Venire Panelist No. 11, Mrs. William Scott (Petit No. 5):** Ms. Scott was a White

---

[29]The Trial Transcript at this point is unclear, as the record indicates that Juror No. 55, Phillip Goodson responded that Mr. Graves was both his uncle (married to his mother's sister), Transcript 50, and his brother-in-law. Transcript 51.

female age 41. Mrs. Scott did not respond individually to any questions during voir dire, and she was not directly questioned by prosecutors. Even though she was "nonresponsive," the State accepted Mrs. Scott, and the Defense accepted her. She was seated as Petit Juror No. 5. Supp. Transcript 76-77. The State accepted numerous White panelists, who were "nonresponsive" individually in voir dire, including No. 3, Hilda Spring; No. 10, Ronald Ellsworth; No. 11, Mrs. William Scott; No. 21, Richard Cummins; No. 22, Mr. Douglas McMillian; No. 29, Shelby Jean Waldon; No. 35, Mrs. J.M. Gilbert; and No. 36, Patricia Watts. However, the State used the "nonresponsive" justification as a pretext to exclude Black panelists, including No. 7, Lenora Snyder, No. 28, Henry Jones, and No. 30, Theresa Williams. Transcript 136-137 & 138-39.

239. **Venire Panelist No. 12, Vonda Allen:** Before the Venire was actually seated, the trial court excused Ms. Allen "for cause" because she became ill. Transcript 43-44.

240. **Venire Panelist No. 12, Sandra Ezell:** Ms. Ezell was substituted on the venire panel as Juror No. 12 in place of Ms. Allen. Transcript 43-44 & 121. However, the trial court excused Ms. Ezell "for cause" because she had been the victim of a prior home invasion. Transcript 121-123.

241. **Venire Panelist No. 13, Darnetta Moore (Petit No. 6):** Ms. Moore was a Black female age 26. (Her name is misspelled as "Darnette" in the trial transcript, but the correct spelling is on her juror questionnaire. Transcript 35 & 134.) Ms. Moore did not individually respond to any questions during voir dire, and she was not directly questioned by prosecutors. Even though she was "nonresponsive," the State accepted Ms. Moore, and the Defense accepted her. Supp. Transcript 77. She was seated as Petit Juror

No. 6.

242. **Venire Panelist No. 14, Emma Jenkins:** Ms. Jenkins was Black female age 48. In response to questions about any connection to law enforcement, Ms. Jenkins stated: "My father used to be deputy sheriff of Franklin County plus he was a constable and my uncle is a deputy sheriff in Jefferson and two first cousins on the force up there, and another thing I forget to ask. The security guard, that was my line of profession before I retired two years ago." Transcript 124. She was excluded from the jury by the State using peremptory S-4. Supp. Transcript 75. In the *Batson* hearing, the State misstated her response, and said that she claimed that she was related to a previous deputy in Franklin County, when in fact she was related to a sheriff and a constable. The State argued that her relative was unpopular, and "had some problems during the course of his tenure," so there were "some bad feelings between law enforcement between (sic) this prospective juror and her family." Transcript 137. This justification was a pretext for excluding this Black female, who had many family connections to law enforcement as well as her own career as a security guard. The State failed to question Ms. Jenkins individually about the alleged problems and "bad feelings" concerning her father's service as a constable. The State accepted White panelists who had similar connections with to law enforcement through their family members, including No. 1, Richard Freeman, No. 5, Lonnie Priest, and No. 15, Grace Oliver, Transcript 124. The State also excluded the Black panelist No. 20, Robert McCoy, because he disclosed a connection to law enforcement. Transcript 138.

243. **Venire Panelist No. 15, Grace Oliver:** Ms. Oliver was a White female age 81. She

indicated that she had a connection to law enforcement because her stepson was an officer in Chipley, Florida. Transcript 124. She was accepted by the State, but excluded by the defense using peremptory D-2. The State exclude Black panelists using the pretext of their connection to law enforcement, including No. 20, Robert McCoy, because he disclosed a connection to law enforcement. Transcript 138.

244. **Venire Panelist No. 16, Mrs. Jack (Margaret) Buie (Petit No. 7):** Ms. Buie was a White female age 56. She stated in voir dire that she had a close friend or family member who had been charged with a crime. Transcript 118-119. However, she was accepted by the State and by the Defense, and seated as Petit Juror No. 7. The prosecutor essentially rehabilitated all the panelists who responded to this question by asking if they could set aside any negative experience arising from the criminal charge, and make a decision in this case based on the evidence presented. Transcript 120. All panelists indicated that they could follow this instruction. Transcript 120. The State accepted the White panelists, No. 16, Margaret Buie and No. 33, Sally Wallace even though they disclosed that they, or *a close friend or family member had been charged with a crime.* Transcript 118-120. However, the State used this same justification to exclude the Black panelists, No. 7, Telishia Hickingbottom, and No. 20, Robert McCoy. Transcript 137-138.

245. **Venire Panelist No. 17, Ms. Wetter Joyce Williams:** Ms. Williams was a Black female age 56. During the juror qualification proceedings, Ms. Williams indicated some uncertainty about the death penalty," but she was rehabilitated by the trial court, and she was not excused "for cause" from the venire. Transcript 137-138. All panelists responded affirmatively to the collective questions posed by the trial court and by counsel as to

whether they could impose the death penalty if the law and the facts warranted that punishment in this case. Transcript 45-46, 47-48, 97, 103-104, 117. However, Ms. Williams was excluded from the petit jury by the State using peremptory S-5. Supp. Transcript 75. The State argued that it was concerned about her views on the death penalty, even though she was rehabilitated by the court, and she said that she could apply the law as instructed by the court and impose the death penalty if it was warranted by the evidence. The State also argued that Ms. Williams had previously been represented by Attorney Max Graves who was assisting the defense. Transcript 137-38. The State also excluded the Black panelist No. 38, James Griffith, because he had previously been represented by Mr. Graves. Transcript 137-138 & 141. This part of the State's argument was a pretext, because the State accepted juror No. 9, Denver Goodson, a white male, even though he disclosed that he was Mr. Graves' brother-in-law. Transcript 51. The State also accepted the White panelists, No. 39, Johnny Allred, and No. 33, Sally Wallace, even though they had previously been represented by Mr. Graves. Transcript 52-53.

246. **Venire Panelist No. 18, Ms. Francis Griffin:** Ms. Griffin was a White female age 62. Mrs. Griffin did not individually respond to any questions in voir dire, but she raised her hand in response to the question as to whether she, or a close friend or family member had ever been charged with a crime. TR. 118-19. She was not directly questioned by prosecutors about this, but she was excluded from the jury by the State using peremptory S-6. Supp. Transcript 75; Transcript 138. No justification was offered by the State for the exclusion of Ms. Griffin because she was White. Transcript 138. Petitioner's attorneys

failed to request that the State articulate a neutral reason for excluding this female from the jury.

247.  **Venire Panelist No. 19, Ms. Sharon Middleton:** Ms. Middleton was a Black female, age 34. Her husband was a Deputy Sheriff in Franklin County where this trial was conducted. In spite of that close connection to local law enforcement, the trial court did not excuse Ms. Middleton "for cause." She was accepted by the State, even though she had a connection to law enforcement, but she was excluded by the Defense using peremptory D-3.

248.  **Venire Panelist No. 20, Mr. Robert Lee McCoy:** Mr. McCoy was a Black male, age 54. He stated that he knew Charles Case, who was a highway patrolman in Franklin County, but he had not talked with him about this case. Transcript 126-127. The State did not ask Mr. McCoy any specific questions in voir dire. He was excluded from the jury by the State using peremptory S-7. Supp. Transcript 75-76. The State's justification for excluding Mr. McCoy was that "he indicated on questioning during voir dire that he either himself, a close family member, or a relative had been charged with a crime or a close personal friend had been charged with a crime and he also indicated that he was related somewhat to law enforcement." Transcript 138.  This was a pretext for discrimination because the State accepted the White panelists, No. 16, Margaret Buie and No. 33, Sally Wallace, even though they disclosed that they, or a close friend or family member had been charged with a crime. Transcript 118-119. The State also accepted the White panelist, No. 1, Richard Freeman, even though he knew the same highway patrolman that Mr. McCoy knew. Transcript 126.

249. **Venire Panelist No. 21, Mr. Richard Cummings (Petit No. 8):** Mr. Cummings was a White male age 29. (His name is also spelled "Cummins" in the Record. Transcript 35.) He was nonresponsive to all questions posed in voir dire, except for those that called for a collective response from all the panelists. Transcript 45-46, 47-48, 97, 103-104, 117. He was accepted by the State and by the Defense, and seated as Petit Juror No. 8. This White male was accepted by the State even though he was "nonresponsive." However, the State used the nonresponsive justification to exclude Black Panelists. No. 7, Lenora Snyder; No. 28, Henry Jones, and No. 30, Theresa Williams, by asserting that they were nonresponsive during voir dire. Transcript 136-137 & 138-39.

250. **Venire Panelist No. 22, Mr. Douglas McMillian, Jr.:** Mr. McMillian was a White male age 25. (His correct name appears on his juror questionnaire as Dougle M. McMillan, Jr., but his name is spelled as Douglas McMillian in the Record. Transcript 35.) He was totally "nonresponsive" to all questions posed in voir dire, except those that called for a collective response from all the panelists. He was accepted by the State, but excluded from the jury by the Defense using D-4. The State accepted this White male, but excluded Black panelists, No. 7, Lenora Snyder, No. 28, Henry Jones, and No. 30, Theresa Williams because they were nonresponsive. Transcript 136-137 & 138-39. In addition, the State accepted Mr. McMillian even though he was only 25 years old. The State also accepted the White male panelist, No. 29, Richard Cummins, who was 29 years old. But the State excluded a Black panelist, No. 30, Teresa Williams, on the pretext that she was too young, because she was 28 years old. Transcript 139. This was a pretext to conceal the underlying goal of keeping this Black female off this jury.

251. **Venire Panelist No. 23, Ms. Janet Wright:** Ms. Wright was a White female age 26. She was excluded from the jury by the State using peremptory S-8. Supp. Transcript 77; Transcript 138. No justification was offered because she was White, and the gender issue was not raised by defense counsel in the Batson hearing. Transcript 138.

252. **Venire Panelist No. 24, Mr. Andrew K. Smith (Petit No. 9):** Mr. Smith was a Black male. His age was not listed in the Record. He was totally unresponsive to all questions posed to the panel, except those that required a collective response from everyone. He was accepted by the State and by the Defense, and seated as Petit Juror No. 9. Supp. Transcript 77; Transcript 138. The fact that the State accepted a single black male to serve on the jury does not excuse the fact that the prosecutor improperly excluded other jurors on the basis of their race and gender.

253. **Venire Panelist No. 25, Ms. Cynthia Richardson:** Ms. Richardson was a Black female age 27. She responded to the trial court's question about her prior jury service, which was about two years and two months before this trial. The State excluded from the jury by using peremptory S-9. Supp. Transcript 78; Transcript 138. To justify this action, the prosecutor alleged that she was "attempting to be excused from the jury as having served on a previous jury. It was obvious to us that she did not want to serve on this jury." Transcript 138. However, the Record indicates that this was a pretext, and an inaccurate characterization of Ms. Richardson's statements in voir dire. She responded truthfully to the trial court's question about prior service on a jury, and stated that she had served on a jury in the Norris case in 1997. Transcript 29. However, she stated: *"If you need me – I can stay around now."* Transcript 29. The court determined that her prior jury service

was in August 1997, which was about two years and one month prior to the Knox trial, so she was not excused. Transcript 29. The State's characterization of Ms. Richardson's response as trying to get out of jury duty was a mere pretext for excluding this Black female from the jury. Transcript 138.

254.   **Venire Panelist No. 26, Mrs. Thomas (Clarece) Dier:** Ms. Dier was a White female age 48. (Her name is also spelled "Deer" in the Transcript.) In response to the question of whether anyone had read any newspaper articles, she said that she had seen an article in the Enterprise Journal. Transcript 41. She did not recall any details and said that it would not affect her jury services in this case. Transcript 41-42. She did not individually respond to any other questions posed in voir dire, and she was not asked any direct questions by the State. The State accepted Ms. Dier, even though she had read something about the case, and was generally nonresponsive to all other questions. However, she was excluded from the jury by the Defense using peremptory D-5.

255.   **Venire Panelist No. 27, Mr. H.B. Dean, Jr.:** Mr. Dean was a White male age 59. In voir dire, he disclosed that he had served in the military. Transcript 128. He was nonresponsive to all other questions posed to the panel. Mr. Dean was accepted by the State and by the Defense, and seated as Petit Juror No. 10. The State accepted the White panelists, No. 3, Hilda Spring, No. 8, Richard Cummins, No. 10, Ronald Ellsworth; No. 11, Mrs. William Scott, No. 22, Mr. Douglas McMillian; No. 29, Shelby Jean Waldon; No. 35, Mrs. J.M. Gilbert; and No. 36, Patricia Watts, even though they were also individually "nonresponsive" during voir dire. However, the State justified the exclusion of two black panelists, No. 28, Henry Jones and No. 30, Theresa Williams, by asserting

that they were "pretty nonresponsive to any of the questioning." Transcript 138-39.

256.  **Venire Panelist No. 28, Mr. Henry Jones:** Mr. Jones was a Black male age 37. He was excluded from the jury by the State using peremptory S-10. Supp. Transcript 78; Transcript 138-139. The State justified this strike by stating that he was "[p]retty nonresponsive to any of the questioning." Transcript 138. In addition, the State argued that Mr. Jones "was wearing a ponytail, a sort of strange hair design," and that "[h]is age is very much in line with the age of the defendant and because of that, we were very much concerned that he may identify with him and both have unusual hairstyles." Transcript 138-39.  The State's arguments were a pretext for discrimination because the State accepted White panelists who were also "nonresponsive" to the prosecutor's general questions. Specifically the State accepted seven white jurors even though they were nonresponsive in voir dire:  No. 10, Ronald Ellsworth; No. 11, Mrs. William Scott; No. 21, Richard Cummins; No. 29, Shelby Jean Waldon; No. 22, Mr. Douglas McMillian; Venire No. 35, Mrs. J.M. Gilbert; and No. 36, Patricia Watts. However, the State excluded two Black panelists, No. 30, Theresa Williams, and No. 28, Henry Jones, a black male, by asserting that they were "pretty nonresponsive to any of the questioning." Transcript 138-39. In addition, the fact that the State excluded Mr. Jones because he had a hairstyle similar to that of Mr. Knox revealed that the prosecutor wanted to minimize the number of Black males on this jury. This peremptory challenge evidenced a bias against a hairstyle commonly worn by Black males, and was an unacceptable race-based exercise of the State's peremptory challenges.

257.  **Venire Panelist No. 29, Ms. Shelby Waldon:** Ms. Waldon was a White female age 60.

Ms. Waldon did not respond individually to any questions posed during voir dire, other than the general questions posed to the entire panel for a collective response. She was not directly questioned by prosecutors. She was accepted by the State and by the Defense, and seated as Petit Juror No. 11.

258.  **Venire Panelist No. 30, Ms. Teresa Williams:** Ms. Williams was a Black female age 28. She did not respond to any questions during voir dire, other than the general questions posed to the entire panel for a collective response. Ms. Williams was not directly questioned by prosecutors. She was excluded by the State using peremptory S-11. Supp. Transcript 79; Transcript 139.  The State's justification was that she was "pretty young ... a very young age and this serious a charge we felt like it would be best based on her age that we exhausted one of our challenges on her." Transcript 139. The State also argued that she was "pretty much nonresponsive to the questions," and that she "appeared at some point to be nodding off as to some observation that was relayed to us." Transcript 139. The State chose not to ask Ms. Williams any individual questions. The state accepted White panelists who were essentially nonresponsive in voir dire, including No. 10, Ronald Ellsworth; No. 11, Mrs. William Scott; No. 21, Richard Cummins; No. 29, Shelby Jean Waldon; No. 22, Mr. Douglas McMillian; Venire No. 35, Mrs. J.M. Gilbert; and No. 36, Patricia Watts. In regard to Ms. Williams' "young age," she was 28 years old. Transcript 139. However, the State the State accepted the White male panelist No. 22, Douglas McMillian, Jr., even though he was only 25 years old, and he was nonresponsive in voir dire. In addition, the State's argument that Ms. Williams was "nonresponsive" is a pretext because the Record indicates that she did in fact respond to the collective

questions posed to the entire venire. Transcript 45-46, 47-48, 97, 103-104, 117. Finally, the assertion that she "appeared to be nodding off as to some observation that was relayed to us" was not documented in the Record, and the prosecutor did not bring this conduct to the court's attention during voir dire. This is the sort of unsupported generic justification used as a pretext to justify racial discrimination, and it should not be approved in this case.

259.   **Venire Panelist No. 31, Ms. Shirley McGehee:** Ms. McGehee was a White female age 60. She not respond individually to any questions during voir dire, and she was not directly questioned by prosecutors. The State accepted Ms. McGehee, but the defense excluded her using peremptory D-6. Supp. Transcript 79.

260.   **Venire Panelist No. 32, Mr. Tommy L. Combs:** Mr. Combs was a White male age 34. Mr. Combs did not respond individually to any questions posed during voir dire, and he was not directly questioned by prosecutors. He was accepted by the State, even though the State used the "nonresponsive" justification as a pretext to exclude Black panelists, No. 7, Lenora Snyder, No. 28, Henry Jones, and No. 30, Theresa Williams. Transcript 136-137 & 138-39. Mr. Combs was excluded from the jury by the Defense using peremptory D-7.

261.   **Venire Panelist No. 33, Ms. Sally Wallace:** Ms. Wallace was a White female age 38. She disclosed in voir dire that she had previously been represented by Attorney Max Graves, who was assisting the defense. Transcript 52-53. She also responded that she, or a close personal friend, or a family member, had been charged with a crime. TR. 118-19. In spite of these disclosures, the State accepted Ms. Wallace for the jury. Supp. Transcript 80. The State also accepted White female No. 15, Margaret Buie, even though she

disclosed that she or a close friend or family member had been charged with a crime. Transcript 118-119. However, the State excluded the Black panelists, No. 8, Telishia Hickingbottom, No. 17, Wetter Joyce Williams, and No. 20, Robert McCoy using the same reason as a pretext for discrimination. TR. 137-138. The State also accepted the White panelists, No. 9, Denver Goodson, who was related to Attorney Max Graves by marriage, and No. 39, Johnny Allred and No. 33, Sally Wallace, even though they had previously been represented by Mr. Graves. Transcript 52-53.

262. **Venire Panelist No. 34, Ms. Tammy McDaniels:** Ms. McDaniels was a White female age 39. She was accepted by the State and by the Defense, and seated as Petit Juror No. 12.

**ALTERNATE JURORS**

263. **Venire Panelist No. 35, Mrs. J.M. Gilbert:** Ms. Gilbert was a White female age 54. She was accepted by the State, but excluded from the jury by the Defense using peremptory D-A-1.

264. **Venire Panelist No. 36, Ms. Patricia Watts:** Ms. Watts was a White female age 40. She was accepted by the State and by the Defense, and seated as Alternate Juror 1-A.

265. **Venire Panelist No. 37, Ms. Shelia Costley:** Ms. Costley was Black female age 40. She was excluded from the jury by the State using peremptory S-A-1. Supp. Transcript 82; Transcript 140. The State asserted that "it was related to us that Mrs. Costly had a drinking problem with alcohol," and that "also that recently law enforcement had made a drug purchase from her brother, and we're obviously concerned in regards to her feelings toward law enforcement." Transcript 140. The State's justification for excluding Ms.

Costly as an alternate juror was a pretext, as she was never directly questioned by the prosecutor about whether she in fact had a problem with alcohol, or whether she had any adverse feelings toward law enforcement because of any legal troubles her brother may have had.

266. **Venire Panelist No. 38, Mr. James Griffith:** Mr. Griffith was a Black male age 49. The State excluded him from the jury by using peremptory S-A-2. Supp. Transcript 82; Transcript 141. The State argued that Mr. Griffith "indicated in the course of the voir dire that he had been represented by Mr. Max Graves ... who ... of course, [is] participating with the defense we felt it appropriate to challenge him as a juror." Transcript 141. The fact that Mr. Griffith had previously been represented by Attorney Max Graves was a pretext for racial discrimination in this case, because the State accepted a White panelists, No. 39, Johnny Allred and No. 33, Sally Wallace, even though they had previously been represented by Mr. Graves. Transcript 52-53. The State also accepted White panelist No. 9, Denver Goodson, who was related to Mr. Graves by marriage. Transcript 51.

267. **Venire Panelist No. 39, Johnny Allred:** Mr. Allred was a white male, age 56. Mr. Allred indicated that he was connected to law enforcement, because the Sheriff of Franklin County was his nephew. Transcript 125. He also indicated that he had previously been represented by Attorney Max Graves. Transcript 52-53. The State accepted Mr. Allred even though he had previously been represented by Attorney Max Graves, who was assisting the Defense in jury selection. The State also accepted the White panelists, No. 9, Denver Goodson who was related to Graves by marriage, and No. 33, Sally Wallace, who had previously received legal services from Mr. Graves. Transcript 51, 52-

53. However, the State excluded Black jurors using the pretext that they had previously been represented by Mr. Graves, including No. 17 Wetter Joyce Williams and No. 38 James Griffith, Transcript 52-53.  Although Mr. Allred was accepted by the State, he did not serve on the jury because he was excluded by the Defense using peremptory D-A-2.

268. **Venire Panelist No. 40, Ms. Tiffany Burris:** Ms. Burris was a White female age 27. Because both sides had exhausted their peremptory challenges for alternate jurors, she was seated as Alternate Juror No. 2.

### D.    LEGAL STANDARDS FOR PROVING A BATSON CLAIM

269. In 1986, the U.S. Supreme Court changed the juror selection process when it held that states may not tolerate discrimination on the basis of race in now peremptory challenges are exercised against prospective jurors in a criminal trial. *Batson v. Kentucky*, 476 U.S. 79 (1986). The *Batson* decision "immediately revolutionized the jury selection process that takes place every day in federal and state criminal courtrooms throughout the United States." *Flowers v. Mississippi*, 588 U.S. ___, 139 S.Ct. 2228, 2242–43 (2019).

270. In *Flowers*, the Supreme Court recently held: "Equal justice under law requires a criminal trial free of racial discrimination in the jury selection process. Enforcing that constitutional principle, *Batson* ended the widespread practice in which prosecutors could (and often would) routinely strike all black prospective jurors in cases involving black defendants." *Flowers*, 139 S.Ct. at 2242.

271. In the decades since *Batson*, the Supreme Court has vigorously enforced and reinforced the decision, and guarded against any backsliding. *See Foster*, 578 U. S. ___, 136 S.Ct. 1737, 195 L.Ed.2d 1; *Snyder v. Louisiana*, 552 U.S. 472, 128 S.Ct. 1203 (2008);

*Miller-El v. Dretke*, 545 U.S. 231, 125 S.Ct. 2317 (2005) (*Miller-El II*).

272. "Under *Batson*, once a prima facie case of discrimination has been shown by a defendant, the State must provide race-neutral reasons for its peremptory strikes. The trial judge must determine whether the prosecutor's stated reasons were the actual reasons or instead were a pretext for discrimination." *Flowers*, 139 S.Ct. at 2241 (citing *Batson*, 476 U.S. at 97–98). The holdings in the above-cited cases established standards that call into question the manner in which Knox's *Batson* claim was decided when the judgment was rendered in the initial State Petition for Post-Conviction Relief on March 24, 2005. Due to trial counsel's ineffective assistance, and even though the trial judge recognized that the racial discrimination issue was close, there was no rebuttal offered to the State's articulated reasons for excluding black jurors, and the issue of gender discrimination was not even asserted. The intervening decisions by the U.S. Supreme Court in *Miller-El II*, *Snyder*, *Foster*, and *Flowers* call for a different result in Petitioner's case.

273. In *Flowers*, 139 S.Ct. at 2241-42, the Supreme Court emphasized four parts of the *Batson* analysis that "warrant particular emphasis":

(1)  First, a defendant need not prove a history of racially discriminatory strikes in order to make out a claim of race discrimination. "In the eyes of the Constitution, one racially discriminatory peremptory strike is one too many."

(2) Second, the prosecutor may not rebut a claim of discrimination "by stating merely that he challenged jurors of the defendant's race on the assumption – or his intuitive judgment – that they would be partial to the defendant because of their shared race."

(3) Third, the Court stated that each removal of an individual juror because of his or her

race is a constitutional violation.

(4) Fourth, under the Equal Protection Clause, the Court stressed, even a single instance of race discrimination against a prospective juror is impermissible. "So in the real world of criminal trials against black defendants, both history and math tell us that a system of race-based peremptories does not treat black defendants and black prospective jurors equally with prosecutors and white prospective jurors."

274.    In support of his *Batson* claims, Petitioner has offered evidence of the type that has been specifically approved by the U.S. Supreme Court including:

(1)  statistical evidence about the prosecutor's use of peremptory strikes against black prospective jurors as compared to white prospective jurors in the case;

(2)  evidence of a prosecutor's disparate questioning and investigation of black and white prospective jurors in the case;

(3)  side-by-side comparisons of black prospective jurors who were struck and white prospective jurors who were not struck in the case;

(4)  a prosecutor's misrepresentations of the record when defending the strikes during the *Batson* hearing;

(5)  relevant history of the State's peremptory strikes in past cases; or

(6)  other relevant circumstances that bear upon the issue of racial discrimination.

*See, e.g., Foster*, 578 U. S. ___, 136 S.Ct. 1737; *Snyder*, 552 U.S. 472, 128 S.Ct. 1203; *Miller-El II*, 545 U.S. 231, 125 S.Ct. 2317; *Batson*, 476 U.S. 79, 106 S.Ct. 1712.

275.    Under applicable standards, the categories of evidence that may be considered in assessing *Batson* issues, including: (1) the prosecutor's striking of a majority, but not all

of the black prospective jurors from the panel; (2) "the prosecutor's dramatically disparate questioning of black and white prospective jurors;" and (3) "the prosecutor's proffered reasons for striking one black juror . . . while allowing other similarly situated white jurors to serve on the jury. . . ." *Flowers*, 139 S.Ct. at 2244.

276. Petitioner clearly presented in his Second Amended Successive Petition for State Post-conviction Relief facts and evidence that must be considered on the merits, in order to adjudicate his *Batson* Claims.

277. During the selection of the petit jury, 40 panelists were actively considered for jury service. This panel consisted of 24 White panelists (60% White) and 16 black panelists (40% Black). By using peremptory challenges to exclude Black panelists, the State managed to seat a jury that had 10 White jurors (83.3% White) and 2 Black jurors (16.6% Black). The State also excluded the two Black alternate jurors in favor of two white jurors. See United States Census Bureau, Franklin County, Mississippi 2000 Census, Summary File DP-1; Comparative juror analysis. This amounted to a substantial reduction in the proportionate number of Black jurors, as the racial composition of the venire indicated that 5 black jurors would be expected to serve on this petit jury.

278. Therefore, this petit jury consisted of less than one-half the proportional ratio for the general population in Franklin County according to the 2000 census, which was 36.3% Black, and 62.8% White. See United States Census Bureau, Franklin County, Mississippi 2000 Census, Summary File DP-1; Comparative juror analysis.

279. In regard to gender discrimination, the 40 panelists actively considered for this jury consisted of 27 women (67.5% female) and 13 men (32.5% male). As seated, the petit

jury consisted of 6 women and 6 men, for a 50% to 50% division. This was more than

one-third more men on the jury than would be expected based on the venire composition.

280.   The final gender composition of the petit jury was 50% female (5 White women and 1

Black woman) and 50% Men (5 White men and 1 Black man). The final racial

composition of the jury was 83.3% White (10 Whites) and 16.6% Black (2 Whites).

281.   The State was allowed a total of 12 peremptory strikes for the 12 petit jurors, but only

used 11 of these strikes, 8 to exclude Black male and female panelists, and 3 to exclude

White female panelists. The State also had 2 peremptory strikes for the 2 alternate jurors,

and both those strikes were used to exclude Black females. Thus the State had a total of

14 peremptory challenges, and the State uses 13 of those challenges to exclude Black and

female jurors.

282.   The State used 10 out of 13 of its strikes (77%) to exclude Black panelists from the petit

jury and the alternates, and 10 out of 13 strikes (77%) to exclude women from the petit

jury. Petitioner's Venire charts and Comparative Juror Analysis, and Prosecutor's Juror

selection notes.

283.   The State failed to exercise a single peremptory challenge against any White male who

was seated on the venire. Instead, the State used 100% of its peremptory challenges to

exclude Black panelists and female panelists.

284.   The prosecutor's calculated use of 100% of its strikes to exclude Blacks and women from

the jury bears directly on the necessary inquiry into the motivation behind the State's

articulated reasons for striking 77% of the Blacks and 77% of the women available for

jury service on the petit jury.

285. It is unlikely that the high number of strikes that the State exercised against Black and female panelists occurred by "happenstance." *Miller-El v. Cockrell*, 537 U.S. 322, 342 (2003). In *Miller-El*, the Court held that the prosecutors used their peremptory strikes to exclude 91% of the eligible African-American venire members, and only one served on petitioner's jury. "In total, 10 of the prosecutors' 14 peremptory strikes were used against African-Americans. Happenstance is unlikely to produce this disparity." *Miller-El*, 537 U.S. at 342.

286. The comparative juror analysis in this case shows that the State used some characteristics or responses of Black and female jurors as justification to exclude them from the petit jury, but the State accepted White male jurors who had the same characteristics or responses.

287. The State's actions in this case violated the prohibitions against discrimination established in *Batson v. Kentucky*, 476 U.S. 79, 86-87, 106 S.Ct. 1712, 1717-18 (1986) ("Racial discrimination in selection of jurors harms not only the accused whose life or liberty they are summoned to try . . . [but also, by] denying a person participation in jury service on account of his race, the State unconstitutionally discriminated against the excluded juror."); and *J.E.B. v. Alabama ex rel. T.B.*, U.S. 127, 129, 114 S.Ct. 1419, 1421 (1994) ("We hold that gender, like race, is an unconstitutional proxy for juror competence and impartiality.").

288. Based on the racial and gender discrimination against certain jurors by the State, Petitioner respectfully submits that he should be granted a new trial in this case.

**CLAIM FIVE:    JURY INSTRUCTIONS/SUFFICIENCY OF PROOF**

### A.    THE INSTRUCTIONS FOR "AGGRAVATING CIRCUMSTANCE" WERE VAGUE AND OVER-BROAD

289.    Mr. Knox was convicted of capital murder and sentenced to death by a jury in the

Circuit Court of Amite County, Mississippi. At trial and on appeal to the Mississippi

Supreme Court, Knox objected to the sufficiency of evidence to support the "especially

heinous, atrocious or cruel" aggravating circumstance and the purported limiting

instructions given by the trial court. *Knox,* 805 So.2d at 532. *Cf.*, Transcript 430-432.

290.    The trial court granted two limiting instructions on the "especially heinous" aggravating

factor in this case. The first part of the Sentencing Instruction Number 2, C.P. 147,

provides, "Consider only the following elements of aggravation in determining whether

the death penalty should be imposed." But then goes on to say:

> 2.    Whether the capital offense was especially heinous, atrocious or cruel in
> that the defendant inflicted physical or mental pain before death, that there was
> mental torture and aggravation before death, or that a lingering or torturous death
> was suffered by the victim, in that Steve Knox bludgeoned and choked Miss
> Spears and stuffed her into the trunk of her car while she may have still been
> alive.

291.    The second limiting instruction, designated S-8 in the transcript, page 430, was given as

Sentencing Instruction Number 12, C.P. 150, and reads:

> The Court instructs the jury that in considering whether the capital offense
> was especially heinous, atrocious or cruel; heinous means extremely wicked or
> shockingly evil; atrocious means outrageously wicked and vile; and cruel means
> designed to inflict a high degree of pain with indifference to, or even enjoyment of
> the suffering of others.
> An especially heinous, atrocious or cruel capital offense is one
> accompanied by such additional acts as to set the crime apart from the norm of
> capital murders - the conscienceless or pitiless crime which is unnecessarily
> torturous to the victim. If you find from the evidence beyond a reasonable doubt
> that the defendant utilized a method of killing which caused serious mutilation,

that there was dismemberment of the body prior to death, that the defendant inflicted physical or mental pain before death, that there was mental torture and aggravation before death, or that a lingering or torturous death was suffered by the victim, then you may find this aggravating circumstance.

292.  In affirming the sentence, the Mississippi Supreme Court held that the sentencing phase jury instructions adequately limited the "especially heinous, atrocious and cruel aggravating circumstance." *Knox,* 805 So.2d at 532.

293.  This instruction is unconstitutionally vague, and violates Mr. Knox's Eighth and Fourteenth Amendment rights. The correct standard for reviewing an instruction challenged as unconstitutional is to determine whether, taking the instruction as a whole, there is a "reasonable likelihood" that the jury interpreted the instruction in an unconstitutional manner. *Boyde v. California,* 110 S.Ct. 1190, 1200 (1990).  An instruction attempting to narrow the class of murderers eligible for the death penalty is unconstitutionally vague and overbroad when a "person of ordinary sensibility could fairly characterize almost every murder as 'outrageously or wantonly vile, horrible and inhuman'" and therefore falling within its scope. *Godfrey* v. *Georgia,* 446 U.S. 420, 428-29 (1980).  *See also Maynard v. Cartwright,* 486 U.S. 356 (1988); *Clemmons v. Mississippi,* 110 S.Ct. 1452 (1990).

294.  In this case, there is clearly the "reasonable likelihood" anticipated by the *Godfrey v. Georgia* Court,  that the jury at Mr. Knox's capital sentencing trial interpreted the trial court's limiting instructions in an unconstitutional manner.

295.  This limiting instruction, the second part of Sentencing Instruction Number 2, CP. 147, was unconstitutional for several reasons. First it spoke in the imperative, telling the jury that the defendant had, in fact, "bludgeoned and choked Miss Spears and stuffed her into

the truck of her car while she may have still have been alive," and thus, necessarily, that the crime was, in fact, especially heinous, atrocious and cruel.

296.    The instruction, therefore, was a directed verdict on the question whether the crime was especially heinous, atrocious or cruel in violation of Mr. Knox's rights under the Fifth, Eight and Fourteenth Amendments to the United States Constitution. *See Sullivan v. Louisiana,* 113 S.Ct.. 2078 (1993), where Justice Scalia opines, "although a judge may direct a verdict for the defendant if the evidence is legally insufficient to establish guilt, he may not direct a verdict for the State, no matter how overwhelming the evidence." *Id*., at 2080.

297.    By not requiring evidence that Miss. Spears was actually alive when put into the trunk but rather that she "may have been alive," the jury was allowed, indeed compelled, to base its death sentence decision mere speculation.  Basing a death sentence on speculation is clearly a violation of the Eight and Fourteenth Amendments to the United States Constitution.

298.    The second limiting instruction, above-referenced Sentencing Instruction Number 12 is likewise constitutionally flawed. In *Shell v. Mississippi,*111 S.Ct. 313, 498 U.S. 1 (1990) (1990) *(per curiam),* the United States Supreme Court held[30] that the first paragraph of the instruction was unconstitutionally vague.

299.    The complained-of instruction in *Shell v. Mississippi* appears to be identical to that *sub judice*.  Specifically, in its second paragraph, it includes numerous alternate definitions of

---

[30] "Although the trial court in this case used a limiting instruction to define the 'especially heinous, atrocious, or cruel' factor, that instruction is not constitutionally sufficient." *Id*.

the terms "heinous, atrocious, or cruel" to purportedly provide a non-exclusive list of some vague examples of heinous, atrocious or cruel offenses. *Id*., at 498 U.S. 3, 111 S.Ct. 314.

300.   Justice Marshall wrote separately to find the alternate definitions and the non-exclusive list are themselves unconstitutionally vague. *Id*. The first sentence of the second paragraph does nothing to cure the unconstitutionality. It is readily apparent that a person of ordinary sensibility could fairly characterize almost every death as a conscienceless or pitiless crime that is unnecessarily tortuous. Murderers do not display conscience or manifest pity when killing their victims, nor do they ensure that their victims are not unnecessarily tortures. Thus, the first sentence of the second paragraph did nothing to limit the class of murderers eligible for the death penalty and is itself unconstitutionally vague and overly broad. *Id*., at 498 U.S. 3-5, 111 S.Ct. 314-15.

301.   For the same reasons, the second sentence of the second paragraph is also clearly unconstitutional. A person of ordinary sensibility could fairly characterize almost every murder as involving physical pain before death, or mental pain before death or mental torture and aggravation before death, or a lingering or tortuous death, or causing serious mutilation.

302.   Moreover, even if some portions of the instruction pass constitutional muster, the instruction must be declared unconstitutional when taken as a whole. There is obviously a reasonable likelihood that the jury relied on the vague and overly broad portions. The United States Supreme Court has repeatedly held that the State may not pile alternative definition upon alternative definition in an utterly confusing attempt to define vague

terms, and that an otherwise vague definition of vague terms is not cured by the inclusion of an alternate, constitutionally adequate definition unless there is no reasonable likelihood that the jury relied on the vague terms. *See Leary* v. *United States,* 385 U.S. 6, 31-32 (1969); *Boyde V., California,* 110 S.Ct. 1190 (1990); *Shell* v. *Mississippi,* 111 S.Ct. 313, 314 (Marshall, J., concurring); *Bachellar* v. *Maryland,* 397 U.S. 564 (1970).

### B.  AGGRAVATING FACTORS WERE NOT INCLUDED IN INDICTMENT

303.  In its decision in *Ring* v. *Arizona,* 535 U.S. 584, 122 S.Ct. 2428 (2002), the United States Supreme Court ruled that aggravating circumstances submitted to the jury in the penalty phase are, for all intents and purposes, elements of the aggravated crime of capital murder, a greater offense than murder. *Ring* explicitly rejected the proposition that the aggravating circumstances do not function as an elements of the crime of criminal murder, overruling *Walton v. Arizona*, 497 U. S. 639 (1990), to the extent that it reached the opposite conclusion.  535 U.S. 609, 122 S.Ct. at 2443.

304.  As a consequence, because aggravating circumstances may increase the penalty for murder for life imprisonment with possibility of parole to life imprisonment without parole or death, capital defendants are entitled to an indictment alleging the aggravating circumstances on which the State intends to rely at sentencing.

305.  Absent such an indictment, and there can be no dispute that the indictment against Mr. Knox lacks such circumstances, the sentencing court lacked jurisdiction to convict a defendant of capital murder and sentence him to death.  Accordingly, Mr. Knox's death sentence must therefore be vacated.

### C.    JURY FOUND THE AGGRAVATING CIRCUMSTANCES IN THE DISJUNCTIVE

306.    Mr. Knox's death sentence violates the Sixth, Eighth and Fourteenth Amendments to the United States Constitution because the jury found the aggravating circumstances in the disjunctive, *i.e.*, the use of the word "or" allowed them to find one of two distinct facts. Therefore, the jury's verdict did not establish that the jury found the existence of aggravating circumstances beyond a reasonable doubt.

307.    In Jury Instruction 2 SP, the jury was instructed, specifically, "consider only," in imposing a death sentence, that they must find:

> The capital offense was committed while the defendant was engaged in the commission, of, or an attempt to commit, or flight after committing or attempting to commit, a robbery . . . .

*Id.*, at CP 147.

308.    A plain reading of the foregoing clearly shows that six members of the jury could have found that the offense was committed while engaged in an attempt to commit robbery, while the other six may have found the offense was committed during "flight after committing" a robbery.

309.    The United States Supreme Court, in the case of *Apprendi v. New Jersey,* 530 U.S. 466 (2000) found that the Sixth Amendment requires "any fact that increases the maximum penalty for a crime must be . . . proven beyond a reasonable doubt."

310.    As a necessary consequence of the flawed instruction, the sentencing verdict did not, indeed could not, demonstrate that the jury unanimously (and rationally) found the existence of at least one valid aggravating circumstance necessary to impose the death sentence.

95

311.   The instruction required the jury to find at least one aggravating factor beyond a reasonable doubt before Mr. Knox would be eligible for the death penalty. Given the erroneous instruction this was not possible. Because a jury's sentencing determination is an essential element of the death sentencing process *Ring* requires that the jury and not a reviewing court make the ultimate determination to impose a death sentence.

312.   In *Monge v. California,* 524 U.S. 721 (1998) the United States Supreme Court recognized that the qualitative difference between a life sentence and a death sentence requires a heightened degree of reliability in capital cases. "Because the death penalty is unique 'in both its severity and its finality,' [citation omitted] we have recognized an acute need for reliability in capital sentencing proceedings." *Id*., at 732.  See also *Eddings v. Oklahoma,* 455 U.S.104 (1982).

313.   The complained-of SP 2 Instruction giving rise to Mr. Knox's death sentence calls into question his death sentence. The jury's verdict does not demonstrate that the jurors unanimously found beyond a reasonable doubt the existence of at least one valid aggravating factor to support their sentencing decision.

314.   In the case of *Leary v. United States,* 395 U.S. 6  (1969)[31], the United States Supreme Court, faced with an ambiguous jury instruction, similar to that *sub judice*, opined:

For all we know, the conviction did rest on that ground. It has long been settled that, when a case is submitted to the jury on alternative theories the unconstitutionality of any of the theories requires that the conviction be set aside.

*Leary*,  395 U. S. at 31-32.

---

[31]  *See also Boyde v. California,* 494 U.S. 370 (1990) at 379-380;   *Bachellar v. Maryland,* 397 U.S. 564 (1970) at 571.

315. "For all we know," indeed. Instruction SP 2's disjunctive language renders Mr. Knox's death sentence constitutionally infirm.

### D. NO RATIONAL FINDER OF FACT COULD HAVE FOUND AGGRAVATORS

316. Mr. Knox was denied his Eighth and Fourteenth Amendment rights when the jury sentenced him to death based on an aggravating factor that no rational finder of fact could have found, *i.e.*, that Steve Knox bludgeoned and choked Mrs. Spears and stuffed her into the trunk of her car while she may have still been alive. It was simply not in the proof before the jury.

317. The jury found the Mr. Knox eligible for death based on the aggravating factor that Steve Knox bludgeoned and choked Mrs. Spears and stuffed her into the trunk of her car while she may have still been alive. Transcript 457.

318. However, no rational trier of fact could have reached such conclusions because the only proof about her cause of death came via the medical examiner who testified for the State. That witness, Dr. Steven Hayne, indicated the victim had died by manual strangulation. Transcript 170, 178.

319. There was no testimony, or other evidence, indicating that the victim was placed alive in her car trunk. Therefore, the jury findings violate the Eight and Fourteenth Amendment.

## UNEXHAUSTED CLAIMS AND EVIDENCE

320. Petitioner's attorneys have obtained new evidence that is directly relevant to Petitioner's claims, and that supports new claims, but this evidence has never been presented to, or considered by the Mississippi Supreme Court, and thus is not contained in the Record, and has not been "exhausted" so that it may be considered by this Court.

321. Therefore, Petitioner's attorneys have contacted the Office of Capital Post-Conviction Counsel (OCPCC) and the Director, Krissy Nobile, has agreed to file a successive petition for state post-conviction relief on behalf of Mr. Knox, so that this evidence can be considered by the State court on the merits, and included in the Record that is considered by this Court.

322. Under these circumstances, Petitioner respectfully requests that he be allowed to amend his federal Petition to add the unexhausted evidence and claims, after the Mississippi Supreme Court rules on Mr. Knox's successive petition for state post-conviction relief that is being prepared by Krissy Nobile, Director of OCPCC.

### A.    TRIAL COUNSEL'S FILES CONTAIN NEWLY DISCOVERED EVIDENCE

323. Mr. Knox's initial post-conviction attorney, Robert Ryan, failed to conduct any independent investigation into Mr. Knox's case. As a result, Mr. Ryan failed to request or obtain the files from Mr. Knox's trial attorneys, Gus Sermos and Leonard Rosenthal. In addition, Mr. Ryan failed to obtain the prosecutor's files, which contained the juror selection lists that would have supported Mr. Knox's *Batson* claims.

324. In his prior successive petition for state post-conviction relief, Mr. Knox's counsel contacted Mr. Sermos who stated that he was semi-retired, and he no longer had any of his files related to Mr. Knox. Mr. Sermos also explained that his co-counsel, Leonard Rosenthal, was deceased, and he did not know what had happened to Mr. Rosenthal's files concerning Mr. Knox.

325. Mr. Knox's current attorneys have now obtained Mr. Sermos's trial files, which he apparently had only recently located. These files contain information that is directly

relevant to Mr. Knox's claims for ineffective assistance by trial counsel, at both the guilt and sentencing phases of Mr. Knox's trial. However, none of the evidence in these files has been presented to the Mississippi Supreme Court for consideration on the merits.

326. One important item contained in Mr. Sermos's file was the sealed envelope that contained a letter in which the unidentified author detailed hearing the confession of the person who actually committed the murder in question.

327. The sealed envelope contained DNA material that has now been collected and analyzed. The results of this analysis must now be presented to the Mississippi Supreme Court so that these samples can be run through appropriate DNA databases. The goal is to identify the author of the letter, so that the identity of the person who confessed to the murder can be determined. This potential exculpatory information would be critical to Mr. Knox's claims.

328. Mr. Sermos's files also contain relevant information about his investigation in both the guilt and sentencing stages of the trial. He has no notes concerning any investigation of the substantiated allegations concerning other perpetrators. In addition, he stated in an affidavit that the State relied on in opposing Petitioner's state post-conviction Petition that he failed to offer more mitigation evidence at trial because he "was unsuccessful in contacting several other relatives who lived out of state."

329. However, Mr. Sermos's office files clearly show that Mr. Knox's parents provided him with the names and telephone numbers of Mr. Knox's siblings who lived in New York, and who knew about Mr. Knox's traumatic and abusive childhood, his history of seizure-like spells, and other relevant information about his personal history that could have been

presented in mitigation. Mr. Knox was advised by attorney Charles Press, who was experienced in death penalty litigation, that he should contact the family members in New York. However, Mr. Sermos has no records showing that he attempted to do so.

330. In addition, Mr. Sermos noted early on in the case that he needed to get Mr. Knox's school records, and the parents provided Mr. Sermos with the name of the elementary schools that Mr. Knox attended. There are no records in Mr. Sermos's file showing that he made any attempt to get those school records which contained important information about Mr. Knox's medical issues, and the fact that his childhood was so traumatic that Mr. Knox requested that he be allowed to live in a group home, so he would not have to live with his abusive father.

331. The reason Mr. Sermos did not follow up with any additional investigation to develop mitigation evidence from Mr. Knox's New York relatives is clearly stated in his notes. He was following Mr. Rosenthal's advice that they only needed to arrange to call witnesses who lived in Amite County.

**B.    NEW EVIDENCE CONCERNING SYSTEMIC DEFICIENCIES IN THE OCPCC**

332.  Petitioner's attorneys have also obtained new affidavits from lawyers and expert witness that address the issue of systemic deficiencies that existed in the OCPCC at the time Mr. Knox's initial Petition for state post-conviction relief was filed.

333. These affidavits address the number of death penalty cases that the Mississippi Supreme Court assigned to the OCPCC during the time when Mr. Knox's case was pending, and the deadlines that the Supreme Court established for filing the state petitions. The affidavits offer both factual and expert testimony about the severe understaffing and

100

underfunding of the Office that made it physically impossible for the attorneys in the OCPCC to provide effective representation to all of the death row inmates during that time. Mr. Knox was a victim of these systemic deficiencies.

334. These affidavits are not currently a part of the Record prepared in the state court proceedings in this case. Petitioner will present this evidence in the successive Petition, so that it may be considered by the Mississippi Supreme Court.

## C. BATSON CLAIM

335. In regard to Petitioner's *Batson* claims, Mr. Knox's counsel has now obtained new information directly relevant to his case that has never been presented to, or considered by the Mississippi Supreme Court. Counsel have found evidence that one of his trial attorneys had an improper agreement not to raise *Batson* issues in jury selection.

336. Counsel believe this improper agreement between Mr. Knox's attorney, Mr. Rosenthal, and Ronnie Harper, the prosecuting attorney in Franklin County where Mr. Knox's case was tried, was that neither would assert challenges pursuant to *Batson v. Kentucky* concerning how the other exercised peremptory challenges in jury selection.

337. Mr. Rosenthal was primarily responsible for the *Batson* arguments at Mr. Knox's trial, and his response to the State's justifications for excluding Black panelists from the jury was: "I can't really dispute anything that Ronnie [Harper, the district attorney] has said." Trial Transcript, 139. Petitioner respectfully submits that he should be allowed to present this evidence to the State court in support of his claim of ineffective assistance of trial counsel concerning the *Batson* issues.

## D. BASIS FOR STAY OF PROCEEDINGS TO EXHAUST CLAIMS

338. For the reasons set forth above, Petitioner respectfully submits that his attorneys have established "good cause" for the prior failure exhaust these new claims and evidence, because:

    a.    Counsel did not have perviously have access to trial counsel's file that contains Mr. Sermos's billing records and evidence documenting his investigatory activities (or lack thereof) in this case;

    b.    Counsel did not previously have access to the original still-sealed envelope that contains a letter documenting a third party's confession to committing the murder, and identifiable DNA evidence that could potentialy lead to exculpatory evidence for Mr. Knox;

    c.    Counsel was not previously aware that there are significant affidavits and records in parallel legal proceedings that asserted claims of systemic deficiencies in the OCPCC. This evidence is directly relevant to Petitioner's claims of ineffective assistance of post-conviction counsel, as this evidence shows that the OCPCC was understaffed and underfunded at the time the Office represented Petitioner, and that the Office was subject to control by the Mississippi Supreme Court; and

    d.    Counsel did not previously know that one of Petitioner's trial attorneys had an improper agreement with the prosecuting attorney in this case that neither would raise *Batson* issues to contest the other's use of peremptory challenges to exclude jurors based on race.

339. The undersigned attorneys respectfully submit that they have promptly advised the State

and this Court of the existence of this newly discovered evidence, and counsel has not been dilatory in this regard.

340.    Petitioner respectfully submits that this newly discovered evidence has never been presented to or considered by the Mississippi Supreme Court in regard to Petitioner's claims. This newly discovered evidence is potentially meritorious, and in the interest of comity, the State court should be given the opportunity to address the merits of this new evidence by way of a successive petition for state post-conviction relief.

341.    Accordingly, Petitioner respectfully submits that a brief stay of these proceedings is appropriate, and in the interest of justice in this death penalty case. Petitioner faces the ultimate punishment, and he should be allowed to present all relevant evidence to the State court in support of his claims that he received ineffective assistance from his court-appointed trial attorneys and his initial post-conviction attorneys, so that he should be granted appropriate relief by the State court.

### PRAYER FOR RELIEF

WHEREFORE, Petitioner prays that the Court:

a.  Grant a temporary stay of proceedings so that unexhausted claims and evidence can be presented to the State Court by a successive petition for post-conviction relief, or, in the alternative,

b.  Grant an evidentiary hearing as to all claims not fully developed on the trial, appellate, and state post-conviction record;

c.  Grant summary judgment by issuance of the writ of *habeas corpus* under 28 U.S.C. Section 2254, vacating either Petitioner's conviction, death sentence, or both, where there

are no genuine issues of material fact as to the claims herein pled; and,

d.  Grant such general or other relief to which Petitioner may be entitled in this

proceeding.

RESPECTFULLY SUBMITTED, this 27th day of March, 2023

                    BY:    ____S/Thomas C. Levidiotis_____
                           THOMAS C. LEVIDIOTIS, MSB # 9397
                           Attorney for Petitioner, Steve Knox
                           tomlevidiotis@ymail.com
                           tomlevidiotis@outlook.com
                           215 Vivian Street
                           Post Office Box 1617
                           Oxford, Mississippi 38655
                           (662) 234-1070

                           ____S/David L. Calder_____
                           David L. Calder, MSB # 7686
                           Attorney for Petitioner Steve Knox
                           3330 Whippoorwill Lane
                           Oxford, MS 38655
                           Phone: (662) 832-1354
                           Fax: (866) 474-0923
                           E-mail: davidcalder23@gmail.com

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI

STEVE KNOX                                                          PETITIONER

V.                                                    CIVIL ACTION NO.5:13-CV-241-KHJ

BURL CAIN, Commissioner, Mississippi
        Department of Corrections;
TIMOTHY MORRIS, Mississippi State
        Penitentiary Superintendent; and
LYNN FITCH, Attorney General of the
        State of Mississippi                                        RESPONDENTS

## CERTIFICATE OF SERVICE

The undersigned certify that this day they caused to be electronically filed the foregoing

*Amended Petition for Habeas Corpus under 28 U.S.C. § 2254* using the ECF system, which provides

service to the Attorney General of the State of Mississippi.

.        RESPECTFULLY SUBMITTED, this 27th day of March, 2023,

                        BY:        S/Thomas C. Levidiotis
                                THOMAS C. LEVIDIOTIS, MSB # 9397
                                Attorney for Petitioner, Steve Knox
                                tomlevidiotis@ymail.com
                                tomlevidiotis@outlook.com
                                215 Vivian Street
                                Post Office Box 1617
                                Oxford, Mississippi 38655
                                (662) 234-1070

                                S/David L. Calder
                                David L. Calder, MSB # 7686
                                Attorney for Petitioner Steve Knox
                                3330 Whippoorwill Lane
                                Oxford, MS 38655
                                Phone: (662) 832-1354
                                Fax: (866) 474-0923
                                E-mail: davidcalder23@gmail.com