# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
### WESTERN DIVISION

## No. 5:13–CV–00241–KHJ

## STEVE KNOX
*Petitioner*

v.

## BURL CAIN
### MISSISSIPPI DEPARTMENT OF CORRECTIONS COMMISSIONER

## MARC McCLURE
### MISSISSIPPI STATE PENITENTIARY SUPERINTENDENT
*Respondents*

# MEMORANDUM OF AUTHORITIES
# IN SUPPORT OF ANSWER IN OPPOSITION TO
# SECOND AMENDED PETITION FOR A WRIT OF
# HABEAS CORPUS BY A PRISONER IN STATE CUSTODY

LYNN FITCH
Attorney General of Mississippi

BRAD A. SMITH
Special Assistant Attorney General
Mississippi Bar No. 104321
Post Office Box 220
Jackson, Mississippi 39205-0220
Telephone: 601-359-3805
Email: Brad.Smith@ago.ms.gov

*Counsel for Respondents*

# TABLE OF CONTENTS

*page*

TABLE OF CONTENTS ............................................................................. i

TABLE OF AUTHORITIES ...................................................................... ii

ARGUMENT ............................................................................................. 1

    CLAIM I: .................................................................................. 1

    CLAIM II: ................................................................................ 14

    CLAIM III: .............................................................................. 38

    CLAIM IV: .............................................................................. 61

    CLAIM V: .............................................................................. 122

CONCLUSION ...................................................................................... 132

CERTIFICATE OF SERVICE .............................................................. 133

# TABLE OF AUTHORITIES

*page(s)*

Respondents Burl Cain and Marc McClure offer the following in further support for their Answer to Second Amended Petition for a Writ of Habeas Corpus by a Prisoner in State Custody, Doc. 95, and as additional grounds for denying Petitioner Steve Knox's Second Amended Petition for a Writ of Habeas Corpus by a Prisoner in State Custody, Doc. 85.

## ARGUMENT

This Court must determine whether Knox "'in custody in violation of the Constitution or laws or treaties of the United States.'" *Coleman v. Thompson*, 501 U.S. 722, 730 (1991) (quoting 28 U.S.C. § 2254). This inquiry focuses not on the state court's "judgment, but the lawfulness of [Knox's] custody *simpliciter*." *Id*. With that in mind, Knox is not entitled to extraordinary relief from his 1999 state-court capital-murder conviction or death sentence for the reasons in Respondents' Answer, Doc. 95, and because:

## I.    Federal review is barred, not de novo.

Federal review of the five grounds in Knox's Second Amended Petition is barred because the Mississippi Supreme Court, in *Knox III*, clearly and expressly relied on adequate and independent state procedural-law grounds to support its decision.[1] Of course, Knox argues the opposite. He readily admits the

---

[1] In their Answer, Respondents asserted AEDPA's exhaustion requirement as a defense because none of the grounds in the Second Amended Petition that requirement. They showed each ground presented was technically exhausted, subject to the adequate-and-independent-state-law doctrine, and barred from federal review by the doctrine of procedural

Mississippi Supreme Court relied on the UPCCRA's statutory bars as grounds for denying his Second Amended PCR Application in *Knox v. State* (*Knox III*), No. 2014-DR-00849-SCT (Miss. 2022), but maintains those bars do not preclude federal habeas review. *See* Doc. 113 at 1–26. Knox is wrong.

This Court, sitting in habeas review, court is not an initial-review court, and federal habeas relief is not a stand-in for run-of-the-mill error correction. AEDPA and Supreme Court precedent severely limit the scope of review and availability of relief in several ways. *See Shinn v. Ramirez*, 596 U.S. 366, 377 (2022). For example, section 2254(e)(1) requires this Court to presume the Mississippi Supreme Court's factual determinations are correct and permits the Court to find those determinations unreasonable only where Knox "rebut[s] the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see Valdez v. Cockrell*, 274 F.3d 941, 948 n.11 (5th Cir. 2001) (holding section 2254(e)(1)'s presumption of correctness applies to explicit findings of fact as well as "those unarticulated findings which are necessary to the state court's conclusions of mixed law and fact").

AEDPA's exhaustion requirement is another way. A state prisoner must "first to exhaust state court remedies before seeking federal relief." *Broadnax v.*

---

default. And they did so with citations to supporting facts and legal authority. See, e.g., Doc. 95 at 20–24; 35–43; 60–65; 71–76; 86–88; 102–03; 109–111; 116–121.

*Lumpkin*, 987 F.3d 400, 406 (5th Cir. 2021). "A federal habeas court generally may *consider* a state prisoner's federal claim[s] only if he has first presented [his] claim[s] to the state court in accordance with state procedures." *Shinn*, 596 U.S. at 371 (emphasis added); *see* 28 U.S.C. § 2254(b)(1)(A). He must present the same federal grounds (same legal theory and factual predicate) that he presses in federal court to the appropriate state court in compliance with the state procedure. *See id.* at 378 (citing *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999)). If he does, then the federal court may consider his federal grounds under AEDPA's highly circumscribed scope of review. *See id.* (citing C*ullen v. Pinholster*, 563 U.S. 170, 180 (2011)).

But if not, and the state court would dismiss his claims on state procedural-law grounds, then the prisoner's "claims are technically exhausted because, in the habeas context, state-court remedies are exhausted when they are no longer available, regardless of the reason for their unavailability." *See id.* (cleaned up) (quoting *Woodford v. Ngo*, 548 U.S. 81, 92–93 (2006)). Those claims, while "technically" exhausted, are claims the prisoner has not fairly presented in state court if at all and cannot do so consistent with state law. A state-court remedy is exhausted when it becomes unavailable. So claim exhaustion occurs one of two ways—properly or technically. A prisoner either gives the state courts a fair opportunity to consider his federal constitutional claims or he doesn't.

3

Initial review of a state court's judgment of conviction and sentence in a state criminal proceeding is not readily available, certainly not automatic as Knox claims. Whether he properly or technically exhausts his state-court remedies, Knox is not entitled to *de novo* review in federal habeas proceedings. A prisoner, who properly exhausts his federal grounds, automatically subjects those grounds to AEDPA's re-litigation bar, which he must overcome under AEDPA's highly deferential standards and stringent requirements.

The same is true of grounds that are subject to the adequate-and-independent-state-law doctrine. "[A] habeas petitioner who has failed to meet the State's procedural requirements for presenting his federal claims has deprived the state courts of an opportunity to address the merits of those claims in the first instance." *Davila*, 582 U.S. at 527. Under this doctrine, "a federal court may not review federal claims that were procedurally defaulted in state court—that is, claims that the state court denied based on an adequate and independent state procedural rule," *Davila*, 582 U.S. at 527, "'even when the state court also relies on federal law,'" *Buntion v. Lumpkin*, 982 F.3d 945, 949 (5th Cir. 2020) (quoting *Harris v. Reed*, 489 U.S. 255, 264 n. 10 (1989)). A federal habeas court must "presume the adequacy and independence of a state procedural rule when the state court expressly relies on it in deciding not to review a claim for relief, as the Mississippi Supreme Court did here." *See Sones v. Hargett*, 61 F.3d 410, 416 (5th Cir. 1995) (citing *Harris*, 489 U.S. at 262).

4

That said, the "presumption of adequacy" is rebuttable. *Id.* Knox bears the burden to rebut it. *See McCleskey v. Zant*, 499 U.S. 467, 494 (1991). He may do so in a couple of ways. One is by showing a state procedural-law ground is inadequate to support the state court's judgment. A state-law ground is inadequate if it was "not regularly applied" in the vast majority of similar cases at the time of the state court's decision. *See Wright v. Quarterman*, 470 F.3d 581, 586 (5th Cir. 2006); *Sones*, 61 F.3d at 416 (quoting *Johnson v. Mississippi*, 486 U.S. 578, 587 (1988)). The prisoner may also rebut the presumption if he can show the state court's decision rests on the application of a state procedural bar "depend[s] upon a federal constitutional ruling on the merits." *See Stewart v. Smith*, 536 U.S. 856, 860 (2002). Otherwise, a state-law ground is independent of federal law if the state court's decision "clearly and expressly" relies on that ground to support its decision or "does not fairly appear to rest primarily on federal law or to be interwoven with federal law." *See Coleman*, 501 U.S. at 735.

The Mississippi Supreme Court clearly and expressly based its decision in *Knox III* on the UPCCRA's time, successive-writ, and waiver bars (and two others) as state procedural-law grounds in support of its judgment. *See* 75-10 at 295–99. The Fifth Circuit has repeatedly ruled Mississippi's time, successive-writ, and waiver bars are adequate and independent state procedural-law

grounds.[2] And Knox does not seriously try to rebut the presumption of adequacy for any one of the UPCCRA's statutory bars. *See* Doc. 113 at 1–10. He argues, instead, that the UPCCRA's statutory bars are inadequate under *Cruz. v. Arizona*, 598 U.S. 17, 20 (2023). Knox is mistaken and fails to rebut the presumption of adequacy for those reasons and these:

### Cruz v. Arizona

This case is not one of the exceptional cases, like *Cruz*, where the Supreme Court deemed a state procedural ruling to be an inadequate state-law ground and no bar to federal review. *See Cruz*, 598 U.S. at 26. *Cruz* concerns the adequacy prong of the adequate-and-independent-state-law doctrine. This exception only applies in exceptional cases "reserved for the rarest of situations" where a state court's *application* of a "generally sound rule" is too "novel or unfounded" to be adequate. *See id*. at 26–29. A state court's application of a rule is "without fair support, or so unfounded as to be essentially arbitrary" renders the state-law rule inadequate and no bar on federal habeas review. *See id*. at 32. Under *Cruz*, a state procedural rule is inadequate where a state court's

---

2 *See, e.g.*, *Spicer*, 2021 WL 4465828, at *3 (applying § 99-39-5(2)(b)'s time bar and § 99-39-27(9)'s successive-writ bar to petition asserting *Strickland* claims) *Johnson v. Puckett*, 76 F.3d 809, 815 n. 3 (5th Cir. 1999) (ruling § 99-39-5(2)(b)'s time bar and § 99-39-21(1)'s waiver bar to *Batson* claim); *Moawad v. Anderson*, 143 F.3d 942, 947 (5th Cir. 1998) (applying § 99-39-23(6) successive-writ bar); *Stokes v. Anderson*, 123 F.3d 858, 860 (5th Cir. 1997) (applying § 99-39-21(1)'s waiver bar); *Lott v. Hargett*, 80 F.3d 161, 164–65 (5th Cir. 1996) (holding § 99-39-5(b)(2)'s time bar and § 99-39-23(6)'s successive-writ bar adequate and independent state procedural-law grounds that will to preclude "federal habeas review of the substantive claims raised in the motion"); *Sones*, 61 F.3d at 417–18 (applying § 99-39-5(2)(b)'s time bar).

application of that rule is based on an interpretation that "abruptly depart[s] from and directly conflict[s] with its prior interpretation." *Id.* at 32.

Knox tries and fails to tailor the facts of his case to fit *Cruz's* holding. In *Knox III*, the Mississippi Supreme Court denied Knox's Second Amended Petition in a written En Banc Order that was based on state procedural-law grounds. According to Knox, the state supreme court applied the UPCCRA's bars in a novel and unexpected way by denying his Petition in a written order that only briefly addressed the UPCCRA's bars.

That argument is a tough sell. It is not supported by citations to authority. And Respondents are unaware of any law that requires the state supreme court to adjudicate the merits of procedurally barred post-conviction relief claims. *See* Miss. Code Ann. § 99-39-27(5). Knox does provide citations to several decisions entered by the Mississippi Supreme Court in other death penalty PCR cases. Besides that, the court's application of the UPCCRA's bars in those cases is no different from its application in *Knox III*. Consider the *Grayson* decision. *Grayson* recognized petitioners under sentence of death have a right to PCR counsel's assistance held PCR counsel's ineffectiveness may provide cause for a default. The state court agreed. It announced the right to PCR counsel. *See id.* at 125. The *Grayson* court then applied the UPCCRA's bars to Grayson's successive PCR application and the grounds in it. It ruled the UPCCRA's bars precluded review of every ground.

Knox argues the application of the UPCCRA's statutory bars in *Knox III* was novel and inadequate state law grounds under *Cruz. v. Arizona*, 598 U.S. 17, 20 (2023). Knox goes on to argue *de novo* review is appropriate for two reasons. First, he argues the Mississippi Supreme Court relied on a novel application of the UPCCRA's statutory bars. Doc. 113 at 10–11. Second, Knox argues the *Knox III* decision is based on a materially insufficient record because he was denied an evidentiary hearing and, in turn, an opportunity to develop the factual bases of the grounds in his Second Amended Petition. Doc. 113 at 11–12. Knox alternatively claims post-conviction counsel's ineffectiveness in *Knox II* is good cause under *Martinez v. Ryan*, 566 U.S. 1 (2012) that excuses any default that bars review of the grounds presented. Doc. 113 at 15–25.

He argues the application of the UPCCRA's statutory bars in *Knox III* was so novel that the court's decision renders the UPCCRA's bars inadequate state law grounds under *Cruz. v. Arizona*, 598 U.S. 17, 20 (2023). And because they are, Knox insists this Court may and should review the grounds in his Second Amended Petition, *de novo*.

If the prisoner fails to rebut the presumption, then "an adequate and independent finding of procedural default will bar federal habeas review of the federal claim, unless [he] can show cause for the default and prejudice attributable thereto, … or demonstrate that failure to consider the federal claim

will result in a fundamental miscarriage of justice."[3] *Id.* at 749–50 (brackets added, citations and internal quotation marks omitted). If a prisoner proves cause for a state-court procedural default and prejudice resulting from the denial of federal review, then the federal habeas court may consider a federal ground in the first instance. *See Martinez*, 566 U.S. at 17.

"To establish cause, the prisoner must 'show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule.'" *Shinn*, 596 U.S. at 379 (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)). Factors that may qualify as cause are government interference that makes compliance with a state rule impracticable, the factual or legal basis of a claim was unavailable of supporting facts or law at the time of the default, and constitutionally ineffective assistance of counsel. *See Murray*, 477 U.S. at 488. And "to establish prejudice, the prisoner must show not merely a substantial federal claim, such that the errors at trial created a *possibility* of prejudice, but rather that the constitutional violation worked to his *actual* and substantial disadvantage." *Shinn*, 596 U.S. at 379–80 (cleaned up) (quoting *Murray*, 477 U.S. at 494). Knox fails to rebut the presumption of adequacy or attempt to do so for any specific ground supporting the *Knox III* decision.

---

[3] "Likewise, if the state-court record for that defaulted claim is undeveloped, the prisoner must show that factual development in federal court is appropriate." *Shinn*, 596 U.S. at 379.

Three adequate and independent state procedural-law grounds preclude review in this case because Knox does not rebut the presumption of adequacy, does not show cause or prejudice to excuse any default, and does not show review is necessary to prevent a fundamental miscarriage of justice. Federal review of the grounds presented in Knox's Second Amended Petition is barred. The *Knox III* decision clearly and expressly rests on five of the UPCCRA's statutory bars. According to the Fifth Circuit, the UPCCRA's time, successive-writ, and waiver bars are state procedural-law grounds that will preclude federal habeas review.[4] And nothing in the state supreme court's order suggests the state court "reviewed the merits of [Knox]'s claim[s]" or "relied on any federal constitutional law in denying his claim[s]." *See Spicer v. Cain*, 2021 WL 4465828, *3 (5th Cir. Sept. 29, 2021). Knox's *de novo*-review argument is wholly inconsistent with AEDPA and Supreme Court precedent.

### *Martinez v. Ryan*

"[T]here is no constitutional right to counsel during post-conviction proceedings." *Bell v. Epps,* 2008 WL 2690311, *15 (N.D. Miss. 2008) (citing

---

[4] *See, e.g.*, *Spicer*, 2021 WL 4465828, at *3 (applying § 99-39-5(2)(b)'s time bar and § 99-39-27(9)'s successive-writ bar to petition asserting *Strickland* claims) *Johnson v. Puckett*, 76 F.3d 809, 815 n. 3 (5th Cir. 1999) (ruling § 99-39-5(2)(b)'s time bar and § 99-39-21(1)'s waiver bar to *Batson* claim); *Moawad v. Anderson*, 143 F.3d 942, 947 (5th Cir. 1998) (applying § 99-39-23(6) successive-writ bar); *Stokes v. Anderson*, 123 F.3d 858, 860 (5th Cir. 1997) (applying § 99-39-21(1)'s waiver bar); *Lott v. Hargett*, 80 F.3d 161, 164–65 (5th Cir. 1996) (holding § 99-39-5(b)(2)'s time bar and § 99-39-23(6)'s successive-writ bar adequate and independent state procedural-law grounds that will to preclude "federal habeas review of the substantive claims raised in the motion"); *Sones*, 61 F.3d at 417–18 (applying § 99-39-5(2)(b)'s time bar).

*Murray v. Giarratano*, 492 U.S. 1 (1989); *Pennsylvania v. Finley*, 481 U.S. 551, 555–56 (1987); *Martinez v. Johnson*, 255 F.3d 229, 240–41 (5th Cir. 2001); 28 U.S.C. § 2254(i). Under the equitable exception announced in *Martinez v. Ryan*, the ineffective assistance of post-conviction counsel in an initial state-court collateral review proceeding may provide cause for a default that bars review, but only for *technically* exhausted ineffective assistance of trial claim that has some merit. *See* 566 U.S. at 14; *Shinn*, 596 U.S. at 378–79.

**28 U.S.C. § 2254(e)**

Here, it is readily apparent that Knox did not properly exhaust any ground in his Second Amended Petition. He did not *fairly* present the substance of his federal grounds to the Mississippi Supreme Court consistent with the UPCCRA's provisions and procedure. To obtain post-conviction relief in *Knox III*, Knox had to show the claims presented were (a) procedurally alive, and (b) made a substantial showing of the denial of a state or federal right. *See* Miss. Code Ann. § 99-39-27(5); *see also Grayson*, 118 So. 3d at 125 (explaining that if a claim is procedurally alive, then the court asks whether the claim makes a substantial showing of the denial of a state or federal right). Knox did not do that. His Second Amended PCR Application and every claim in it was subject to and barred by the UPCCRA's time and successive-writ bars. Some of his claims were subject to the UPCCRA's waiver bar. None are procedurally alive.

11

Federal habeas courts generally "will not take up a question of federal law presented in a case 'if the decision of the state court rests on a state law ground that is *independent* of the federal question and *adequate* to support the judgment.'" *Lee v. Kemna*, 534 U.S. 362, 375 (2002) (emphasis in original) (quoting *Coleman*, 501 U.S. at 729). "[A]n adequate and independent finding of procedural default will bar federal habeas review of [Knox's grounds], unless [he] can show cause for the default and prejudice attributable thereto, or demonstrate that failure to consider the federal claim will result in a fundamental miscarriage of justice." *See Coleman*, 501 U.S. at 749–50 (citations and internal quotation marks omitted). They do not because "a habeas petitioner who has failed to meet the State's procedural requirements for presenting his federal claims has deprived the state courts of an opportunity to address the merits of those claims in the first instance." *Davila v. Davis*, 582 U.S. 521, 527 (2017). And federal habeas courts "presume the adequacy and independence of a state procedural rule when the state court expressly relies on it in deciding not to review a claim for collateral relief, as the Mississippi Supreme Court did here." *Sones v. Hargett*, 61 F.3d 410, 416 (5th Cir. 1995) (citing *Harris v. Reed*, 489 U.S. 255, 262 (1989)).

That said, the "presumption of adequacy" is rebuttable. *Id.* One way to rebut the presumption is by showing "the procedural bar [in question] [wa]s not regularly applied" when the state supreme court decided *Knox III*. *See Wright v.*

12

*Quarterman*, 470 F.3d 581, 586 (5th Cir. 2006); *Sones*, 61 F.3d at 416 (explaining that petitioners rebut the presumption by showing the state procedural rule in question "is not 'strictly or regularly followed'" (quoting *Johnson v. Mississippi*, 486 U.S. 578, 587 (1988)). The *Knox III* opinion clearly and expressly states the Mississippi Supreme Court's decision rests on its application of the Uniform Post-Conviction and Collateral Relief Act's (UPCCRA) statutory bars. The presumption of adequacy applies to the claims presented in this case. To rebut it, show "the procedural bar [in question] is not regularly applied." *Wright*, 470 F.3d at 586; *see Sones*, 61 F.3d at 416 (explaining that petitioners rebut the presumption by showing the state procedural rule in question "is not 'strictly or regularly followed'" (quoting *Johnson*, 486 U.S. at 587). Knox chose to rely on *Cruz v. Arizona's* holding.

He also claims that PCR counsel's ineffectiveness in *Knox II* not only excuses every procedural default in this case, but warrants factual development, record expansion, and an evidentiary hearing under 28 U.S.C. § 2254(e) for every ground in his Second Amended Petition. The Court should reject the assertions under it, starting with his assertion that the decision to deny the Second Amended PCR Application in *Knox v. State (Knox III)*, No. 2014-DR-00849-SCT (Miss. Mar. 10, 2022) rests on a novel application of firmly established state procedural law.

## II.    Knox is not entitled to relief for Claim Two.

Claim Two attacks trial counsel's penalty-phase efforts to develop and present mitigation evidence. *See* Docs. 85 at 200–21; 113 at 26–69. When an IATC claim is based on counsel's performance at the sentencing phase of a capital trial "the question is whether there is a reasonable probability that, absent the errors, the sentencer ... would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 465 U.S. at 695. Knox argues trial counsel did not conduct a "meaningful" investigation into mitigating evidence and did not consult or retain expert assistance. Claim Two should be denied.

### A.    The default doctrine bars review of Claim Two.

The Mississippi Supreme Court denied Knox's Second Amended PCR Application in *Knox III* after ruling the UPCCRA's f Claim Two. Knox exhausted his state-court remedies for claims state-court conviction or sentence years before Claim Two was presented to the United States Supreme Court he filed his original habeas petition and raised Claim Two. The default doctrine bars Claim Two. Knox try to show good cause for a default, meet § 2254(e)'s requirements, or show review is necessary to avoid a fundamental miscarriage of justice. The default doctrine bars review of Claim Two.

Knox also suggests that the affidavits of Dr. Robert Shaffer and those signed by his friends and family constitute newly discovered evidence. He is

14

mistaken. "Newly discovered evidence warrants a new trial if the evidence will probably produce a different result or verdict; further, the proponent must show that the evidence has been discovered since the trial, that it could not have been discovered before the trial by the exercise of due diligence, that it is material to the issue, and that it is not merely cumulative, or impeaching." *Ormond*, 599 So. 2d at 961 (citation and internal quotation marks omitted).

Knox's new information was not fairly presented in state court and does not fairly present to this Court attached to Knox's Amended Motion for Leave includes, affidavits of a Dr. Robert Shaffer; more affidavits from family members Vera Knox, Ronald Knox, and Willie Knox; affidavits from friends Ann Perry and Sylvia Green; and one from Knox himself. Doc. 113 at 29, 32–41, 51–53; Docs. 85-43, 49, 50. This is not "evidence which could not have been discovered with reasonable diligence at the time of [Knox]'s trial or direct appeal." *Brown v. State*, 948 So. 2d 405, 411 (Miss. 2006). Knox's second claim cannot be reviewed under the UPCCRA's newly-discovered-evidence exception. The information supporting this claim does not meet the UPPCRA's newly-discovered-evidence standard. As Knox all but admits the information offered to support this claim was available at the time of trial and direct review.

**B.  Claim Two has no merit.**

The Court reviews claims of ineffectiveness under the cause-and-prejudice standard in *Strickland*, 466 U.S. at 687. *See Stringer v. State*, 454

So. 2d 468 (Miss. 1984) (adopting *Strickland's* standard for determining ineffective-assistance-of-counsel claims). To meet *Strickland's* standard, Knox must show a specific deficiency or deficiencies in counsel's performance that prejudiced his Defense. *See Wiggins v. Smith*, 539 U.S. 510, 521 (2003)). If not, then the inquiry ends and his claim fails.

To show deficient performance, Knox must identify a specific deficiency and show that deficiency caused counsel's performance to fall below an objective standard of reasonableness. *Ronk*, 267 So. 3d at 1248 (quoting *Wiggins*, 539 U.S. at 521). The standard of reasonableness is based on "prevailing professional norms." *See Wiggins*, 539 U.S. at 521. These norms are guides to determining what is reasonable. *Id.* But they are only guides. *Id.* "[S]trategic choices made after thorough investigation of law and fact are virtually unchallengeable...." *Id.* "[W]hat investigation decisions are reasonable depends critically on ..." "informed strategic choices made by the defendant and on information supplied by the defendant." *Id.* at 691. "For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether. And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's

failure to pursue those investigations may not later be challenged as unreasonable." *Id.*

Knox must also show that any deficiency in counsel's performance prejudiced the Defense. *See Ronk*, 267 So. 3d at 1248. This requires more than showing an error "had some conceivable effect on the outcome of the proceeding." *Strickland*, 466 U.S. at 693. For guilt-phase IATC claims, the Court should determine whether Knox "has met the burden of showing that the decision reached would reasonably likely have been different absent the errors." *See id.* at 696. For penalty-phase IATC claims, Knox must show there is a reasonable probability the death penalty would not have been imposed but for a specific deficiency in counsel's performance. *Cole*, 666 So. 2d at 775. A determination on *Strickland's* prejudice prong must be based on "the totality of the evidence before the judge or jury." *Strickland*, 466 U.S. at 695. Lastly, being represented by multiple attorneys makes establishing claims of ineffectiveness much more difficult. *See Ronk*, 267 So. 3d at 1256 (noting that an IATC claim "is hard to mount[]" "when a defendant is represented by multiple attorneys....") (citing *United States v. Dunfee*, 821 F.3d 120, 128 (1st Cir. 2016)). The fact is that Knox was represented by more than one attorney at trial.

17

And yet, he bases his claims of ineffectiveness almost entirely upon his critiques of Gus Sermos's representation. Even if they were accurate (and they are not), Knox's critiques are insufficient to establish his IATC claims.

The State would call attention to a second fact, which is fatal to Knox's second claim. In his Amended Motion for Leave, Knox states: "It is not possible to accurately assess the prejudice resulting from counsel's failure to have his client evaluated at this time, as there is need for funds to secure appropriate testing and the assistance of an expert. However, should such an evaluation produce evidence that Knox suffers from a neuropsychological impairment, such evidence would clearly be very strong mitigating evidence in this case." (Amended Mot. for Leave at 213). Knox admits that he does not have evidence that shows he suffers from a neuropsychological impairment.

Knox admits that he cannot show actual prejudice resulting from an alleged failure to investigate and present mitigating evidence, concerning mental health. He must prove both *Strickland* prongs to prevail on a claim of ineffective assistance. *Crawford v. State*, 218 So. 3d 1142, 1150 (Miss. 2016). But Knox is merely asserting alternative courses of action were more reasonable. *Strickland*, 466 U.S. at 689. His assertions do not establish deficient performance. *Id.* And Knox cannot show actual prejudice. He can, and does, speculate. But he cannot show a reasonable probability exists that he

would not have been sentenced to death. Nevertheless, the State will address the specifics of his second claim out of an abundance of caution.

But first, the State submits that the Court should consider the time and resources that Knox's present counsel has expended to uncover the information that Knox says proves his second claim. The information before the Court shows that present counsel's representation began at least as early as June 24, 2014, when Knox's initial successive PCR application was filed.[5] The information before the Court shows that present counsel was investigating claims for relief four years after filing Knox's initial successive PCR application. The Court's docket shows that present counsel filed an eighth motion for time to file his first amended successive PCR application on May 22, 2018. The motion states, in pertinent part, that:

> 2. This Court initially stayed Petitioner's proceedings until March 24, 2017, and authorized Petitioner to file any supplementation to his Motion for Leave to File Successive Petition for Post-Conviction Relief by that date.
>
> 3. Petitioner has requested several extensions of time in this case. The first three motions were necessary as the undersigned was seeking production of the Rule 22 materials from the prosecution's trial file. After that information was produced, the undersigned has previously filed four additional motions for extensions of time, **in order to complete psychological testing and evaluations, research the relevant issues, and allow time for investigation in order to locate family members of Steve Knox who have information that may be relevant to the issues raised in the supplemental Petition.**

---

[5] It goes without saying that present counsel represented Knox prior to June 24, 2014, and conducted an investigation to prepare his initial successive PCR application.

....

**5.    Due to the limited resources available to the undersigned in his search for family members, which has thus far only been partially successful**, and the seriousness of the issues that Petitioner faces in this case, the undersigned has requested assistance from Carol Camp, of the Mississippi Office of Capital Post-Conviction Counsel, who has agreed to assist the undersigned in this case. Ms. Camp formally entered her appearance as counsel for Steve Knox in this case on May 3, 2018.

(Docket entry dated May 22, 2018) (emphasis added).

Present counsel's ninth motion for an extension of time states, in

pertinent, as follows:

6.    **Petitioner's co-counsel made an extended trip to Poughkeepsie, New York, from July 8-15, 2018, and located several friends and family members who have not previously been identified or interviewed**. In addition to identifying and interviewing these relevant witnesses, **counsel must also obtain the life history records of Mr. Knox, his parents, siblings, and extended family members**. Counsel has also traveled to the Amite County area and located additional relatives there who have been interviewed.

7.    In order to comply with counsel's constitutional obligation to conduct a comprehensive, multi-generational mitigation investigation, **counsel must make additional trips to New York State and to southern Mississippi to conduct in-person interviews and to obtain life-history records concerning Petitioner.**

....

11.    Under these circumstances, the undersigned now respectfully requests an additional sixty-day extension of time for filing the Supplemental Petition. **This extension is necessary to allow counsel to complete interviews with family members, gather additional records, and complete the additional investigation** that is necessary in order for Petitioner's issues to be properly presented to this Court.

20

(Docket entry dated Aug. 2, 2018) (emphasis added).

And present counsel's tenth motion for an extension of time reads, in part, as follows:

> 4.    In the course of this investigation, the undersigned has located numerous family members and witnesses who have information that is relevant to these proceedings. However, most of these individuals live in New York, Virginia, Connecticut, and North Carolina. Petitioner's co-counsel has already made two week-long trips to New York, Virginia, and Connecticut to interview potential witnesses and obtain affidavits from them, and to locate medical, police, jail, court, prison, employment, social services, and other records that are relevant to these proceedings.

> 5.    Petitioner's co-counsel made an extended trip to Virginia, New York, and Connecticut from September 10-16, 2018, and located additional friends and family members who have not previously been identified or interviewed. During this investigation, additional family members and witnesses were identified, which will require a third trip to New York, Connecticut, Virginia, and North Carolina to conduct in-person interviews and to obtain statements and life-history records concerning Petitioner. This trip is currently planned for the week of November 4, 2018 due to the other professional obligations of co-counsel.

> 6.    Petitioner's co-counsel has identified more than 40 witnesses and family members who need to be located and interviewed to investigate whether trial counsel was ineffective during both the guilt and penalty phases of Petitioner's trial.

> 7.    Moreover, extensive guilt and penalty phase investigation still needs to be done in Mississippi. Petitioner is one of fourteen children and has a large extended family whose members live throughout southern Mississippi. There are several key witnesses who have substantial information about Petitioner's culpability who need to be interviewed.

> 8.    This investigation is necessary to re-examine the circumstances surrounding the murder, and to develop a comprehensive life history of Mr. Knox, his parents, siblings, and extended family members. Petitioner's counsel has a mandate

> from the federal district court, as well as a constitutional obligation, to conduct comprehensive factual and multi-generational mitigation investigations.

(Docket entry dated Oct. 3, 2018).

These excerpts show present counsel was still pursuing the information—information trial counsel allegedly should have discovered—1,562 days (or more than four years and three months) after Knox's initial successive PCR application was filed. The record shows that trial counsel had 291 days to prepare for Knox's trial.[6] How can trial counsel be deficient, much less ineffective, for failing to obtain information that present counsel could not obtain in more than four years' time (and three trips to New York and other states)?

These excerpts prove that present PCR counsel has had exponentially more time and resources than trial counsel to devote to digging up potential mitigation evidence. "[T]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 688. Counsel is entitled to formulate a trial strategy that is reasonable at the time and "to balance limited resources in accord with effective trial tactics and strategies." *Harrington*, 562 U.S. at 107. And *Strickland* requires the Court to assess trial counsel's performance from trial counsel's perspective

---

[6] Trial counsel was appointed on December 10, 1998. (CP 10). Trial began on September 27, 1999.

at the time. This instance is a shining example that illustrates precisely why "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689; *see generally Waters v. Thomas*, 46 F.3d 1506, 1514 (11th Cir. 1995) ("That other witnesses could have been called or other testimony elicited usually proves at most the wholly unremarkable fact that with the luxury of time and the opportunity of focus resources on specific parts of a made record, post-conviction counsel will inevitably identify shortcomings in the performance of prior counsel.... In retrospect, one may always identify shortcomings ... but perfection is not the standard of effective assistance."). Knox does not demonstrate *Strickland* deficiency merely by showing what present counsel has amassed for an amended successive PCR application, particularly when trial counsel did not have the luxuries of unlimited time or a huge budget.

That said, Knox claims trial counsel failed to investigate his life history. Mildred Knox's affidavit states that trial counsel, Gus Sermos, did not meet her or speak with her prior to trial and did not talk to any of Knox's family members prior to trial. Mildred does not state whether trial counsel Leonard Rosenthal met or spoke with family members prior to trial. *See Ronk*, 267 So. 3d at 1256. Vera Knox's affidavit states, "I do not understand why no one in

23

my family was contacted by Steve's trial attorney, and why no one investigated Steve's background." Ronald and Willie Knox also claim that trial counsel never contacted them prior to trial. And yet, Gus Sermos's November 29, 2004, affidavit, which this Court cited in rejecting this IATC claim in *Knox II*, states as follows:

> 4. Further, I obtained information from Knox regarding his family/relatives and their contact information. I met with Knox's mother and father, Mildred and Herbert Knox, at their residence at least two (2) times to obtain case-fact information and any possible mitigating facts or circumstances concerning Steve Knox. I also visited Knox's maternal grandfather, Rev. Alfred Knox, at his residence[,] regarding information about Steve Knox. Rev. Knox spoke with me at length about his grandson, Steve Knox, and I determined from his comments that he would not be helpful to Knox's case. And I met with J.B. and Pearleen Knox, Knox's uncle and aunt, to seek out any viable factual and/or mitigation information.
>
> 5. I also spoke with other relatives in an effort to find mitigation information. And I was unsuccessful in contacting several other relatives who lived out of state.[7]

While there is a conflict between the affidavits of Petitioner's family members and trial counsel's affidavit, trial counsel had no reason to lie about his efforts to secure potential mitigation evidence from Knox's family members prior to trial. The same cannot be said of Knox's family members, who obviously want to see him off of death row. Knox bears the burden of proving trial counsel's

---

[7] Sermos's affidavit was attached as Exhibit 1 to the State's Response to Application for Leave to File Petition for Post-Conviction Relief in the Trial Court and Supplement/Amendment to Application for Post-Conviction Relief, *Knox I*, 805 So. 2d 527, No. 2002-DR-00912-SCT (Miss. Nov. 29, 2002).

ineffectiveness. The fact that Knox's family members have given statements that conflict with trial counsel's statements does not establish a claim of ineffectiveness, especially when trial counsel is presumed competent.

And the fact that present PCR counsel presents affidavits from Knox's out-of-state family members and friends is not proof of deficient performance. "Counsel for a criminal defendant is not required to pursue every path until it bears fruit or until all conceivable hope withers." *Brown v. State*, 798 So. 2d 481, 497 (Miss. 2001) (quoting *Lovett v. Florida*, 627 F.2d 706, 708 (5th Cir. 1980)). Knox does not explain or show why or how trial counsel should have known about his "new" evidence or that counsel could have obtained it. The years of time that it taken t has taken much more time and money than trial counsel had to obtain statements from individuals who also want nothing more than to see Knox off death row.

For another, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable...." *Strickland*, 466 U.S. at 690-91. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 690-91. The duty to investigate and prepare is not limitless and not every breach means that counsel has failed to render reasonably effective assistance. Sermos's affidavit is proof that trial

25

counsel did conduct a mitigation investigation. This investigation cannot be deemed unreasonable under the circumstances simply because successive PCR counsel obtained affidavits from friends and family members, after three trips to New York, Connecticut, Virginia, and North Carolina. To find for Knox on *Strickland* deficient performance prong, based on the potential mitigation evidence he has uncovered nearly twenty years after trial, would essentially amount to a mandate from this Court that no attorney can fulfill his or her Sixth Amendment obligation unless they are armed with a budget that rivals that of the Mississippi Office of Capital Post-Conviction Counsel.[8]

The substance of these friend and family member affidavits paints a picture of a less than ideal childhood. They show that Knox's large family was poor; Knox may have been "slow"; his father drank heavily on the weekends; his mother was not affectionate; his parents spanked him; he may have been molested as a child by a neighbor; he suffered from seizures and blackouts; his hygiene was poor; he was homeless at times; he was active at a church in New York; he was the victim of a police-brutality incident in Poughkeepsie; he enjoyed boxing; he became addicted to crack cocaine, and he suffered from head injuries. In other words, Knox attempts to follow the script in cases like *Wiggins*

---

[8] Knox's motions for time in this case reveal that the numerous out-of-state trips to secure family member affidavits were made after present PCR counsel requested and received both assistance and funding from the Mississippi Office of Capital Post-Conviction Counsel.

*v. Smith*, 539 U.S. 510 (2002), and *Williams v. Taylor*, 529 U.S. 362 (2000). He cites both in support of his second claim—neither of which existed at the time of trial.

In *Wiggins*, the United States Supreme Court found capital defense counsel rendered ineffective assistance because counsel merely obtained a pre-sentence investigation report and Department of Social Services records "documenting petitioner's various placements in the State's foster care system." *Wiggins*, 539 U.S. at 523, 533. A more thorough investigation would have uncovered evidence of severe and continuous physical and sexual abuse petitioner suffered at the hands of his own mother, a string of foster families, and a work supervisor. Similarly, in *Williams*, defense counsel was found to have rendered ineffective assistance because counsel's inadequate mitigation investigation did not uncover evidence of petitioner's "nightmarish childhood," including abuse and the fact that his parents had been incarcerated for criminal neglect of their children, and that petitioner was "borderline mentally retarded." 529 U.S. at 395-96.

In the present case, trial counsel did not merely rely on a pre-sentence investigation report. And Knox presents no evidence of a horrific childhood that trial counsel failed to discover. Trial counsel spoke with as many of Knox's family members as he could locate. Trial counsel strategically chose not to

introduce information obtained from some family members because it "would not be helpful to Knox's case." (St. Ex. 1 at ¶4 to Initial Resp.).

As to the suggestion that trial counsel should have uncovered and presented information that Knox may have been sexually molested as a child, Knox's family members provided affidavits in 2005 that only contained speculation and conjecture that Knox may have been molested. His sister Vera "believed" and "wondered" whether Knox had been molested because there was a "marked change in Steven's behavior" around the same time an alleged sexual predator in the neighborhood allegedly "abused another one of my brothers." (Pet.'s Ex. A-21). Also, in 2005, Knox's brother Willie alleged that Knox was molested at around age 11, but he did not indicate any personal knowledge of such. Thirteen years later, brothers Willie and Ronald provided additional affidavits stating that they were sexually abused by the child molester in the neighborhood, but neither indicate personal knowledge that Knox was. (Pet.'s Ex. I, J). Importantly, Knox provides an affidavit to support his amended successive petition, and yet makes no allegation whatsoever that he had been sexually abused as a child. Simply put, the information presented in this round of appeals does not show a deficient mitigation investigation similar to the deficient mitigation investigations in *Wiggins* or *Williams*.

Knox argues that Dr. Shaffer's affidavit and opinion is the most significant evidence that supports this IATC claim. He claims that the same

information could have been developed by trial counsel had they conducted an adequate mitigation investigation. Dr. Shaffer's opinion is that Knox **may have** frontal, temporal, and parietal lobe impairment. The import of that "maybe" is that, according to Shaffer, "frontal lobe deficits interfere with impulse control and the ability to appreciate the consequences of a series of actions," and "impairment of the temporal/parietal junction (TPJ) is known to interfere with social judgment and the ability to understand the experience of another person." (Pet.'s Ex. T). Dr. Shaffer also opines that the results of Knox's QEEG are **similar to** QEEG results of individuals who have suffered a brain injury. In other words, it appears that Dr. Shaffer is merely speculating rather than actually diagnosing Knox with any particular disorder. Nevertheless, Dr. Shaffer concludes his report with the following: "To a reasonable degree of scientific certainty, any behavior related to the crime, whether as an accomplice or independently, must be considered to occur in an altered state of consciousness in which moral reasoning and judgment was unavailable to Mr. Knox." (Pet.'s Ex. T at 11).

Dr. Shaffer's opinions are based on Knox's self-reporting, the affidavits of Knox's friends and family, the school, medical, and jail records provided by Knox, and Shaffer's interpretation of the results of a battery of neuropsychological tests he administered to Knox. But comparing the information contained in the affidavits Shaffer relies upon with his reporting

29

of the same information, it seems that he takes some liberty in his reporting the information he says supports his expert opinion.

For instance, Dr. Shaffer states that "Mr. Knox was described as neurally compromised beginning at birth...." (Pet.'s Ex. T at 10). But Knox attaches no exhibit that shows an individual describing Knox as neutrally compromised since birth. Dr. Shaffer also states that Knox "continues to be troubled by posttraumatic distress resulting from childhood rape...." (Pet.'s Ex. T at 10). And yet, no affiant so much as suggests having personal knowledge of a rape. Knox does not claim to have been raped in his affidavit. At best, family members speculate that Knox may have been sexually abused because two of his brothers were sexually molested by an individual in their neighborhood. Dr. Shaffer also characterizes the alleged police assault as "a near death experience." (Pet.'s Ex. T at 10). Knox describes the incident as one where he was "struck in the head in the course of this altercation and knocked unconscious." (Pet.'s Ex. N). Dr. Shaffer then says that Knox's memories of the alleged rape and "near death experience ... are likely to manifest in compulsive or automatic outbursts of aggressive behavior along the lines of what is known as flashback response." (Pet.'s Ex. T at 10). But this characterization is at odds with every single affiant who described Knox. His younger brother, Willie Knox, stated, "I never saw Steve act violently toward anybody." (Pet.'s Ex. J at ¶20). Ann Perry, a close friend of Knox, describes him as a kind, reliable,

respectful, and pleasant young man. (Pet.'s Ex. K at ¶10). No affidavit or any other documentary evidence submitted on Knox's behalf supports Dr. Shaffer's suggestion that a "flashback response" caused Knox to act aggressively.

Knox also incorrectly assumes that trial counsel would have been granted the funds to hire a neuropsychological expert had trial counsel sought it. To obtain funding to hire a neuropsychological expert, trial counsel must show a substantial need for such expert assistance. *King v. State*, 960 So. 2d 413, 422 (Miss. 2007). "Undeveloped assertions of helpfulness to the defense are insufficient to show that need." *Id.* (quoting *Holland v. State*, 705 So. 2d 307, 333 (Miss. 1997)). Knox's post-conviction neuropsychologist says it is possible that Knox may suffer from some mental impairment. It is doubtful that such an unsubstantiated assertion would have been sufficient to support a request for public funds for expert assistance.

Another problem with Knox's second claim is that Dr. Shaffer does not state in his affidavit that he was available to testify at Knox's trial or would have testified had he been asked. "[T]o prevail on an ineffective assistance claim based on counsel's failure to call a witness, the petitioner must name the witness, demonstrate that the witness was available to testify and would have done so, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable to a particular defense." *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009); *see* Miss. Code Ann. § 99-39-

31

9(1)(e). Without such showings, the Court has "no evidence beyond speculation that [at the time of trial] defense counsel could have found and presented an expert witness who would have testified as he claimed in his post-conviction applications." *Woodfox v. Cain*, 609 F.3d 774, 808 (5th Cir. 2010).

Finally, Knox avoids the fact that trial counsel had no reason to seek out and obtain a neuropsychological expert. Trial counsel's "decisions as to which, if any, expert a particular defendant requires are fact sensitive and necessarily vary from case to case." *Carter v. Mitchell*, 443 F.3d 517, 527 (6th Cir. 2006). *Strickland* plainly states,

> when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether. And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable.

466 U.S. at 691. Sermos's affidavit states that he and co-counsel met with Knox numerous times to discuss the facts of the case with him, to review the State's discovery, to discuss potential defenses, and to discuss the State's plea offer.[9] "Based on our meetings, discussions, and communications with Knox, Mr. Rosenthal and I concluded that neither Knox's sanity nor his competence to

---

[9] Sermos Aff. at ¶3. Sermos's affidavit was attached as Exhibit 1 to the Response to Application for Leave in *Knox I*, 805 So. 2d 527, No. 2002-DR-00912-SCT.

assist counsel and go forward with the case were issues in question."[10] While they are different legal concepts from mitigation evidence, competency and sanity relate to some form of mental impairment. The information before the Court shows that trial counsel had no reason to believe that Knox suffered from *any* mental impairment, and that trial counsel's judgment was based on numerous meetings with Knox and information obtained from numerous family members "in an effort to find mitigation information."[11] What this information shows is that trial counsel's decision not to present certain potential mitigation evidence was based on a reasonable mitigation investigation. Trial counsel's decision is reasonable, and virtually unchallengeable.

To be sure, trial counsel presented a very brief mitigation case to the jury. But when the United States Supreme Court determined that Wiggins received ineffective assistance of trial counsel, it started its inquiry by noting, "[O]ur principal concern in deciding whether [trial counsel] exercised 'reasonable professional judgment' is not whether counsel should have presented a case in mitigation. Rather, we focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence of Wiggins'

---

[10] Sermos Aff. at ¶3.

[11] *Id.* at ¶¶ 4-5.

background was itself reasonable." 539 U.S. 510, 523 (2003); *see also Havard v. State*, 928 So. 2d 771, 795 (Miss. 2006) ("The failure to present a case in mitigation during the sentencing phase of a capital trial is not, per se, ineffective assistance of counsel.").

Knox wholly fails to show that trial counsel's mitigation investigation was unreasonable. He merely shows that, twenty years after trial, his friends and family now want to provide information to help his case. "[A] court is to determine whether counsel exercised reasonable professional judgment in conducting its investigation based on an assessment of the prevailing professional norms, including a context-dependent consideration of the challenged conduct as seen from counsel's perspective at the time." *Moffett*, 156 So. 3d at 849 (quoting *Crawford*, 867 So. 2d at 217). Under that standard, it is clear that Knox does not make a substantial showing that trial counsel was deficient for failing to present PCR counsel's mitigation investigation.

Even assuming *arguendo* that trial counsel was deficient, Knox's second claim must be denied because he fails to show actual prejudice. He fails to show that had the aforementioned affiants been discovered and their testimony presented at sentencing, there is "a reasonable probability that the result of the proceeding would have been different." *See Moffett*, 156 So. 3d at 849. In determining *Strickland* prejudice based on an allegation of an unreasonable mitigation investigation, the Court considers both aggravating-circumstances

34

evidence presented at trial as well as the newly offered mitigation evidence. *Id.* If the new mitigation evidence "would barely have altered the sentencing profile presented to the decision maker," there is no *Strickland* prejudice. *Id.* (quoting *Chamberlin*, 55 So. 3d 1054).

The friend and family affidavits that Knox attaches to his Amended Motion for Leave collectively paint a picture of a less than ideal childhood and speculation of an alleged incident of child molestation. Had evidence of the same been presented to the sentencing jury, there is no reasonable probability that the jury would have concluded that the balance of aggravating and mitigating circumstances did not warrant death. The information contained in the friend and family affidavits would not alter Knox's sentencing profile when stacked against the aggravating-circumstances evidence presented to the jury. This evidence shows an elderly victim was brutally attacked, beaten, and strangled to death in her own home. It shows her body was thrown in the trunk of a car, possibly while she was still alive, all for Knox's pecuniary gain.

Further, Knox does not consider the possibility that introducing negative evidence of his childhood would harm his mitigation case rather than help it. This evidence is double-edged and cuts both ways. It shows that Knox had thirteen other siblings who grew up in the same environment and led relatively productive lives. (Pet.'s Ex. A-20).

In *Chanthakoummane v. Stephens*, 816 F.3d 62 (5th Cir. 2016), the Fifth Circuit found the petitioner failed to prove that *Strickland* prejudice resulted from a failure to discover and present evidence of the defendant's upbringing "because it would highlight the fact that his siblings, who grew up in the same environment, 'had avoided a life of violent gang involvement and violent crimes.'" *Id.* at 70. The Fifth Circuit "has repeatedly denied claims of ineffective assistance of counsel for failure to present 'double edged' evidence where counsel has made an informed decision not to present it." *Id.* (citing *Hopkins v. Cockrell*, 325 F.3d 579, 586 (5th Cir. 2003)). Knox was one of fourteen children. (Pet.'s Ex. A-20). Had trial counsel introduced evidence at sentencing that Knox's mom did not love him enough, his parents inflicted corporal punishment, and that his father drank on the weekends, the State would have argued to the jury that Knox had thirteen other siblings who grew up under the same conditions but managed not to murder anyone.

The friend and family member affidavits, along with Dr. Shaffer's report, also suggest that head injuries Knox suffered in the past lead to the possibility that he may suffer from some unspecified mental impairment and/or traumatic brain injury. Knox suggests that the jury may have found him less morally culpable had such possibility evidence been introduced at sentencing. He is mistaken. An alleged "failure" to present a neuropsychologist's opinion testimony during the penalty phase cannot establish *Strickland* prejudice

36

when a neuropsychologist opines post-trial that petitioner has some problems or deficits but does not diagnose the petitioner with any neurological or psychological disorder. *Norman v. Stephens*, 817 F.3d 226, 233 (5th Cir. 2016).

Further, what Dr. Shaffer says is that that people suffering from whatever mental impairment Knox may suffer from have poor impulse control and lesser ability to "appreciate the consequences of a series of actions." (Pet.'s Ex. T at 7). But with or without such testimony from a psychologist, every juror who has voted to sentence a defendant to death knows that the murderer has poor impulse control and the ability to appreciate the consequences of a series of actions. The record reflects that trial counsel did introduce evidence at sentencing that Knox suffered head injuries which led him to apply for social security disability benefits. *Knox II*, 901 So. 2d at 1264-65. And Knox admits the weakness of this claim when he states: "It is not possible to accurately assess the prejudice resulting from counsel's failure to have his client evaluated at this time, as there is need for funds to secure appropriate testing and the assistance of an expert." (Amended Mot. for Leave at 213).

In determining the existence of *Strickland* prejudice based on alleged deficiencies at a capital sentencing proceeding, "the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 465 U.S. at 695. What Knox offers would

37

not have altered the sentencing jury's verdict, considering the aggravating-circumstances evidence established that Knox invaded the home of the elderly woman, and beat and strangled her to death merely to profit from a robbery. The aggravating-circumstances evidence shows that Ms. Spears struggled with Knox during the attack, her death was not immediate, and she may have still been alive when Knox stuffed her body into the trunk of her car. (Tr. 167-179, 196, 215-16). This evidence shows that Knox had no remorse for his actions. Evidence that Knox may have had a bad childhood and may suffer from some brain impairment does not establish a reasonably probability that he would not have been sentenced to death. Knox fails to show *Strickland* prejudice.

Knox's second claim does not meet the requirements of Section 99-39-27(5). It is procedurally barred, and does not substantially show the denial of Knox's right to effective assistance of counsel. The Court must deny Knox's second claim for relief. *See Corrothers*, 255 So. 3d at 105.

## III. Claim Three has no merit.

Knox next claims that trial counsel was ineffective for failing to present a defense to the prosecution's case-in-chief during the guilt phase of trial. (Amended Mot. for Leave at 222-236). Knox fails to show his claim of ineffective assistance for a failure to present a defense. Aside from being barred, Claim Three is without merit. (Amended Mot. for Leave at 222-236).

### i.    DNA Evidence

38

Knox claims that trial counsel was ineffective for "fail[ing] to challenge" the State's DNA expert, Gina Pineda, at trial. Neither the record nor any exhibit attached to Knox's Amended Motion for Leave supports his claim. The opposite is true. And the fact that Knox asks this Court for leave to conduct DNA testing in order to support this claim only shows that Knox has not carried his burden of production and made a substantial showing of a denial of his Sixth Amendment right to the effective assistance of counsel.

With respect to his request for leave, Knox did not present a "proper motion for [DNA] testing." *Grayson*, 118 So. 3d at 136 (citing Miss. Code Ann. §99-39-5(1)). Both by statute and under this Court's precedent, Knox should have first filed a motion for leave to conduct DNA testing, then after obtaining the results, filed his successive petition for post-conviction relief with this Court. *See Howard v. State*, 49 So. 3d 79 (Miss. 2010); *Howard v. State*, 2014-DR-01305-SCT (order dated Aug. 6, 2015). Plus, Knox is still not entitled to DNA testing because he wholly fails to show that retesting the bloody clothing "would provide a reasonable likelihood of more probative results, and that testing would demonstrate by a reasonable probability that the petitioner would not have been convicted or would have received a lesser sentence if favorable results had been obtained through such forensic DNA testing at the time of the original prosecution." Miss. Code Ann. §99-39-5(1)(f). He merely suggests the blood on his clothes may not be Ms. Spears's. But even without

39

the DNA evidence, Knox's fingerprints were still found on Ms. Spears's car and inside its trunk where her body was hidden. And Knox was in possession of Ms. Spears's car keys.

That said, the record belies Knox's contention that Pineda laid no foundation for her expert opinion. Pineda explained DNA and DNA testing to the jury. She told the jury how she obtained the unknown blood sample from Knox's clothing and Ms. Spears's known sample. She explained her testing 10 loci and comparing each loci from the unknown sample to the known sample. She gave her expert opinion that the blood on Knox's clothes matched Ms. Spears's known DNA profile. And she attached statistical significance to her expert opinion.

Pineda explained DNA and DNA testing to the jury as follows:

Basically what DNA stands for is deoxyribonucleic acid, and what DNA is [is] the basic genetic material that every living person has. You're born with the DNA you have. Half of it comes from your biological mother and half of it comes from your biological father, and DNA is present in every nucleated cell in your body, and I'll take myself as an example. If you take a strand of my hair, my sweat, my blood, my saliva, any cell that you get from those biological fluids will have the same DNA as long as it comes from the same individual. DNA in a forensic setting is used to identify either a missing person or it's used to compare an unknown sample to a question sample from a crime scene.

There are two basic methodologies used in DNA analysis and the first one is RFLP which stands for Restriction Fragment Link Polymorphism. And this is where you are actually measuring strands of DNA. This method requires a lot of cells. It requires approximately about one million cells and -- so it requires you to have a lot of sample and it requires you to not only have a lot of it,

40

but it should be in pristine condition. If the DNA is for some reason broken up or degraded or it's been exposed to the sun for a long period of time, you will not get a result with RFLP testing.

The second methodology in DNA testing is called PCR technology and that stands for Polymerase Chain Reaction. And that is the method of choice in a forensic setting because with PCR you only need about fifty cells as opposed to a million cells with RFLP. There's basically three steps to the PCR procedure.

The first one is the extraction procedure which is where you have your substrate, whatever it is, whether it's semen, blood, saliva, urine, and you take the cells that you have from that substrate. That's basically called the DNA extraction. And you take the DNA that are in those cells and isolate it and purify it.

The second step is called the amplification step which is basically -- and I'm going to give you this analogy. It takes the DNA that you have to start out with and makes basically a Xerox copy of it. It copies it a billion-fold times which you have to start out with, and this is performed in an instrument called a thermocycler and it undergoes several temperature variations, but basically you end up with a lot more of the DNA that you had to start off with, and that is why this technology is good in forensic settings because in a crime scene you don't always have good blood or you don't always have a lot of sample. Sometimes it's just a minute blood sample, but with PCR, you can take the small amount of sample that you have and amplify it and end up with a larger amount of DNA so that you will be able to analyze it.

The third part of the PCR process is the detection process. This is just where you take the DNA that you have amplified and you look at it and you compare you look at the DNA you got from a known sample which we know came from a particular individual and you compare that profile to the DNA of your question sample.

And when you make that comparison, it's going to be one of two things. Either the person will be excluded as a particular donor in the question sample which means that we test several areas of the DNA. We don't test the whole strand of DNA. We only test the areas that have been well, thoroughly researched and documented in the scientific literature. These areas have been studied and have been published and are widely used in the forensic setting because a lot of our DNA is the same. We have -- it's what makes us human.

41

It's what gives us two arms, a nose, two ears, so a lot of it is the same but the only parts that we look at of the DNA are the parts that are different. So when we're making this comparison, we look at the several areas of the DNA that we tested and we look at what we call loci which is just another name for the particular area on the DNA that you test. We test different loci and in this we tested ten loci and we compared each loci from the known sample to the question sample, and basically, as I was saying, one of two things can happen. Either the known sample will be excluded as a DNA donor in the question sample, and they will not be excluded as a donor in the question sample.

(Tr. 339-342).

Pineda also established the chain of custody. Specifically, Pineda testified that she received Ms. Spears's reference blood stain card and Knox's green sweat pants from the Mississippi Crime Lab on May 11, 1999, at 9:05 a.m. (Tr. 343-46). She also identified the exact packaging the evidence came in, the carrier, the case number, the sample numbers, and her initials. (Tr. 343-49).

Pineda testified that after subjecting the submitted samples to Polymerase Chain Reaction DNA testing, "the conclusions that we were able to draw from this particular case were the DNA results from the DNA found on the green sweat pants were consistent with the known sample of the victim, Ella Mae Spears. That means that Ella Mae Spears is not excluded as the DNA donor in those sweatpants." (Tr. 349-350). At that point, the following exchange between the prosecutor and Pineda occurred:

Q. Ms. Pineda, in layman's terms, if you would, you said Mrs. Ella Mae Spears is not excluded as the blood donor on those pants. Whose blood is on those pants?

42

A.   That would mean Ella Mae Spears.

Q.   Okay. And can you give us some sort of -- I know there are no absolute certainties in the universe. In terms of probabilities that that's not Mrs. Ella Mae's blood on there. Can you give us some numbers?

A.   Yeah. What we do when we generate a DNA profile is we apply a statistical analysis to it. We look at the three race groups. We look at Caucasian, Afro-American, and Hispanics, and we look to see how common this profile is in that particular population. In this case, the DNA profile that gave results for the sweat pants and for the known samples is present with the frequency of approximately one in six hundred million persons of the Caucasian population --

Q.   I'm sorry. One in what?

A.   Six hundred million.

Q.   Six hundred million.

A.   Million persons of the Caucasian population.

A.   It's present approximately one in twelve point five million persons in the Afro-American population and when we looked at the Hispanic population, that particular profile is present in one and two hundred and twenty-six million people.

Q.   Is it fair to say there's a one in twelve million chance that that's not Mrs. Ella Mae Spears' blood on there?

A.   To put it this way, if that is not Mrs. Ella Mae Spears' blood you would have to look at twelve point five million other people of the Afro-American race to possibly find another donor.

Q.   Could we be reasonably certain that's Mrs. Ella Mae Spears' blood on those pants?

A.   To a reasonable scientific degree of certainty, yes.

(Tr. 350-51).

The record belies Knox's claim that Pineda simply provided a conclusory

opinion. And trial counsel did challenge Pineda's opinions on cross-

43

examination. It was noted above that trial counsel specifically challenged Pineda on her random match probability opinion and the fact the DNA analysis of Ms. Spears's known blood sample yielded inconclusive results for four of the fourteen tested loci. (Tr. 355-361). In doing so, trial counsel extracted concessions from Pineda that it was theoretically possible someone in the courtroom could have a DNA profile that matched the tested items, and that it was possible the analyzed sample of Ms. Spears's known blood was a bad, degraded, or improperly stored. (Tr. 355, 359-360). Accordingly, Knox's claim that trial counsel was ineffective for failing to sufficiently challenge Pineda's expert opinions is without merit.

Knox presents no affidavit from any DNA expert who opines that Ms. Spears is excluded as the contributor of the blood found on the clothes that Knox was wearing on the day when Ms. Spears's body was discovered. Instead, Knox presents a stale affidavit from Peter D'Eustachio, a purported DNA expert who disagrees with portions of Pineda's testimony. D'Eustachio's affidavit shows that it was executed years ago, on October 4, 2005. The affidavit states that D'Eustachio reviewed a six-page ReliaGene Technologies report, dated May 24, 1999, and the transcript of Pineda's testimony in forming his conclusions. (Pet.'s Ex. A-15 at ¶ 3). His affidavit also states that "based on available information, it cannot be established with confidence that a match exists, and if, hypothetically, a match does exist, the probability that it arose

44

by chance is difficult to estimate, but likely to be much larger than the number

suggested by Pineda." (Pet.'s Ex. A-15 at ¶ 9). But D'Eustachio's lack of

confidence in Pineda's opinions seems to be based entirely on the fact that

Knox's attorneys have only provided him with a summary report and the trial

transcript. D'Eustachio's affidavit reads,

> It is difficult to reach an independent scientific conclusion about
> this test from these two items, as they include none of the actual
> test results that an analyst would evaluate in order to establish a
> typing pattern, but only a summary outline of the results, and none
> of the laboratory notes and records than an analyst should have
> generated in the course of performing the test to document actual
> outcomes at various key stages in the testing procedure. Indeed, it
> is not clear from the materials provided to me that such records
> exist or, if so, than anyone except ReliaGene personnel has ever
> reviewed them. As Ms. Pineda notes in her testimony (page 357,
> discussion of controls; page 359-360, discussion of inconclusive
> results), critical examination of this material is essential to
> correctly interpret test results.
> ....
> In my experience, critical examination of the full test results and
> notes is especially important in cases where the DNA samples may
> be damaged, degraded, or contaminated.

(Pet.'s Ex. A-15 at ¶¶ 5, 7).

Again, D'Eustachio acknowledges that he has reviewed only Pineda's

testimony and a summary report. The fact that he has not received Pineda's

lab notes and other relevant records certainly does not equate to a finding that

Pineda did not possess all relevant data she needed to form her expert opinion.

And, as pointed out in the State's original response to Knox's Motion for Leave,

D'Eustachio admits discomfort in expressing an expert opinion because he has

been provided insufficient data. But he gives one anyway. His opinion, however, is simply that he is not confident the blood on Knox's clothes matched Ms. Spears's known DNA profile because he has not been provided with additional data.

D'Eustachio's also opines that Pineda's random match probability testimony was overstated. D'Eustachio states in his affidavit, "I have performed a statistical calculation ... and conclude that, even if the DNA typing pattern reported by ReliaGene is correct, the number given in Ms. Pineda's testimony - 1 in 12.5 million - overstates its rarity by a factor of at least 200 times." (Pet.'s Ex. A-15 at ¶ 8). Significantly, D'Eustachio does not show his work. He apparently expects the Court to accept his conclusory opinion that Pineda's random-match-probability testimony was exponentially overstated.

Knox attempts to impeach Pineda's trial testimony with conclusory opinions, which are admittedly based on incomplete information, in an attempt to show trial counsel was ineffective. His attempts and D'Eustachio's conclusory opinions on match probability statistics do not establish *Strickland* ineffectiveness. What Knox suggests is that trial counsel was ineffective for failing to call a DNA expert to rebut the State's DNA expert. This is inconsistent with United States Supreme Court precedent that explicitly states: "*Strickland* does not enact Newton's third law for the presentation of

46

evidence, requiring for every prosecution expert an equal and opposite expert from the defense." *Harrington*, 562 U.S. at 111.

This type of claim is disfavored because "the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have stated are largely speculative." *Day*, 566 F.3d at 538. "[T]o prevail on an ineffective assistance claim based on counsel's failure to call a witness, the petitioner must name the witness, demonstrate that the witness was available to testify and would have done so, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable to a particular defense." *Id.* If these showings are not made, then a reviewing court has "no evidence beyond speculation that [at the time of trial] defense counsel could have found and presented an expert witness who would have testified as he claimed in his post-conviction applications." *Woodfox*, 609 F.3d at 808.

This is the situation facing the Court. Knox does not show trial counsel was ineffective for failing to call D'Eustachio as an expert witness at trial. First, D'Eustachio does not state in his affidavit that he was available to testify at Knox's trial or would have testified had he been available. Knox can only speculate that D'Eustachio was available to testify and would have testified consistent with the statements in his affidavit had he been called to do so at trial. Knox's speculation is not evidence that establishes any deficiency in trial

47

counsel's performance, particularly when all of the facts before the Court are considered.

Looking to the record, the facts in this case belie Knox's assertions. They clearly show trial counsel employing a strategy of attacking weaknesses in the State's case. This strategy does not render trial counsel *per se* ineffective. *Havard*, 928 So. 2d at 788. They also show D'Eustachio's critique of Pineda's testimony is cumulative to the testimony and concessions trial counsel elicited from Pineda on cross. "Not calling witnesses who will testify ... to matters cumulative in nature is not deficient performance by counsel." *Havard*, 988 So. 2d at 337.

Even when considered in isolation, D'Eustachio's opinions do not show trial counsel was ineffective. They do not exonerate Knox of capital murder. Assuming that trial counsel was deficient for failing to secure a DNA expert, Knox cannot show actual resulting prejudice. D'Eustachio's opinions do not show a reasonable probability exists that, but for trial counsel's failure to secure a DNA expert, the jury would not have convicted Knox of capital murder. *See id.* at 330. D'Eustachio's opinions do not exclude Ms. Spears as the contributor of the blood found on the clothes that Knox was wearing on the day when her body was discovered. The fact that D'Eustachio's opinions are predicated on insufficient information and considering the facts in the record—specifically Pineda's testimony—a reasonable probability exists that, had trial

48

counsel secured a DNA expert, the jury would have heard opinion testimony from the defense that the blood on Knox's clothes matched Ms. Spears's DNA profile. *See Jordan v. State*, 918 So. 2d 636, 649 (Miss. 2005). And the fact that trial counsel attempted to impeach Pineda on the same points that D'Eustachio raises only shows trial counsel's handling of Pineda was not ineffective.

Briefly, the State would call attention to D'Eustachio's conclusory opinion, that Pineda's random match probability testimony was exponentially overstated (Pet.'s Ex. A-15 at ¶ 8). This opinion is improper and woefully inadequate evidence for purposes of establishing a claim of *Strickland* ineffectiveness. First, D'Eustachio's conclusory opinion is improper evidence. "Post-conviction proceedings are for the purpose of brining to the trial court's attention facts not known at the time of judgment." *Brown v. State*, 798 So. 2d 481, 491 (Miss. 2001). The record clearly shows Knox is not calling to the Court's attention facts that were not known at the time of trial.

Second, D'Eustachio's conclusory opinion is woefully inadequate evidence of ineffectiveness. DNA expert opinion testimony on population statistics, like D'Eustachio's conclusory opinion, touches on the weight and credibility of the evidence. D'Eustachio's conclusory opinion is relatively insignificant. DNA expert opinion testimony related to lab error rates also goes to the weight and credibility of the evidence and renders population statistical data relatively insignificant. The record reflects Pineda testified to lab error

49

rates on both direct and cross examination. Specifically, she noted that, since ReliaGene's inception, all of its DNA analysts' proficiency test conclusions were verified to have been correctly reported by external agencies. (Tr. 336, 358). D'Eustachio's opinion on population statistics is conclusory, based on insufficient data, and rendered insignificant by Pineda's trial testimony. This opinion is not evidence of ineffectiveness.

Knox also complains that Pineda did not present scientific standards, data, or notes that she relied on in forming her opinion" that the DNA samples from Knox's bloody clothes matched Ms. Spears's known profile. What exactly Knox takes issue with is not clear. Expert witnesses do not typically present their notes or case files when testifying. Knox does not appear to assert a discovery violation by not turning over the same, as former Rule 9.04 of the Uniform Circuit and County Court Rules would not have required disclosure of a DNA expert's notes or case file.

### ii.  Fingerprint Evidence

Knox also claims trial counsel was ineffective for failing to challenge the State's latent print expert, which, he argues, was given without a proper foundation. The record reflects that Jamie Bush, Mississippi Crime Lab latent print examiner/supervisor, was accepted as an expert in the field of latent print examination without objection from the defense. (Tr. 309). The record shows Bush's opinion was that four latent fingerprints lifted from Ms. Spears's car

trunk lid matched Knox's known fingerprints, and that a latent print pulled

from a magazine in the trunk also matched Knox's known fingerprints. (Tr.

314, 316-17). Here too, the facts in the record contradict Knox's claim. Before

giving an expert opinion, Bush explained to the jury what a latent fingerprint

is as well as the process of latent print examination:

> To understand -- you need to understand what a latent print is. A
> latent print is basically a chance impression that is left on an object
> that it's come in contact with friction ridge skin. Friction ridge skin
> is a unique skin that is located on two areas of the human body.
> It's located on the palms of our hand and our fingers and on the
> bottom of our feet and toes. It's very unique skin in that this skin
> is rough. It's not smooth like the back of your cheek or the back of
> your hand. It's actually quite rough because it has raised areas we
> call ridges and between it, valleys we call furrows. Much like the
> appearance of a washboard or a freshly plowed field, but, now, this
> ridges don't simply run from left to right. They actually turn. They
> make shapes. At points they stop and start again, and we call that
> a ridge ending. Occasionally you'll see a small tiny ridge within the
> structure that resembles that of a pencil dot on a piece of paper.
> We call that a dot. Sometimes the ridge will actually split into two
> ridges much like the appearance of a fork in a road. We call that
> bifurcation. The bifurcation, the dot, and the ridge endings are
> only three of the minute details that are present on the friction
> ridge skin.
>
> Now, on these ridges there are thousands of tiny pores and these
> pores constantly exude sweat. As the sweat comes out of the pores,
> it coats that ridge. Thereby -- if I were sweating and I placed my
> finger on this rail, what I would leave behind is a latent print, but,
> most importantly, it's a reproduction of those minute details on
> that particular finger.
>
> Now, a latent print usually cannot be seen. The word latent means
> hidden. It usually takes some type of development process such as
> the application of fingerprint powder to see the print. When this
> print has been lifted, then it can be compared. Now, identifications
> are made when the latent print or unknown print and the ink print

> that is being compared to are sufficient quantity and quality and that the ridge detail within the two are in complete agreement without any unexplainable differences, identifications can be made.
>
> To compare the prints to come to that, I basically take the latent or Unknown print, place it beside an ink print and using a magnifying device such as a four power magnifying glass, I first look at the latent print to find some of these unique details like I talked about before. The dot, bifurcations and ridge endings. We look for a target group of them. Then I look in the same corresponding area in the ink print to see if they exist. If they do not, then I can exclude that print and look at another known print. However, if they do exist, I go back to the latent print, find a new target group of details and then search it again in the ink print in the same corresponding area. This back and forth side by side comparison continues until the identification or non-identification of the print can be established.

(Tr. 309-311). Bush then testified about examining the latent prints lifted by crime scene technicians to determine if they were of value for comparison:

> A latent print of value is basically a print that contains sufficient quality and quantity of ridge detail that it can be identified. There are other latent prints that are not of value and the best way to think about those are smears. Like you might see a smear on your refrigerator, on the glass of your car. Those generally are not of value for comparison purposes, but if they contain sufficient quantity and quality within the print and it can be identified, we call that a latent of value.

(Tr. 313). The facts in the record prove that Bush found eight latent prints of value to compare to Knox's known prints, and further found five of those eight prints of value matched Knox's known prints. (Tr. 314-17). The facts in the record contradict Knox's assertions that a proper foundation for Bush's opinion testimony was not laid. He does not show trial counsel was ineffective for

52

failing to object to Bush's testimony, or whatever it is he suggests should have been done with regard to the fingerprint testimony.

Knox clearly has not shown trial counsel was ineffective under *Strickland's* standard in relation to the fingerprint evidence presented at trial. Knox also makes an unrelated request for leave to have the three latent prints of value which were pulled from Ms. Spears's car—the three that did not match Knox's known prints—run through the FBI's fingerprint database. He claims the results could show he is innocent. Knox merely speculates in making this assertion. In doing so, he effectively concedes that he cannot substantially show the denial of his Sixth Amendment right to the effective assistance of counsel because he cannot meet *Strickland's* standard. "[V]irtually every act or omission of counsel would meet that test." *Brawner v. State*, 947 So. 2d 254, (Miss. 2006) (citing *Williams*, 529 U.S. at 393). Additionally, Knox's issue with the State's fingerprint expert does not meet the UPCCRA's fact pleading requirement.

Knox does not explain how this retesting would prove his innocence, and the State submits he cannot. Even if those prints identified another individual, the facts do not change. It would not change the fact that Knox left four fingerprints on Ms. Spears's car and one on a magazine that was recovered near her body from the trunk of her car. It would not change the fact that Knox was in possession of her car keys. It would not change the fact that his clothing

53

was covered in Ms. Spears's blood on the day her body was discovered. Considering the evidence of his guilt, identifying the individual who left the three latent prints would be an exercise in futility. And unlike Knox's DNA testing request—albeit improperly inserted in a successive PCR application—the UPCCRA does not provide leave to retest fingerprint evidence.

### i. The Anonymous Letter and the ENTERPRISE JOURNAL Newspaper Article

Knox claims that trial counsel failed to investigate an anonymous letter, allegedly sent to trial counsel prior to trial, which stated some other person killed Ms. Spears and framed Knox. He further claims a newspaper article corroborates the anonymous letter. Knox has also procured an affidavit from a friend which states, "word on the street" was Knox's cousin actually killed Ms. Spears. Knox claims trial counsel was ineffective for failing to pursue this highly suspect information.

Knox's claim regarding the anonymous letter and the newspaper article has already been answered by the State in its initial response to the successive petition. To recap, one of Knox's own exhibits, an affidavit from Knox's mother, Mildred Knox, calls into question whether trial counsel even received the anonymous letter in question. Mildred stated in an affidavit that after Knox's trial, trial counsel advised her to go to the jailhouse in Liberty to retrieve her son's belongings. (Pet.'s Ex. A-20 at ¶18). At the jailhouse, Mildred was given

54

a plastic bag. "In the bag was a letter in its original envelope addressed to Gus Sermos and post marked in Jackson, Mississippi. It was a long anonymous letter that said Steven did not kill Mrs. Spears." (Pet.'s Ex. A-20 at ¶18). At the very least, Knox's possession of the letter in jail suggests that if trial counsel ever received the anonymous letter, he at least discussed it with Knox. Not only does Knox fail to show trial counsel ever received the letter, Knox's claim that trial counsel did not investigate the outlandish assertions in the letter is purely speculative.

But first, the State offers the following summary of the anonymous letter (Pet.'s Ex. A-1). The anonymous letter states that the anonymous author, at some unspecified time, was riding around with other unnamed individuals when they passed a "spaced out" Knox on a road and gave him a ride. The anonymous letter goes on to state that, the following week, anonymous author and his anonymous cousin saw Knox on the road again in a similar "out of it" state. The anonymous letter recalls that the cousins were near Ms. Spears's home when anonymous cousin asked anonymous author, "ain't this where that school teacher Mrs. Spears live[?]" The anonymous letter also recalls that anonymous author confirmed the house was Ms. Spears's home and that anonymous cousin pronounced, "Man I hate that bitch every sence school when she used to pulled my ear. She aways grabed the same one. Now she's being a bitch tring to get [anonymous cousin] busted. I oughta run up in her house

55

right now and blow her brain out and make it look like this nigga did it, [?] put blood on him don't nobody no him." The anonymous author then remembers feeling pity for Knox because "anything could happen to him and he'll never know what happen to him[,]" and noting that when he asked anonymous "cousin to drive him home,... he started yelling [?], 'man f**k that new yorker. This would have been a perfect murder but [she] aint home.'" Anonymous author remembers hearing weeks later that Ms. Spears had been killed and that Knox was the suspect. Anonymous author recalls that, on one occasion, he got anonymous cousin drunk and anonymous cousin confessed to murdering Ms. Spears and hiding the body in her car. Anonymous author also remembers his cousin stating, "I put her blood on that nigga from New York and her car keys in his pockets so it looks like he done it." Anonymous author admits that he experienced feelings of guilt and remorse, knowing an innocent Knox had been wrongly accused. Anonymous author pleads with trial counsel (who, rather than Knox, was the intended recipient of the letter), to "help Steve out of this mess." But anonymous author predictably refuses to identify himself or his cousin. He does not want his cousin to go to jail. And he explains that he fears his cousin, who was "caught up in the game in New Orleans," and the possibility that cousin may "send his boys from New Orleans to kill" him. (Pet.'s

56

Ex. A-1).[12] How fortunate for Knox that this fortuitous anonymous letter is before the Court—a letter, which was penned by a "John Dow [*sic*]," that shows that states an unidentified individual actually killed Ms. Spears and framed Knox for the murder by somehow managing to place Ms. Spear's blood on the clothes that Knox just so happened to be wearing the day her body was discovered.

These absurd statements are the "other evidence" that trial counsel was allegedly *Strickland* deficient for not pursuing. Chief among the problems with Knox's third claim is that "a defendant who alleges that trial counsel's failure to investigate constituted ineffectiveness must also state with particularity what the investigation would have revealed and specify how it would have altered the outcome of trial,... or how such additional investigation would have significantly aided his cause at trial." *Cole*, 666 So. 2d at 776 (internal citations omitted). Knox does not claim that had trial counsel investigated the tale regaled by an unidentified author of an anonymous letter that trial counsel would have discovered the "real murder." He does not because Knox was represented by two habeas attorneys who have possessed the anonymous letter

---

[12] In an attempt to make the letter, or the claim based on the letter, seem less ridiculous, Knox presents an ENTERPRISE JOURNAL newspaper article published shortly after the murder. He claims this article corroborates portions of the anonymous letter. Because it addressed this article in its response to initial Knox's Motion for Leave, the State incorporates that response herein. How, under any interpretation, the newspaper article (Pet.'s Ex. A-13) corroborates the anonymous letter is entirely unclear.

since at least 2005 and present counsel who has possessed this letter for many years. None of these attorneys, all of whom have certainly conducted intensive post-conviction investigation, have yet to uncover the identity of the author or his cousin, the alleged real killer. In short, Knox fails to show how the anonymous letter could have possibly aided his defense at trial. His failure to present a defense IATC claim necessarily fails.

The record shows that, rather than present such a ridiculous story to the jury, trial counsel reasonably chose to defend Knox at the guilt phase by employing a strategy of attacking the State's evidence and arguing Knox was innocent of capital murder because the prosecution failed to prove the underlying robbery.[13] This strategy does not render trial counsel *per se* ineffective. *Havard*, 928 So. 2d at 788. Knox does not show that trial counsel received the anonymous letter or knew anything about it. Aside from that, he does not, and cannot, show a reasonable probability exists that he would not have been convicted of capital murder had trial counsel investigated the allegations made in the anonymous letter.

Since filing his Amended Motion for Leave, Knox's present counsel procured an affidavit signed by Kendrick Veals (Pet.'s Ex. M). He submits to this Court that Veals's affidavit is evidence, which also shows that an

---

[13] At no time did trial counsel concede or suggest that Knox committed the murder. Trial counsel focused on attacking the State's proof of the underlying robbery.

individual other than Knox is responsible for Ms. Spears's murder. (Amended Mot. for Leave at 86). Veals states in his affidavit that he knew Knox, a neighbor, for two or three years before Ms. Spears was murdered. (Pet.'s Ex. M at ¶4). Veals also knew Ms. Spears because she tutored him when he was in school. (Pet.'s Ex. M at ¶5). Knox relies on a portion of Veals's affidavit as proof of his innocence. Specifically, he relies on the portion of the affidavit where Veals states, "Steve had a cousin who killed himself before trial. His name was Derrick Knox. This cousin hated Ms. Spears and thought she was mean. The word on the street was that he is the person who killed Ms. Spears." (Pet.'s Ex. M at ¶6). Knox suggests that trial counsel was also ineffective for failing to seek out and speak with Veals to discover "the word on the street."

Knox fails to show that trial counsel was ineffective in handling the State's DNA and fingerprint experts or for failing to investigate the claims in the anonymous letter and "the word on the streets." Because the issues under his third claim are without merit, in addition to being procedurally barred, he cannot show that trial counsel or his initial PCR counsel were ineffective for failing to raise these issues. This claim does not meet the requirements of Section 99-39-27(5). *Corrothers*, 255 So. 3d at 105. Because it does not, Knox's failure to present a defense IATC claim must be denied.

### ii.    Mental illness

In his fourth sub-issue Knox claims that the Court should recognize the mentally ill and disabled constitute a class of individuals who are categorically excepted from imposition of the death penalty, and that he is a member of this class. (Amended Mot. for Leave at 236-244). This issue fails on its face.

### A. History of Knox's Claim that Severely Mentally Ill and Disabled Inmates are Ineligible for the Death Penalty.

Knox first raised this claim in *Knox III* but could have raised it much earlier. The Petition for Post-Conviction Relief filed in *Knox II*, cites the Supreme Court's decision in *Atkins v. Virginia*, 536 U.S. 304 (2002). *Steve Knox v. State of Mississippi*, No. 2002-DR-00912-SCT (Miss. Feb. 14, 2003) (Petition for Post-Conviction Relief at 15 (¶ 41)). Additionally, Knox cites no authority that holds the mentally ill and disabled are exempt from capital punishment. His argument quickly becomes mere assertions, which should be denied.

Knox relies entirely upon the holdings in *Atkins*[14] and *Roper v. Simmons*, 543 U.S. 551 (2005).[15] Problem is, neither *Atkins* nor *Roper* apply in this case. "*Roper* exempted juvenile offenders from the death penalty, and *Atkins* exempted the mentally retarded." *Dickerson v. State*, 173 So. 3d 8, 18 (Miss. 2015). Knox "is neither under eighteen nor mentally retarded. Therefore, he is

---

[14] The Supreme Court decided *Atkins* on June 20, 2002, approximately six months after the Court affirmed the judgments of conviction and sentence on direct review in *Knox I*.

[15] The Supreme Court decided *Roper* on March 1, 2005, approximately three years after *Knox I*.

60

not exempt from the death penalty under *Atkins* or *Roper*." *See Dickerson*, 173 So. 3d at 18. "'[T]he Supreme Court has never held that mental illness removes a defendant from the class of persons who are constitutionally eligible for a death sentence.'" *Dickerson*, 173 So. 3d at 18 (quoting *Ripkowski v. Thaler*, 438 F. App'x 296, 303 (5th Cir. 2011)). Counsel (trial, appellate, or PCR) was not deficient for failing to make this argument. Like others before him, Knox contends that he suffers from "a serious neurocognitive disorder, including an inherited condition that resulted in a low I.Q., a history of bizarre behavior that included periodic blackouts similar to epileptic seizures, and a history of repeated traumatic brain injury." (Amended Mot. for Leave at 244). '[t]he Supreme Court has never held that mental illness removes a defendant from the class of persons who are constitutionally eligible for a death sentence.'" *Dickerson*, 173 So. 3d at 18 (quoting *Ripkowski*, 438 F. App'x at 303). There is no merit to Knox's mental health issue.

## IV. Knox is not entitled to relief for Claim One.

Claim One in Knox's Second Amended Petition purports to be an IATC claim based on alleged a failure to challenge the peremptory strikes the State used against black and female venire members. *See* Doc. 85 at 133–200. But a review of Claim One quickly reveals ineffective assistance is not the focus of

that claim. Claim One is a combined *Batson*[16] / *J.E.B.*[17] claim, masquerading as combined IATC / IAAC[18] claim. *See* Doc. 85 at 133–200. Knox doubles-down on his *Batson* / *J.E.B.* claim under Part IV of his Memo. Doc. 113 at 69–136.

Respondents addressed the allegations under Claim One and asserted several defenses to that claim in their Answer. *See* Doc. 95 at 29–56. They incorporate their response and the defenses they asserted to Claim One in their Answer here by reference. Doc. 95 at 29–56. And they offer the following in support of their Answer, *see* Doc. 95 at 29–56, and in response primarily to the arguments under Part IV. of Knox's Memo, *see* Doc. 113 at 69–136, but also Claim One of Knox's Second Amended Petition, *see* Doc. 85 at 133–200.

### A.    The default doctrine bars federal review.

In *Knox II*, Knox raised an IATC claim based on alleged failures to challenge the State's peremptory strikes against black venire members at the appropriate time. Doc. 73-1 at 43–46. The same cannot be said of Claim One. The default doctrine bars review because:

---

[16] *Batson v. Kentucky*, 476 U.S. 79 (1986).

[17] *J.E.B. v. Alabama*, 511 U.S. 127 (1994).

[18] IAAC or "ineffective assistance of appellate counsel."

### 1. Knox "technically" exhausted Claim One.

After coming up short in *Knox I* and in *Knox II*, Knox returned to state court years later and presented an expanded version of the same IATC claim that PCR counsel raised in *Knox II*. Only in *Knox III*, Knox presented this IATC claim as a general IAPCC[19] claim against PCR counsel in *Knox II*. Docs. 74-1 at 28–43, 74-2 at 196–212. He even amended that IATC claim, replacing it with what is now Claim One—an IATC claim based on alleged failures to make race *and* gender-based challenges to the State's peremptory strikes. Doc. 74-7 at 3–77. Knox also attached "evidence" that he claimed post-conviction counsel should have presented in *Knox II* to support Claim One. *See, e.g.*, Docs. 74-7 at 402–12; 74-8 at 89–106, 242–14, 317–37.

And Knox did so, knowing full-well that Claim One was technically exhausted. He knew before he presented Claim One to the Mississippi Supreme Court that he could not do so consistent with the UPCCRA's procedure. He knew Claim One was technically exhausted before he presented that claim to the state supreme court. This is the reason why Knox presented Claim One as an IAPCC claim.[20] At the time of *Knox III*, IAPCC was a *judicially* crafted exception to the

---

[19] IAPCC or "ineffective assistance of post-conviction counsel."

[20] There is no other reason for Knox to make ineffective assistance assertions against PCR counsel in *Knox II*. IAPCC is not a ground for federal habeas relief, *see Martinez*, 566 U.S. at 17 (citing 28 U.S.C. § 2254(i)), or one for state post-conviction relief, *see Grayson*, 118 So. 3d at 125–26.

UPCCRA's *statutory* bars—a purely state-law matter. *See Grayson v. State*, 118 So. 3d 118, 125–26 (Miss. 2013). Claim One could be reviewed under *Grayson's* exception only if Knox's PCR application *proved* {not just claimed} that counsel in *Knox II* was ineffective for failing to raise and properly support Claim One. *See id.* at 125–26.

But Knox's Second Amended PCR Application failed to make that showing. The Mississippi Supreme Court expressly confirmed this conclusion in its March 10th En Banc Order. Doc. 75-10 at 298. Looking there, the state court made quite clear that Knox "failed to demonstrate constitutionally deficient performance by original post-conviction relief counsel" for not raising Claim One in *Knox II*. Doc. 75–10 at 298. And because he failed to meet *Grayson's* exception, the UPCCRA's bars precluded review of his state-court version of Claim One. *See* Doc. 75-10 at 298–99. Knox could not obtain post-conviction relief for Claim One, and the Mississippi Supreme Court was statutorily required to deny that claim. *See* Miss. Code Ann. § 99-39-27(5). The UPCCRA's bars precluded review of Claim One.

Knox did not properly exhaust Claim One; he did not fairly present it to the Mississippi Supreme Court consistent with the UPCCRA's procedure. "Fair presentation does not entertain presenting claims 'for the first and only time in a procedural context in which its merits will not be considered unless there are special and important reasons therefor.'" *Carty v. Thaler*, 583 F.3d 244, 254 (5th Cir. 2009) (quoting *Castille v. Peoples*, 489 U.S. 346, 351 (1989)). Knox

64

presented Claim One for the first time in state court, years after the post-conviction proceedings in *Knox II* ended. So Knox presented Claim One for the first time in state court years after he had exhausted all his state-court remedies for presenting that claim. Claim One is {and always has been} a "technically" exhausted claim. *See Shinn*, 596 U.S. at 378 (explaining that claims are technically exhausted when state-court remedies for those claims are no longer available) (quoting *Ngo*, 548 U.S. at 92–93). Claim One is "technically" exhausted. So the default doctrine applies to Claim One. In the absence of an applicable exception or good cause, the default doctrine bars federal habeas review. *See id.* (quoting *Davila*, 582 U.S. at 528). Knox does not show Claim One may be reviewed under an exception to the default doctrine. The Court should find Claim One is technically exhausted and, as a consequence, procedurally defaulted.

## 2. **Adequate and independent state-law grounds bar review.**

And because Knox presented Claim One to the state supreme court in a manner that was inconsistent with the UPCCRA's procedure, three adequate and independent state procedural-law grounds now bar federal habeas review. "[A] federal court may not review federal claims that were procedurally defaulted in state court—that is, claims that the state court denied based on an adequate and independent state procedural rule." *Davila*, 582 U.S. at 527. Knox may not "'avoid the exhaustion requirement by defaulting [his] federal claims in state court.'" *See Sones*, 61 F.3d at 416, n. 8 (quoting *Coleman*, 501 U.S. at 732).

65

Knox did not and could not present Claim One to the state supreme court in a manner consistent with state procedural law after the proceedings in *Knox II* ended. *See* Miss. Code Ann. §§ 99-39-5(2)(b), 99-39-21(1)–(3), 99-39-27(9). Knox completed one full round of state appellate review proceedings on June 9, 2005, when the Mississippi Supreme Court entered its Mandate, Doc. 73-2 at 8, in *Knox II. See Brown v. State*, 255 So. 3d 141, 144 (Miss. 2017) (noting that state prisoners "are entitled to file only one petition for post-conviction") (citing *Russell v. State*, 819 So. 2d 1177, 1178 (Miss. 2001)). So when he raised Claim One in *Knox III*, the state supreme court clearly and expressly ruled it was procedurally barred as the UPCCRA required. Doc. 75-10 at 295–99 (citing Miss. Code Ann. § 99-39-27(5)). The state court ruled the UPCCRA's statutory bars precluded review and confirmed that Knox had technically exhausted Claim One. *See* Doc. 75-10 at 295–99. In particular, the state court expressly relied on the UPCCRA's time, successive-writ, and waiver bars as procedural-law grounds for denying Knox's Second Amended Petition. *See* Doc. 75-10 at 295–99. Mississippi's time, successive-writ, and waiver bars are adequate and independent state procedural-law grounds that will preclude federal habeas review. *See Spicer*, 2021 WL 4465828, at *3 (citing *Johnson*, 176 F.3d at 815 n. 3, and *Moawad*, 143 F.3d at 947); *Stokes*, 123 F.3d at 860.

That said, the Court may review Claim One if it finds Knox has shown: (a) failing to consider the claim will result in a fundamental miscarriage of justice,

*Coleman*, 501 U.S. at 750; (b) cause and prejudice exist for Knox's failure to properly raise the claim, *Sykes*, 433 U.S. at 87; or (c) the UPCCRA's time, successive-writ, and waiver bars were not "firmly established and regularly followed" in state court, *Ford*, 498 U.S. at 423–24. It is Knox's burden to rebut the presumption of adequacy or provide cause and prejudice to excuse a specific state-court default. *See Sones*, 61 F.3d at 416–18. Knox does not try to overcome or excuse the procedural defaults that bar federal review of Claim One. *See* Docs. 85 at 133–200; 113 at 69–136. He does not try to show cause and actual prejudice as it *specifically* relates to Claim One or that federal review of that claim is necessary to prevent a fundamental miscarriage of justice. *See* Docs. 85 at 133–200; 113 at 69–136. Nor does he try to rebut the presumption that Mississippi's time, waiver, or successive-writ bars are adequate and independent state-law grounds that preclude review of Claim One. Docs. 85 at 133–200; 113 at 69–136. So Claim One should be denied.

Knox presented Claim One to the state supreme court in *Knox III*, just not in a manner consistent with state procedure. And there is little wonder why the state supreme court denied Claim One. Its En Banc Order clearly states that the state court's decision to deny Knox's Second Amended PCR Application rests entirely on the UPCCRA's statutory bars. *See* Doc. 75-10 at 295–99. Three of the statutory bars the state court relied on are independent and adequate state procedural-law grounds that preclude federal habeas review unless Knox rebuts

67

the presumption of adequacy, shows cause and prejudice, or that review is necessary to prevent a fundamental miscarriage of justice. He does none of those things. Because he does not, the UPCCRA's time, successive-writ, and waiver bars preclude federal review and relief for Claim One.

PCR counsel's performance in *Knox II* cannot provide cause for any procedural default that bars preview of Claim One—or any other claim. While he makes many assertions about trial counsel's jury selection performance, Knox does not show trial counsel's jury selection performance was constitutionally deficient. He cannot. So he asks the Court to carry his burden for him and presume prejudice. For example, at no time in these proceedings has Knox shown Knox, through PCR counsel, raised an IATC claim based on alleged failures to rebut the State's eight peremptory strikes against black venire members. But the Mississippi Supreme Court ruled Knox failed to show IATC "on this issue" in *Knox II. See* 901 So. 2d at 1261–63. The state court ruled Knox's claim failed to meet either prong of *Strickland's* standard.

In *Martinez*, the Supreme Court held

> Where, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a claim of ineffective assistance of counsel at trial if, in the initial-review collateral proceeding, … counsel in that proceeding was ineffective.

566 U.S. at 17.

68

*Martinez's* exception "treats ineffective assistance by a prisoner's state post conviction counsel as cause to overcome the default of a single claim"—ineffective assistance of trial counsel. *See Davila*, 582 U.S. at 524. To meet *Martinez's* exception, Knox must first show state PCR counsel was constitutionally deficient for failing to present Claim One in *Knox II. See Garza v. Stephens*, 738 F.3d 669, 676 (5th Cir. 2013). When reviewing an IAC claim, the Court should "indulge a strong presumption that counsel[s'] conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. Knox must also show a failure to rebut a specific peremptory strike prejudiced his Defense. *See Canales v. Stephens*, 765 F.3d 551, 571 (5th Cir. 2014). Speaking of prejudice, if Knox establishes deficient performance, then he must show PCR counsel's performance prejudiced the Defense in *Knox II*. Knox shows *Strickland* prejudice by showing the underlying IATC claim is substantial. One final point: failing "to establish the deficiency of either attorney precludes a finding of cause and prejudice." *See Sells v. Stephens*, 536 F. App'x 293, 314 (5th Cir. 2013).

Knox presents new evidence with his Second Amended Petition to support his contention that PCR and trial counsel were ineffective for failing to challenge the State's peremptory challenges against black and female venire members. *See, e.g.*, Exs. C, GG, HH-1, HH-2, JJ, KK. It is not entirely clear from the arguments Knox makes that trial or PCR counsel failed to properly discharge a specific obligation to make a specific objection at trial or in *Knox II*.

69

And the "new evidence" that Knox presented in *Knox III* and now offers in support of Claim One was not fairly presented to or reviewed by the Mississippi Supreme Court. Knox did not fairly present Claim One or the facts supporting it to the state supreme court in accordance with state procedural law.  because review of Knox's Second Amended PCR Application (and the claims in it) was barred by the UPCCRA's statutory bars.

*Shinn* narrows *Martinez's* already-narrow scope even more. *Shinn* holds "that, under § 2254(e)(2), a federal habeas court may not conduct an evidentiary hearing or otherwise consider evidence beyond the state-court record based on ineffective assistance of state post-conviction counsel." *Shinn*, 596 U.S. at 382. Under *Shinn* "a federal court may not conduct an evidentiary hearing or otherwise consider evidence beyond the state-court record based on ineffective assistance of state post conviction counsel." *Id.* Knox has "failed to develop the factual basis of a claim in state court proceedings. *See id.* at 381.

"[So] [this] [C]ourt may hold an evidentiary hearing on [Claim One] [or otherwise take new evidence] only if [Claim One] relies on (1) a 'new' and 'previously unavailable' 'rule of constitutional law' made retroactively applicable by [the Supreme] Court, or (2) 'a factual predicate that could not have been previously discovered through the exercise of due diligence." *See id.* at 381 (quoting 28 U.S.C. § 2254(e)(2)(A)(i), (ii)). "If [Knox] can satisfy either of these exceptions, he must also show that further factfinding would show "by clear and

70

convincing evidence," that "no reasonable factfinder" would have convicted him of the crime charged. *See id.* (citing 28 U.S.C. § 2254(e)(2)(B)). But "if § 2254(e)(2) applies and [Knox] cannot meet the statute's standards for admitting new merits evidence, it serves no purpose to develop such evidence just to assess cause and prejudice." *Id.* "[S]tate postconviction counsel's ineffective assistance in developing the state-court record is attributed to [Knox]." *See id.* "And, because there is no constitutional right to counsel in state postconviction proceedings … [Knox] must 'bear responsibility' for all attorney errors during those proceedings…." *See id.* (internal citations omitted).

And the facts in this case are simply not comparable to those in *Miller-El I*, *Miller-El II*, *Snyder*, *Foster*, or *Flowers*. Those cases turn on extraordinary and unique facts. This case does not.PCR counsel could not be deficient for failing to present or adequately support a claim that could not be reviewed, much less be the basis of a decision to grant relief.

### B. Claim One lacks merit.

Claim One is an ineffective assistance of counsel claim based on allegations that the State used race and gender-based peremptory strikes to remove black and female individuals from the venire. Proving it requires Knox to show a deficiency in counsel's performance during jury selection that actually prejudiced his Defense. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). If Knox makes an insufficient showing on either the performance or prejudice prong of

71

*Strickland's* standard, then Claim One must fail. *See Strickland*, 466 U.S. at 697. There is no order this Court must follow when applying *Strickland's* two-pronged standard to Claim One. "If it is easier to dispose of [Claim One]" for lack of sufficient prejudice "that course should be followed." *See id.* That is the case here, and Respondents begin there.

The Sixth Amendment gives Knox the right to a fair trial, which guarantees him effective, not error-free, assistance of counsel. But there is no right to a perfect trial. And not every error of counsel justifies setting aside the judgment of a criminal proceeding. Few will—only those that had an actual and adverse effect on the Defense. Courts apply *Strickland's* standard when determining IAC claims like Claim One. *Strickland* requires Knox to show a reasonable probability exists that, but for a particular error of counsel, the outcome of his capital-murder trial would have been different. A reasonable probability is one sufficient to undermine confidence in the outcome of trial.

Knox admittedly does not try to show *Strickland* prejudice under Claim One. *See* Doc. 113 at 96–99. Rather than try, Knox asks the Court to abandon *Strickland's* standard and presume prejudice. He says Claim One concerns deficiencies in trial counsel's performance that contributed to numerous violations of *Batson's* rule and *J.E.B.'s* rule. And because counsel had a hand in creating or ignoring structural error the Court should presume *Strickland* prejudice. He cites *Weaver v. Massachusetts*, 582 U.S. 268 (2017) as the legal

authority for his claim. Knox's reliance on *Weaver* is misplaced. Claim One is an IATC claim, not a *Batson* claim. And to show *Strickland* ineffectiveness, Knox must show both cause and prejudice.

A petitioner who, like Knox, claims the State violated *Batson* and its progeny is asserting the State denied him a fair trial by removing a prospective juror from the venire for a reason of race, *Powers v. Ohio*, 499 U.S. 400 (1991), or gender, *J.E.B. Petitioner v. Alabama ex rel. T.B.*, 511 U.S. 127 (1994). As demonstrated below, Knox's *Batson*[21] claim does not show the State's use of any peremptory strike resulted in a denial of his right to a fair trial.

To begin, Knox insists that his initial post-conviction review proceedings in *Knox II* "were a part of [his] direct appeal under Mississippi law." Doc. 113 at 70. He cites *Hawkins v. State*, 255 So. 3d 1264, 1270 (Miss. 2018) as authority that supports his assertion. Doc. 113 at 70. Even if *Hawkins* holds that ruling, section 99-39-7 of the UPCCRA expressly states that a "motion under this article shall be filed *as an original action...*" Miss. Code Ann. § 99-39-7 (emphasis added). Collateral review in Mississippi is just that, collateral to direct review. *See* Miss. Code Ann. § 99-39-3. And the UPCCRA's exclusive procedure controls these proceedings.

---

[21] Respondents collectively refer to Knox's *Batson* and *J.E.B.* issues under Claim One as his *Batson* issue or claims.

Besides that, Knox maintains the position that this Court can somehow consider new evidence or that he is entitled to an evidentiary hearing so that he may develop it and expand the record. *See* Doc. 113 at 70–71. He is completely wrong about considering, presenting, or developing facts to support Claim One in these proceedings. "[O]nly rarely may a federal habeas court *hear* a claim or *consider evidence* that a prisoner did not previously present to the state courts *in compliance with state procedural rules*. *Shinn*, 596 U.S. at 375–76. This case is not one of those one of those rare instances.

Knox did not fairly present any new evidence to the Mississippi Supreme Court in *Knox III*. As stated above, the Court may consider new evidence or hold an evidentiary hearing to take evidence on Claim One "only if [Claim One] relies on (1) a 'new' and 'previously unavailable' 'rule of constitutional law' made retroactively applicable by [the Supreme] Court, or (2) 'a factual predicate that could not have been previously discovered through the exercise of due diligence." *See id.* at 381 (quoting 28 U.S.C. § 2254(e)(2)(A)(i), (ii)). "'[W]hen a federal habeas court … admits or reviews new evidence for any purpose, it may not consider that evidence on the merits of a negligent prisoner's defaulted claim unless the exceptions in § 2254(e)(2) are satisfied." *Shoop v. Twyford*, 596 U.S. 811, 823 (2022) (citing *Shinn*, 596 U.S. at 389). Not only that, but the Mississippi Supreme Court's factual determinations are presumed correct until Knox "rebut[s] the presumption

74

of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see Gardner v. Johnson*, 247 F.3d 941, 948 n. 11 (5th Cir. 2001).

Knox fails to show any new "evidence" is excepted from section 2254(e)(2) stringent restrictions and limitations. So this Court may *not* consider any new evidence in support of the IAPCC and IATC claims under Claim One, *i.e.*, *any* evidence that was presented in *Knox III*. Knox is simply wrong in arguing otherwise.

Knox cites and relies on portions of the decisions in *Miller-El II*, *Snyder*, *Foster*, and *Flowers*. Doc. 113 at 71–77. As discussed below, those cases are easily distinguishable from this one. This is not a case where the trial court applied an erroneous legal standard, failed to conduct voir dire or recall a prospective juror's demeanor, or refused to conduct a comparative juror analysis. Unlike the cases Knox relies upon, this case does not involve clear error or exceptional circumstances. So there that precludes deference to the trial court's ruling on Knox's *Batson* challenge.

### Miller-El II

The facts in this case are not comparable to those in *Miller-El II*. In that case, the Supreme Court found the prosecution's explanations for ten peremptory strikes could not be credited in light of the events that occurred throughout the jury selection process. 545 U.S. at 265. The prosecution removed "91% of the eligible African-American venire members" with ten peremptory strikes. *Id.* at

241 (citing *Miller-El I*, 537 U.S. at 342). It struck African-Americans for reasons that equally applied to whites who were seated on the jury. *Id.* at 241–53 (citing *Miller-El I*, 537 U.S. at 343). It misrepresented the voir dire responses of African-Americans when asked to provide reasons for striking them. *Id.* at 241–47. It engaged in disparate questioning of African-American venire members, *see id.* at 255–63, some of which "might fairly be called trickery[,]" *id.* at 261. It used Texas law to rearrange the venire panel, which was frontloaded with a predominant number of African-Americans. *Id.* at 253–55. And it followed an office-wide and decades-old formal policy of systematically excluding African-Americans from juries. *Id.* at 263–66.

### Snyder v. Louisiana

The facts in this case are easily distinguishable from those in *Snyder*. There, the prosecution gave two reasons for a peremptory strike exercised against a black venire member. 552 U.S. at 479. One reason was demeanor-based—that the venire member appeared nervous during voir dire. *Id.* at 478. But this reason was not entitled to deference because there was nothing in the record that showed the trial court credited it. *Id.* at 478–79. The Supreme Court found the prosecution's other reason, the prospective juror's "student-teaching obligation," was a pretext for purposeful discrimination. The Court reached this conclusion because the issue had been resolved by the trial court earlier during the jury-selection process. *Id.* at 479–82. It also found that the prosecution did not exercise

peremptory strikes against similarly-situated white jurors. *Id.* at 484. The Court found the prosecution had questioned white venire members in a way that allowed the prosecution to elicit assurances from the jurors that they would be able to perform their duties if seated. *Id.* at 484–85. So while the prosecution offered two reasons for the strike in question, one could be not credited and one was a pretext for discrimination. *Id.* at 485–86.

### *Foster v. Chatman*

The facts in this case are nothing like those in *Foster* by any stretch of the imagination. In *Foster*, the jury was selected in two phases: the for-cause and peremptory-strikes phases. *Foster v. Chatman*, 578 U.S. 488, 493–94 (2016). The for-cause phase began with a jury pool of ninety venire members. *Id.* at 493. Forty-two prospective jurors remained when this phase concluded. Four of the forty-two were black: Eddie Hood, Evelyn Hardge, Mary Turner, and Marilyn Garrett. *Id.* The prosecution had ten strikes at its disposal when the peremptory-strikes phase began. *Id.* It used nine of those ten to remove all the remaining prospective black jurors. *Id.* Foster made a *Batson* objection, which was overruled. *Id.*

Years later, during state post-conviction proceedings, Foster obtained documents related to jury selection from the prosecution's case file. *Id.* He used these documents to support a Batson claim and offered them as evidence during an evidentiary hearing. Among those documents were copies of a letter that contained the names of the venire members, including the four black jurors who

77

were removed. Their names had been highlighted in green on every copy. *Id.* The copies contained the phrase, "represents blacks[,]" which also had been highlighted in green. *Id.* "The letter 'B' appeared next to each black juror's name." *Id.* During the evidentiary hearing, the state trial court also heard testimony that the letter had been circulated in the DA's office prior to trial for the purpose of obtaining reasons for striking these jurors. *Id.* at 493–94.

Foster also obtained two affidavits, which had been prepared by one of the DA's investigators. *Id.* at 494. Both affidavits stated the investigator's opinions on ten prospective African-American jurors. *Id.* They were identical with one exception. One affidavit contained a notation under one of the African-American's name, which read:

> "If it comes down to having to pick one of the black jurors, [this one] might be okay. This is solely my opinion. . . . Upon picking of the jury after listening to all of the jurors we had to pick, if we had to pick a black juror I recommend that [this juror] be one of the jurors."

*Id.* (citation omitted). This notation had been redacted from the other affidavit. When asked about the redaction, the investigator "guessed the redactions had been done by [the DA.]" *Id.* (citation omitted).

And there was more. The case file contained three handwritten notes that were used at trial and related to prospective jurors Hood, Wilson, and Hinds. The notes referred to the trio as B#1, B#2, and B#3, respectively. *Id.* The case filed contained a list of prospective jurors' names who had not been excused for cause.

The letter "N" appeared next to the names of those jurors the prosecution had removed, including the names of the four black jurors. *Id.* at 495. The case file contained a "'Definite NO's'" list *Id*. The names of all four black jurors appeared on this list. *Id.* Foster obtained a document, entitled "Church of Christ," with a notation in the top right corner, which read: "NO. No black Church." *Id.* (citation omitted). And Foster obtained jury questionnaires from the case file. The race response on every questionnaire had been circled. *Id.* at 495–96.

Despite this evidence, the trial court denied Foster's Batson claim as res judicata and without merit. *Id.* at 496. Foster then petitioned the Georgia Supreme Court for permission to appeal. *Id.* After the state supreme court denied his request, he petitioned the U.S. Supreme Court to consider his claim. *Id.* The Court granted his petition and reversed the state supreme court's decision, which, in effect, affirmed a clearly erroneous determination. *Id.* at 512-14. The Court based its decision on the evidence above and record facts related to the strikes against Garrett and Hood. *Id.* at 502–12.

With respect to the peremptory strike against Garrett, the Court found many of the reasons the DA gave for removing her were false and based on misrepresentations. *Id.* at 502–07. For example, the DA stated his decision to strike Garrett was unexpected and prompted by the last-minute, for cause dismissal of another prospective juror. *Id.* at 502–03. But there were facts in the record that showed the DA planned to strike Garrett. Id. One was the number of

reasons—eleven—the DA offered for an unexpected and last-minute strike. *Id.*at 503. Another fact was that, prior to trial, the DA stated he had identified the individuals he intended to strike. *Id.* (citation omitted). Another was that one of the DA's reasons for striking Garrett—the defense failed to ask about "her thoughts on 'insanity' or 'alcohol,' or 'much questions on publicity'"—was false. *Id.* at 505 (citation omitted). And then there was the fact that Garrett's name appeared on the "Definite NO's" list. *Id.* at 504 (citation omitted).

The Court's decision was based on findings made from a comparative analysis of Garrett and similarly situated white jurors. These findings made the DA's reasons for striking Garrett "difficult to credit." *Id.* at 505. The DA removed Garrett because she was a divorcee, too young, and gave equivocal responses about her familiarity with the area where the crime was committed. *Id.* But the DA accepted white jurors who were divorced, and did not remove one of the eight white jurors who was approximately the same age as Garrett. *Id.* at 506. The Court had "no quarrel with the State's general assertion that it 'could not trust someone who gave materially untruthful answers on voir dire....'" *Id.* (citation omitted). But it was difficult to credit that reason since the DA accepted a white juror with responses similar to Garrett's. *Id.*

The Court found more of the same when reviewing the reasons for striking Hood. They too were based on misrepresentations. The DA described Hood as being "'exactly what [the prosecution] was looking for in terms of age, between

forty and fifty, good employment and married'" but removed him for eight reasons. *Id.* (citation omitted). The primary reasons for removing Hood "shifted over time, suggesting those reasons may be pretextual." *Id.* at 507. Prior to trial, the primary reason was that Hood's son and Foster were close in age. *Id.* 507–08. The primary reason after trial was Hood's Church of Christ affiliation. *Id.* at 508. This reason was based on a misrepresentation. A notation, which appeared on the "Church of Christ" document in the case file, contradicted the DA's religious affiliation reason. *Id.* at 509. The notation stated that the Church of Christ, "'doesn't take a stand on [the] Death Penalty," and considered that matter to be one "'for each individual member." *Id.* at 511 (citation omitted). Another reason was based on a misrepresentation. The DA stated that he was striking Hood for a crime his son was convicted of committing five years earlier. According to the DA, the crime Hood's son committed was similar to Foster's capital-murder charge. *Id.* at 509. It was not. Hood's son had been convicted of stealing hubcaps and received a 12-month sentence term, which was suspended. *Id.*

As with Garrett, the Court based its decision on what was revealed through a comparative-juror analysis. *Id.* at 509–10 (citing *Miller–El I*, 537 U.S. at 339). The Court found the DA had accepted several white jurors whose sons were approximately the same age as Foster. Yet, he struck Hood, even though he said his son's age would not affect his ability to serve on the jury. *Id.* at 509–510. The Court noted that the DA struck white prospective jurors who were affiliated with

81

the Church of Christ, but did not remove any one of them because of their religious affiliation. *Id*. at 510. And the DA stated that he was removing Hood because his wife, who worked at a hospital where the mentally ill were treated, would probably be sympathetic to Foster. *Id*. at 511. But the DA did not strike a white juror whose spouse was employed by the same hospital. *Id*. at 512.

Finally, the Court's decision was based on the fact many of the DA's other reasons for striking Hood were baseless. *Id*. There was no record support for the same reasons that the defense did not ask Hood about Foster's age, criminal responsibility and insanity, or publicity. *Id*. The facts in the record did not support the reasons that Hood seemed confused or slow to respond to voir dire questions. *Id*. At best, the record indicated widespread confusion among the venire. *Id*. The Court found the facts in the record and the evidence Foster presented in state court were more than sufficient to find the state trial court's Batson ruling was clearly erroneous.

### *Flowers v. Mississippi*

The facts in this case are easily distinguishable from those in *Flowers*. In *Flowers*, the Supreme Court based its decision on "[f]our categories of evidence...." *See Flowers v. Mississippi*, 588 U.S. 284, 304 (2019). The categories of evidence, included: "(1) the history from Flowers's six trials showed the prosecution used 36 strikes against black prospective jurors in the first four trials, (2) five of six black jurors at the sixth trial were removed, (3) dramatically disparate

82

questioning of black and white prospective jurors at the sixth trial, and (4) the reasons for striking one black juror (Carolyn Wright) applied equally to similarly situated white jurors. *Id*. The Court also found a pattern of offering misstatements as reasons for strikes. *Id*. at 313–15.

Lastly, Respondents note that Knox also cites and relies on the judgment of the United States District Court for the Northern District of Mississippi in *Pitchford v. Cain*, 706 F. Supp. 3d 614 (N.D. Miss. 2023) *reversed by Pitchford v. Cain*, 2025 WL 227696 (5th Cir. Jan. 17, 2025). Doc. 113 at 78–81. He cites this lower court decision as authority that holds *Batson* objections are not subject to waiver. *See* Doc. 113 at 78–81. It does not. The Fifth Circuit has since reversed the Northern District's judgment in *Pitchford*. Not only that but the Fifth Circuit in *Pitchford* expressly reaffirmed its earlier ruling in *Chamberlin v. Fisher*, 885 F.3d 832, 838 (5th Cir. 2018) (en banc) that there is no "'*requirement* that a state court conduct a comparative juror analysis at all, let alone *sua sponte*.'" *See* 2025 WL 227696, at *6. The *Pitchford* court specifically noted that

> in *Chamberlin*, which held that a state court *need not* conduct a comparative juror analysis *where*, as *here*, a litigant *fails to raise* the argument *at trial. See, e.g., Chamberlin*, 885 F.3d at 838–39 (holding there is no "new procedural rule that state courts must conduct comparative juror analysis when evaluating a *Batson* claim").

*Id*. at *6 n. 9 (emphasis added).

Knox mistakenly relies on *Miller-El II*, *Snyder*, *Foster*, and *Flowers*. Those cases are exceptional cases. This case is not. This is not a case where the trial

court applied an erroneous legal standard; failed to conduct voir dire or recall a juror's demeanor; refused to conduct a comparative-juror analysis; or made an unreasonable judgment. And as the Fifth Circuit's decision in *Pitchford v. Cain*, makes crystal clear, Knox is simply wrong to rely on the district court's judgment. He has waived any argument that he did not make at trial in support of Claim One.[22] *See Pitchford*, 2025 WL 227696, at \*6; *Chamberlin*, 885 F.3d at 838.

Regardless, this Court should defer to the state trial court's *Batson* determination. Respondents address Claim One as the State did in *Knox III*, beginning with Knox's claim that the trial court violated the Sixth Amendment's fair cross-section requirement in addition to the prosecution engaging in racial and gender discrimination during jury selection.

## 1. Knox's Fair Cross-Section issue lacks merit.

Knox believes the state trial court erred in granting his motion for a change of venue and moving his trial to a county with fewer African-American residents. Doc. 113 at 86–91. He is mistaken. It is well-established that Knox's fair cross-section claim raises a Sixth Amendment issue. *See Holland v. Illinois*, 493 U.S. 474 (1990). The Sixth Amendment requires every defendant be fairly tried by an

---

[22] Briefly, Knox cites *Wardley v. State*, 760 So. 2d 774, 778 (Miss. Ct. App. 1999), where the Mississippi Court of Appeals held, in part, "that Wardley's counsel *could* and *did* waive his rights under *Batson v. Kentucky*." *Id*. (emphasis added). In *Wardley*, the Court of Appeals applied state law, which holds "'a party is bound by the acts of his attorney.'" *See id*. at 778 (quoting *Stringer v. State*, 627 So. 2d 326, 330 (Miss. 1993)). Respondents are unaware of the *Wardely* Court "not[ing]," at any point in its decision, as Knox claims, that "Such an agreement is improper." *See* Doc. 113 at 83 (purportedly quoting the *Wardley* decision).

impartial jury, which necessarily means that venires must be selected by using nondiscriminatory criteria and be comprised of individuals that fairly reflect the defendant's community. *See Powers v. Ohio*, 499 U.S. 400, 404 (1991). But the Sixth Amendment's fair-cross-section requirement does not extend to petit juries. *See Holland*, 493 U.S. at 487; *Taylor v. Louisiana*, 419 U.S. 522 (1975). "[T]here is no constitutional right to be tried by a jury that absolutely mirrors any particular community." *Berry v. State*, 882 So. 2d 157, 163 (Miss. 2004); *see Powers*, 499 U.S. at 404. And Knox's fair-cross-section claim has no bearing on whether the prosecution used a peremptory strike in a discriminatory manner. *See generally Holland*, 493 U.S. at 478, 480 (citing *Taylor*, 419 U.S. at 527).

Knox also fails to make a *prima facie* showing. A *prima facie* showing of a violation of a fair cross-section requirement violation must include the following elements:

1) the group alleged to be excluded is a "distinctive" group in the community;

2) the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and

3) this under representation is due to systematic exclusion of the group in the jury selection process.

*Simon v. State*, 688 So. 2d 791, 806 (Miss. 1997) (quoting *Lanier v. State*, 533 So. 2d 473, 477 (Miss. 1988) (quoting *Duren v. Missouri*, 439 U.S. 357, 364 (1979)). Knox's claim only includes the first element. His claim is based on the

assertion that African-Americans, collectively, are a distinct group of residents in Franklin County.

His claim, however, does not include the second or third elements of a *prima facie* fair cross-section requirement violation. Knox does not assert that the representation of black individuals on the venire panel was unfair or unreasonable in relation to the total number of registered voters in Franklin County. He cannot when he states that "Franklin County had a much smaller population, with only 8, 377 residents, and of those only 3,709 **(36.8%) were black**." Doc. 113 at 86 (emphasis in the original). As Knox all but admits, the venire, after the juror qualifications and for-cause challenges, consisted of a greater percentage of black venire members (37.8%), *see* Doc. 113 at 87, than the total percentage of all black Franklin County residents (36.8%), *see* Doc. 113 at 86.

As it concerns *Duren's* third element, Knox does not claim that registered black voters were systematically excluded and underrepresented in Franklin County jury pools, and for good reason. State law does not systematically exclude any distinct group from jury service. *Compare* Miss. Code Ann. §§ 13-5-23, 13-5-25 *with Taylor*, 419 U.S. at 531-33 (holding state law that automatically excludes women from jury service, absent express permission to serve, violated the right to be fairly tried by an impartial jury), *and Duren*, 439 U.S. at 364-67 (holding state law which exempted women from jury service, absent express request to serve, violated the right to an impartial jury trial). Knox's fair cross-section claim

is not relevant to his *Batson* claim. But even if it was, his fair cross-section claim has no merit.

### a. Knox's racial-discrimination issue has no merit.

The State will address Knox's race and gender discrimination issues separately in hopes of avoiding confusion. That said, Knox's racial-discrimination issue under Claim One because it has no merit. "The 'Constitution forbids striking even a single prospective juror for a discriminatory purpose.'" *Foster*, 578 U.S. at 499 (quoting *Snyder*, 552 U.S. at 478). *Batson v. Kentucky* provides the "three-step process for determining a claim of racial-discrimination in jury selection. Under *Batson*,

> a defendant must [first] make a prima facie showing that peremptory challenge has been exercised on the basis of race; second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question; and third, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination.

*Id*. (quoting *Snyder*, 552 U.S. at 476–77).

Knox's racial-discrimination issue focuses on *Batson's* third step. "[T]he trial court must determine whether the defendant has shown purposeful discrimination" at *Batson's* third step. The trial court considers the circumstances that may have a bearing on the issue of racial animus at *Batson's* third step and determines whether a strike was exercised with a discriminatory intent against black venire members. *See id*. This is a credibility determination. And the opponent of a strike must carry the heavy burden of showing purposeful

discrimination. *Johnson v. California*, 545 U.S. 162, 171 (2005). "'[D]etermining whether invidious discriminatory purpose was the motivating factor for exercising strikes demands a sensitive inquiry into such circumstantial ... evidence of intent as may be available.'" *Foster*, 578 U.S. at 501 (quoting *Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 266 (1977)). Some factors in an unexhaustive list that may support an inference of racial discrimination, include:

> (1) disparate treatment, that is, the presence of unchallenged jurors of the opposite race who share the characteristic given as the basis for the challenge; (2) the failure to voir dire as to the characteristic cited; ... (3) the characteristic cited is unrelated to the facts of the case; (4) lack of record support for the stated reason; and (5) group-based traits.

*Corrothers v. State*, 148 So. 3d 278, 305 (Miss. 2014) (quoting *Flowers v. State*, 947 So. 2d 910, 917 (Miss. 2007)); *see Miller-El II*, 535 U.S. at 240–66.

Review of a decision to deny a *Batson* challenge is, "in the absence of exceptional circumstances" highly deferential. *See Foster*, 578 U.S. at 500 (citing *Snyder*, 552 U.S. at 477). Absent exceptional circumstances, a trial court's decision will stand unless the record shows it is clearly erroneous. *Id.* "'Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.'" *Hernandez v. New York*, 500 U.S. 352, 369 (1991) (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 574 (1985)).

And speaking of fact-finding, "[t]he *Batson* issue before [this Court] turns largely on an 'evaluation of credibility.' … The trial court's determination is entitled to 'great deference,' … and 'must be sustained unless it is clearly erroneous….'" *Felkner v. Jackson*, 562 U.S. 594, 598 (2011). "That is the standard on direct review." *Id.* "On federal habeas review, AEDPA 'imposes a highly deferential standard for evaluating state-court rulings' and 'demands that state-court decisions be given the benefit of the doubt.'" *Id.* (quoting *Renico v. Lett*, 559 U.S. 766, 773 (2010)). "As a federal habeas court," this Court is "bound by the state [trial] court's factual findings, both implicit and explicit." *See Stevens v. Epps*, 618 F.3d 489, 499 (5th Cir. 2010) (internal quotation marks omitted) (quoting *Young v. Dretke*, 356 F.3d 616, 629 (5th Cir. 2004)).

During jury selection, the State used thirteen peremptory strikes and removed ten prospective black jurors—Mrs. Lenora Snyder, Ms. Telisha Hickingbottom, Mrs. Emma Jenkins, Mrs. Joyce Williams, Mr. Robert McCoy, Mrs. Cynthia Richardson, Mr. Henry Jones, Ms. Teresa Williams, Ms. Shelia Costley, and Mr. James Griffin. Doc. 72-3 at 138. Knox made a *Batson* challenge based on the number of prosecution strikes against black members of the venire. The trial court did not find a *prima facie* case of purposeful discrimination but asked the prosecution to state its race-neutral reasons out of an abundance of caution. Doc. 72-3 at 139–44. The prosecution stated its race-neutral reasons. Knox offered no rebuttal. Doc. 72-3 at 139–40. The trial court found the

89

prosecution's reasons were valid and race-neutral, denied Knox's *Batson* challenge, and seated a petit jury comprised of ten white jurors, two black jurors, and two white alternates.

### i.  *statistical evidence*

Knox claims that statistical evidence shows a strong *prima facie* case of racial discrimination. Doc. 113 at 89–90. He supports this claim with citations to census population statistics and his interpretations of handwritten notes, which appear on four sets of jury lists. *See* Doc. 113 at 91–93. The statistics that Knox offers as evidence of a *prima facie Batson* violation do not support his claim. First, the state trial court never found a *prima facie* case. So to the extent that Knox claims that a *prima facie* showing is a factor (at *Batson's* third step) that weighs in his favor, he's simply wrong.

The state-court record of Knox's 1999 capital-murder trial clearly reflects Knox making a race-based objection to eight peremptory strikes, and the trial court requiring the prosecution to state its reasons for ten strikes, "out of an abundance of caution and for the record." Doc. 72-3 at 138–40. But at no point in the record does the trial court find a *prima facie* case of racial discrimination. In fact, the record reads:

> BY THE COURT: ... Again, let the record show that, first of all, the Court *does not find -- is not finding* that the challenges by the State were exercised in a discriminatory fashion or appeared to be in such a way as to present a *prima facie* case to the Court....

Doc. 72-3 at 144 (emphasis added). Knox does not show the state court's factual finding is wrong by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1). The relative strength of a prima facie showing is not a factor to be weighed in this case.

In any event, Knox does not establish a *prima facie* case of racial discrimination with his statistical analysis. Doc. 113 at 86–91. Numbers, on their own, do not show an "invidious quality" of the prosecution's strikes that can "'ultimately be traced to a racially discriminatory purpose.'" *See Batson*, 476 U.S. at 93 (quoting *Washington v. Davis*, 426 U.S. 229, 240 (1976)); *United States v. Branch*, 989 F.2d 752, 755 (5th Cir. 1993) (explaining that "[a] prima facie case of racial discrimination requires a defendant to come forward with facts, not just numbers alone"). Knox's statistical analysis does not account for all relevant circumstances, suggest a pattern in the prosecution's strikes, or show a disparate impact on black jurors. Accordingly, his analysis does not raise an inference of racial discrimination.

Knox nevertheless attempts to analogize this case to Miller-El I. Doc. 89–90. His position is that the prosecution's use of its strikes is statistically similar to the *Miller-El* cases. In *Miller-El I*, the Supreme Court found the prosecution used peremptory strikes to remove 91% of the black jurors, who remained when the peremptory-strikes phase began. 537 U.S. at 331. There were 108 eligible jurors. *Id*. "Of the 108 possible jurors reviewed by the prosecution and defense, 20 were African-American. Nine of them were excused for cause or by agreement

of the parties. Of the 11 African-American jurors remaining, however, all but 1 were excluded by peremptory strikes exercised by prosecutors." *Id*.

Applying *Miller-El I's* analysis, 74 prospective jurors remained after juror qualifications. Of those 74 remaining prospective jurors, 27 were black. The trial court excused 4 prospective jurors for cause during individual and general voir dire. Three of those four were black. Of the 70 prospective jurors after jury qualifications and for-cause challenges, 24 (approximately 36%) were black. The prosecution used ten strikes to remove jurors who were black or 42% of the remaining eligible black jurors—a percentage that is not comparable to (less than half of) *Miller-El I's* 91%.

That said, Respondents' position is that Knox's population statistics are not accurate information for determining this issue. He relies on data that show the overall African-American population in Franklin County around the time of trial was approximately 36%. But, under state law, a prospective juror must be at least 21 years of age. Miss. Code Ann. § 13-5-1. Knox's data includes individuals under the age of 21—individuals who could not serve on a jury. So for example, Knox's 36% would be considerably less, approximately 24%, if the residents of Franklin County who were under 21 years of age are not considered. This population percentage more accurately reflects Franklin County's African-American population who could legally serve on a jury. Knox's population percentage is

considerably greater than the 24% of Franklin County's population who were black and old enough to serve on a jury.

Knox presents this statistical analysis, hoping the Court will assume that he has presented a strong prima facie case under *Batson*. He does not demonstrate a pattern of strikes resulting in disparate impact under the totality of relevant circumstances. And Knox offers no explanation for the prosecution's random acceptance of three black venire members. His statistical analysis does not raise an inference of racial discrimination.

Knox's analysis is based on fixed percentages, ratios, and venire compositions. He cannot use this analysis to establish a causal connection between an action and the reason for it because his analysis assumes that the prosecution is the only party whose decisions affect the venire's composition. Clearly, this is not situation facing the Court. Both parties' decisions affect the venire's composition. And one party's decisions directly affect the others' throughout jury selection. An analysis, like Knox's, could be relevant in an extremely controlled situation that involves one party with an identifiable motivation for making a decision that affected a fixed number of individuals for a fixed period of time.

For example, Knox's analysis could be relevant in a situation where an employer who downsized by terminating 10 of its 20 employees, comprised of 15 whites and 5 blacks who all perform the same task. If the employer downsized by

terminating all its black employees and only 5 white employees, then the employer's decisions could raise an inference of racial discrimination. In that situation, the employer terminated 33.33% of its white employees and 100% of its black employees when it could have accomplished the same goal without eliminating its black employees. This analysis suggests race is a possible reason for the employer's decisions. It establishes a causal connection between the employer's terminations and the reason for those terminations.

Knox's analysis does not account for the variables in jury selection. A reviewing court reads words sitting on a page. It does not directly observe the proponent of a strike deliver the reasons for exercising a strike or the subtle nuances that may compel a party to remove a prospective juror. More often than not, a combination of factors leads to the use of a strike. These factors may, and frequently do, change over the course of jury selection. The weight of any given combination of factors is also variable and frequently depends on the number of strikes a party has at its disposal. Because it does not account for these variables, Knox's analysis does not establish any causal connection between the prosecution's strikes against black jurors and any reason for those strikes. His analysis will not support an inference of racial discrimination and cannot establish a prima facie case.

But even if the Court disagrees, the discussion above shows that the percentage of eligible black venire members remaining after juror qualifications

94

and for-cause challenges mirrors Knox's population percentage (36%) when *Miller-El I's* analysis is applied. And the petit jury's composition would have been 25% black had Knox not removed one of the three black jurors the prosecution tendered. This jury composition (25%), while less than Knox's population percentage, would have been statistically insignificant and entirely unlike Miller-El's jury-composition statistics.

### ii. *retrospective comparative juror analysis*

According to Knox, side-by-side comparisons of similarly situated venire members show the prosecution's reasons for eight peremptory strikes against black venire members are pretexts. Knox says these side-by-side comparisons show the prosecution's reason(s) for a given strike applied to similarly situated white venire members, who the prosecution accepted. Doc. 113 at 83–85, 99–125, 127–29. They do not. Courts use side-by-side comparisons of jurors to identify discriminatory treatment. "If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination." *Miller-El II*, 545 U.S. at 241. But as an analytical tool, the side-by-side comparison's utility is severely diminished in § 2254 cases—particularly those where the prisoner offers information for the first time in his federal habeas proceedings.

"[R]etrospective comparison of jurors based on a cold appellate record may be very misleading when alleged similarities were not raised at trial."

95

*Chamberlin v. Fisher*, 885 F.3d 832, 841–42 (5th Cir. 2018) (quoting *Snyder*, 552 U.S. at 483). For that reason, the Court should "'assess the plausibility of that reason in light of all evidence with a bearing on it[,]'" and "'be mindful that an exploration of the alleged similarities at the time of trial might have shown that the jurors in question were not really comparable.'" *Id.* at 841–42 (quoting *Miller-El II*, 545 U.S. at 251–52; *Snyder*, 552 U.S. at 483). Knox fails to show any of the prosecution's reasons for a peremptory strike against a black venire member was pretext for a race-based strike.

**Robert McCoy.** During voir dire, the prosecution asked: "Is there anyone here who either themselves, a family member, or a close personal friend has ever been charged with a crime?" Doc. 72-3 at 121. Robert McCoy was one of ten venire members to raise his hand. Doc. 72-3 at 122. Later during voir dire, defense counsel asked whether any venire member had friends who worked in law enforcement in either Franklin or Amite Counties. Doc. 72-3 at 129. McCoy also responded in the affirmative to this question. Doc. 72-3 at 130. The prosecution gave the following reasons for striking McCoy: "He indicated on questioning during voir dire that he either himself, a close family member, or a relative had been charged with a crime or a close personal friend had been charged with a crime and he also indicated that he was related somewhat to law enforcement." Doc. 72-3 at 141.

Both reasons for striking Mr. McCoy are race-neutral. The prosecution's first stated reason for striking Mr. McCoy—that McCoy, a family member, or close friend had been charged with a crime—is. *See Parker v. Cain*, 2008 WL 453096, at *12 (E.D. La. 2008) (unreported) (finding that potential juror "was under two separate subpoenas, including one pending misdemeanor criminal charge"—was a race-neutral reason for a peremptory strike). Knox says this reason is "over inclusive" and "would apply to an individual whose best friend was charged with shoplifting twenty years ago when they were in fifth grade, as well as to someone whose spouse was convicted of murder two weeks ago. One cannot reasonably assume that a panelist who answered the question in the affirmative would be biased." Doc. 113 at 102. He does not address the prosecution's second reason—that a relative worked in law enforcement.

According to Knox, the prosecution accepted Mrs. Jack Buie after she affirmatively responded to the question concerning criminal charges against herself or others. Doc. 113 at 103–04. But Mrs. Buie, unlike Mr. McCoy, did not indicate any relationship with local law enforcement. If a peremptory strike was exercised for multiple reasons, that a juror may have some similar characteristics with a struck juror is not proof that shows those reasons are pretextual. *See Stevens*, 618 F.3d at 500; *Moore v. Keller Industries, Inc.*, 948 F.2d 199, 202 (5th Cir. 1991). Knox offered the prosecution's jury selection list as evidence that shows Mrs. Buie was a white female for the first time in *Knox III*. XXXX. Even

97

assuming that his interpretation of the prosecution's jury lists is correct and properly before the Court, it does not make Mrs. Buie comparable to Mr. McCoy. The prosecution gave two reasons, not one, for striking Mr. McCoy; and one of them does not apply to Mrs. Buie.

Respondents would also point out the fact that the prosecution struck Francis Griffin, a white female panelist, because she responded in the affirmative to the question concerning criminal charges against herself or others. Doc. 72-3 at 38, 122, 141. This fact "adds strength to the prosecutor's reason and shows consistency of action along racially neutral lines." *Woodward v. State*, 726 So. 2d 524, 531 (Miss. 1997) (citation and quotation marks omitted). The fact that the prosecution struck both Mr. McCoy and Ms. Griffith for answering a question the same way is proof that Knox's racial-discrimination issue must fail.

Knox also argues that the prosecution's second reason for striking Mr. McCoy—that one of his friends was a State Trooper—is merely a pretext. Doc. 113 at 103–04. He supports this argument by pointing out that Richard Freeman was white, accepted by the State, and had two friends in law enforcement. *See* Doc. 113 at 103–04. Again, the prosecution proffered two reasons for striking Mr. McCoy. The record does not show Mr. Freeman responding to the prosecution's question concerning criminal charges against self or others. Freeman and McCoy are not comparable. And Knox's assertions to the contrary are not evidence of racial discrimination.

98

*Cynthia Richardson.* The record shows the prosecution proffered one reason for removing Cynthia Richardson—that "[i]t was obvious to [the prosecution] that she did not want to serve on this jury...." Doc. 72-3 at 141. Knox contends this reason is merely a pretext for racial discrimination. *See* Doc. 113 at 104–06. As evidence, he cites the fact that the prosecution accepted Lonny Priest, a white male, after he identified himself as a prospective juror who had served on a justice-court jury months earlier. *See* Doc. 113 at 105–06.

The record clearly shows the counsel for the prosecution believed Mrs. Richardson was not committed to serving as a juror based on their in-court observations. This is a race-neutral reason. *See U.S. v. Turner*, 674 F.3d 420, 436 (5th Cir. 2012) (recognizing a party's observations can be a proper basis for removing a prospective juror). The record does not show the prosecution removing Mrs. Richardson because of her prior jury service or accepting Mr. Priest over any reservations with his commitment to serve. The two are not comparable.

Knox now argues the prosecution's reason for striking Mrs. Richardson is based on exaggeration or misrepresentation of her conduct and statements in voir dire. *See* Doc. 113 at 104–05. The prosecution's demeanor-based reason for striking Mrs. Richardson is race-neutral. *See Rice v. Collins*, 546 U.S. 333, 341 (2006). Knox cannot show the prosecution's reason was based on a gross misrepresentation based on the record. He can only speculate about what counsel for the prosecution, those who were present, observed at trial. Knox's speculation

99

is not evidence, much less proof that shows the strike against Mrs. Richardson was pretextual. *See id.* And a reason for a peremptory strike, which is facially race-neutral, is presumptively valid unless and until proven otherwise. Knox's speculation does not rebut the section 2254(e)(1)'s presumption. *See id.*

A couple of other points should be noted. One is that Knox adds nothing new to his complaint about the strike used to remove Mrs. Richardson to the arguments made in *Knox II*. So to the extent that Knox specifically argues PCR counsel was ineffective for failing to present this "factor" in *Knox II*, his IAPCC claim fails. Knox cannot establish constitutionally deficient performance. The second noteworthy point is that Claim One fails on this issue because Knox fails to rebut section 2254(e)(1)'s presumption of correctness by clear and convincing evidence as it concerns the trial court's credibility determinations. This Court is bound by the state trial court's implicit and explicit factual findings. *See Stevens*, 618 F.3d at 499 (quoting *Young*, 356 F.3d at 629). The record shows the trial court evaluated the prosecution's credibility and found this reason for removing Mrs. Richardson was race neutral. *See* Doc. 72-3 at 141–42.

**Teresa Williams.** The prosecution removed Teresa Williams for three reasons—all found to be race-neutral. Doc. 72-3 at 142. She appeared young. *See Rice*, 546 U.S. at 341. She was unresponsive to questioning during voir dire. *See Stevens*, 618 F.3d at 500 (a prospective juror's unresponsiveness to voir dire questions is a race-neutral reason) (citing *Woodward v. Epps*, 580 F.3d 318, 340

(5th Cir. 2009)). She appeared to be inattentive and falling asleep during voir dire. *See id.* (a prospective juror's inattentiveness is a race-neutral reason).

Knox claims the prosecution's reason, that Ms. Williams appeared young, is a pretext for discriminatory intent because it accepted Richard Cummins and Ronald Ellsworth. *See* Doc. 113 at 106–07. The record reflects the prosecution's mistaken belief that Ms. Williams was younger than 28. *See* Doc. 72-3 at 141. Still, it is true that Cummins and Ellsworth were 29 and 36, respectively. But the prosecution gave three reason for striking Ms. Williams. Knox addresses only one of the three. So Ms. Williams is not comparable to Cummins or Ellsworth. *See Stevens*, 618 F.3d at 500–01. The same is true of Knox first-ever contentions about the ages of Jurors Scott, Dean, Waldron, McMillian, and McDaniels. *See* Doc. 113 at 107.

As for her unresponsiveness, the record shows that Ms. Williams had ample opportunity to respond to the prosecution's voir dire questions. The prosecution asked 29 questions during its voir dire. Some were clarifying questions that had been directed to individual white and black venire members. Ms. Williams had multiple opportunities to actively participate in voir dire. She was not subjected to individual voir dire because she was not one of the jurors who expressed reservations with the death penalty. It is also worth nothing that the record shows Ms. Williams understood how and when to identify herself in the event she needed to respond to a voir dire question. *See* Doc. 72-3 at 97. The prosecution's reasons

for striking Ms. Williams are race neutral. *See Rice*, 546 U.S. at 341; *Stevens*, 618 F.3d at 500–01.

Also, Knox's comparative juror analysis only addresses one of the three reasons supporting this strike, Ms. Williams's age. Doc. 113 at 106–07. So his contentions about Ms. Williams being a black venire person comparable to any white male venire members. *See Stevens*, 618 F.3d at 500. All three reasons are facially, race neutral.

Plus, all three reasons are also valid because Knox fails to rebut the presumption of correctness concern the trial court's finding the state's reasons were unchallenged and race neutral, *see* Doc. 72-3 at 141–42, much less proof that shows the strike against Ms. Williams was pretextual. The record shows the state trial court found the reasons for removing Ms. Williams were race neutral. *See* Doc. 72-3 at 141–42. Those reasons are valid. *See Rice*, 546 U.S. at 341; *Stevens*, 618 F.3d at 500, 501. And because Knox does not rebut section 2254(e)(1)'s presumption of correctness, the Court is bound by the state trial court's implicit and explicit factual findings. *See Stevens*, 618 F.3d at 499 (quoting *Young*, 356 F.3d at 629). Claim One fails on Knox's contentions with the strike against Ms. Williams.

***Henry Jones.*** The prosecution gave more than one reason for striking Henry Jones. Mr. Jones was unresponsive during voir dire. Doc. 72-3 at 142. This demeanor-based reason is facially valid. *See Rice*, 546 U.S. at 341. The

prosecution also believed Mr. Jones's age and appearance might make him more sympathetic to the Defense. Doc. 72-3 at 143. Mr. Jones was about the same age as Knox. Doc. 72-3 at 142–43. And he had an unusual hair style like Knox. Doc. 72-3 at 142. The prosecution's age-and-appearance based concerns about Mr. Jones's personal biases towards the Defense are valid reasons for striking a venire member. *See Rice*, 546 U.S. at 341; *Purkett v. Elem,* 514 U.S. 705, 769 (1995) (growing long hair "is not a characteristic that is peculiar to any race"); *Turner*, 674 F.3d at 436 ("intuitive assumptions, inarticulable factors, or even hunches can all be proper bases for rejecting a potential juror, even in the *Batson* context"). Like the two before this issue, Knox fails to show comparative-juror evidence that suggests the strike against Mr. Jones was pretextual. *See Stevens*, 618 F.3d at 500.

Claim One also fails on Knox's issue with the strike against Mr. Jones because Knox fails to rebut section 2254(e)(1)'s presumption of correctness. *See* Doc. 113 at 108–11. The state trial court found the prosecution's reasons were unchallenged and race neutral, *see* Doc. 72-3 at 141–42. Those reasons are valid. *See Rice*, 546 U.S. at 341; *Purkett,* 514 U.S. at 769; *Turner*, 674 F.3d at 436. Knox offers conjecture, not proof of a pretext. Knox does not, and cannot, rebut section 2254(e)(1)'s presumption of correctness. Because he does not, the Court is bound by the state trial court's implicit and explicit factual findings. *See Stevens*, 618 F.3d at 499 (quoting *Young*, 356 F.3d at 629).

*James Griffin.* Knox takes issue with the reason for the strike used against James Griffin. Doc. 113 at 111–12. The record shows the prosecution removed Mr. Griffin because Mr. Max Graves, an attorney on Knox's defense team, had previously represented him. Doc. 72-3 at 144. The prosecution did not exercise a strike against Sally Wallace even though she had been represented by Mr. Graves or hired him to perform legal work in the past, *see* Doc. 72-3 at 53. Knox argues that the prosecution's reason for striking Mr. Griffith constitutes evidence of racial discrimination because the prosecution accepted Ms. Wallace Doc. 113 at 111–12. Knox also argues the fact that the prosecution accepted Denver Goodson, who was related to Mr. Graves, amounts to a pretext for racial discrimination. Doc. 113 at 112.

Neither comparison shows disparate treatment. The Court "must 'assess the plausibility of [those] reason[s] in light of all evidence with a bearing on it[,]'" and "'be mindful that an exploration of the alleged similarities at the time of trial might have shown that the jurors in question were not really comparable.'" *See Chamberlin*, 885 F.3d at 841-42 (quoting *Miller-El II*, 545 U.S. at 251-52; *Snyder*, 552 U.S. at 483). Here, the record reveals that, unlike Mr. Griffin, Ms. Wallace and Mr. Goodson had not served as jurors in a criminal trial. Doc. 72-3 at 102.

This record fact is a "crucial difference" between Mr. Griffin and Ms. Wallace and Mr. Goodson that reasonably explains why the prosecution would have kept Ms. Wallace and Mr. Goodson. *See Chamberlin*, 885 F.3d at 842. It

tends to show that Ms. Wallace and Mr. Goodson were more favorable to the prosecution because it was less likely that either one had preconceived notions of what their duties as jurors in a criminal trial would be or that they harbored bias towards the prosecution. That the prosecution devoted a considerable amount of its voir dire to determining which panelists had previously served as jurors and understood the role of a juror in a criminal trial, *see* Doc. 72-3 at 101–10, and noted that Ms. Cynthia Richardson had previously served on a criminal jury are facts that support this conclusion, *see* Doc. 72-3 at 141, only supports this point. They are not evidence of a pretext. *See Harper v. Lumpkin*, 64 F.4th 684, 697–98 (5th Cir. 2023).

Claim One fails on Knox's issue with the strike against Mr. Griffin because Knox does not rebut section 2254(e)(1)'s presumption of correctness. *See* Doc. 113 at 108–11. The state trial court found the prosecution's reasons were unchallenged and race neutral, *see* Doc. 72-3 at 141–42. Those reasons are valid. *See Rice*, 546 U.S. at 341; *Purkett,* 514 U.S. at 769; *Turner*, 674 F.3d at 436. Knox offers conjecture, not proof of a pretext. Knox does not, and cannot, rebut section 2254(e)(1)'s presumption of correctness. *See* Doc. 113 at 108–11. So the Court is bound by the state trial court's implicit and explicit factual findings. *See Stevens*, 618 F.3d at 499 (quoting *Young*, 356 F.3d at 629).

***Lenora Snyder.*** The prosecution removed Ms. Lenora Snyder, believing she held views against the death penalty. During the *Batson* hearing, the prosecution explained that:

> As to number seven, Mrs. [Snyder], in the course of the voir dire, Your Honor, she was sitting on the front row directly in front of counsel table for the state, and at the instance that the Court advised the jury that it was, in fact, a death penalty case there was a drastic reaction on her part. Rolled her eyes, became rather pained in her appearance. Made eye contact with the prospective juror sitting next to her who was also doing somewhat the same thing, and then did not raise her hand on any questions pertaining to the death penalty but it was apparent to myself as well as others that I spoke with that she had a serious reaction to the knowledge of that being the case and because of that, we were very much concerned about her thoughts on the death penalty. Juror number eight, Ms. Higgonbottham [sic], was, in fact, the juror sitting next to Mrs. [Snyder] that I indicated made eye contact with her and also reacted to it.

Doc. 72-3 at 139–40.

Knox argues the prosecution's reasons for removing Ms. Snyder are pretextual because it did not seek to individually voir dire her about her views on the death penalty. Doc. 113 at 113–19. He does not identify any white juror who was similarly situated, makes no comparison with a similarly situated white juror, and fails to offer any evidence of pretext. *See Stevens*, 618 F.3d at 500–01. Nevertheless, the State submits that both of the prosecution's reasons for striking Ms. Snyder are race-neutral. *See Rice*, 546 U.S. at 341; *Stevens*, 618 F.3d at 500–01 (demeanor-based reasons are race neutral reasons).

Knox's argument fails to account for the fact that only the prospective jurors who identified themselves in response to questions about views on the death penalty were subjected to individual voir dire. Doc. 72-3 at 37–50, 56–57, 59–95. The record reflects the reason the trial court did not subject Ms. Snyder to individual voir dire is because she did not identify herself as an individual who could not objectively consider imposing the death penalty. Even after individual voir dire, the prosecution asked whether there were individuals who, after further reflection, opposed the death penalty or had conscientious scruples against it. Doc. 72-3 at 119. No prospective juror, including Ms. Snyder, responded.

Despite these facts, Knox argues the prosecution's concern with Ms. Snyder's personal views were baseless because she did not indicate any opposition to the death penalty. *See* Doc. 113 at 113–14. As noted above, Knox fails to identify any similarly situated white juror who the prosecution accepted. He insists that the prosecution should have pressed Ms. Snyder in open court about her views on the death penalty. Doc. 113 at 115–19. And he ignores state law that holds a trial court's finding that no *Batson* violation occurred where the prosecution removed prospective jurors, who were not individually questioned after indicating opposition to the death penalty. *See Corrothers*, 148 So. 3d at 309.

Claim One fails on Knox's issue with the strike against Ms. Snyder because Knox does not rebut section 2254(e)(1)'s presumption of correctness. *See* Doc. 113 at 111–19. The state trial court found the prosecution's reasons

were unchallenged and race neutral, *see* Doc. 72-3 at 141–42. Those reasons are valid. *See Guidry v. Lumpkin*, 2 F.4th 472, 484 (5th Cir. 2021) (quoting *Purkett*, 514 U.S. at 769). Knox offers conjecture, not proof of a pretext. *See* Doc. 113 at 111–19. Knox does not, and cannot, rebut section 2254(e)(1)'s presumption of correctness. *See Guidry*, 2 F.4th at 484. So the Court is bound by the state trial court's implicit and explicit factual findings. *See Stevens*, 618 F.3d at 499 (quoting *Young*, 356 F.3d at 629).

   ***Telisha Hickingbottom.*** The prosecution removed Ms. Telisha Hickingbottom because it believed she held views against the death penalty and one of her relatives had been previously charged with a crime, which Ms. Hickingbottom failed to disclose. As it concerns the prosecution's death-penalty-views reason, the State incorporates by reference its previous arguments made in response to the allegations related to Mr. McCoy and Ms. Snyder. Knox offers no evidence, *see* Doc. 113 at 120–23, of pretext related to the strike against Ms. Hickingbottom for the same reasons.

   ***Shelia Costly.*** The record reflects that the prosecution removed Ms. Costly, believing that she "had a drinking problem …" and was potentially biased against the State because "law enforcement had [recently] made a drug purchase from her brother…." Doc. 72-3 at 144. Knox argues both reasons are pretextual, without citing any authority or making any comparison with a similarly situated white juror. Doc. 113 at 123–25. For the same reasons those before it are valid.

Knox's retrospective comparative-juror analysis issue fails to identify any evidence of racial discrimination in jury selection. The record reveals the white jurors who were accepted by the prosecution were not similarly situated white venire members. Knox fails to show the trial court erred in denying his *Batson* objection at trial.

### iii. *disparate questioning*

Knox makes no showing (certainly not a persuasive showing) of disparate questioning during voir dire. Instead, he makes bald assertions, such as the prosecution "asked the white male panelists very few questions during voir dire." Doc. 113 at 101. "[T]he prosecutor's questions and statements during voir dire examination and in exercising his challenges may support or refute an inference of discriminatory purpose." *Batson*, 476 U.S. at 97. In this case, the prosecution's voir dire questions do not support an inference of discriminatory intent.

The trial court conducted juror voir dire in two phases—individual and group voir dire. It began group voir dire by generally questioning the venire about qualifications, statutory privileges, and potential bias stemming from the prospective jurors' familiarity with the case, counsel for the parties, law enforcement officers, and witnesses. *See* Doc. 72-3 at 39–95. The trial court also conducted individual voir dire of several prospective jurors on their ability to consider death as a potential sentence. *See* Doc. 72-3 at 57–95.

After the trial court's voir dire, the prosecution briefly discussed the State's burden of proof and the possible courses of the bifurcated trial. It then asked the venire general questions and frequently followed them with additional clarifying questions of individual venire members. The prosecution's follow-up questions were directed to both white and black jurors, who had identified themselves in response to a general question. The prosecution could not ask white males questions during individual voir dire because none indicated his beliefs would impede his ability to serve.

There is nothing pretextual about the prosecution's questioning during group voir dire. *See* Doc. 72-3 at 95–123. And Knox does not show otherwise. For example, the Supreme Court, in *Flowers*, found disparate questioning during voir dire was a factor that supported an inference of pretext. *See* 588 U.S. at 308. The record in that case showed "[t]he State asked … five black prospective black jurors who were struck a total of 145 questions." *See id.* The *Flowers* record also showed "the State asked the 11 seated white jurors a total of 12 questions." *See id.* The disparate-questioning facts in *Flowers* are not present in this case. They do not appear in the record, and Knox fails to show otherwise. And the record does not support Knox's disparate-questioning allegations because they do not account for the juror-selection procedure (group and individual).

Knox's assertions fail to show disparate questioning is a factor that will support an inference of racial discrimination. The facts in the state court record

show the prosecution asked general voir dire questions and follow-up questions of both black and white venire members about their views on the death penalty. The facts in this case also show the prosecution did not ask white males questions during individual voir dire because none of them indicated their ability to serve as juror was compromised by their personal views on the death penalty. So Knox's assertions about disparate questioning amount to nothing more than conjecture.

Relatedly, Knox argues the prosecution intentionally avoided asking follow-up questions to its general question of whether any prospective juror had been charged with a crime or knew anyone who had. *See* Doc. 113 at 121–24. He contends that the prosecution used this general question to generate a facially race-neutral reason for striking black venire members. *See* Doc. 113 at 23–24. In support, he cites pages 118 through 119 of the Trial Transcript. Doc. 113 at 121–22. But a more thorough review of the Trial Transcript belies this argument.

Beginning on page 118, the Trial Transcript shows the prosecution asked the venire members to indicate if "either themselves, a family member, or a close personal friend ha[d] ever been charged with a crime[.]" Doc. 72-3 at 121. Prospective Jurors 16, 17, 18, 20, 33, 42, 43, 44, 48, 59, 62, 66, and 72 identified themselves in response. Doc. 72-3 at 122. The prosecution then singled out prospective juror 48 because he was the last to respond and asked him to answer two follow-up questions. Doc. 72-3 at 122. "Can you disregard that experience whatever it was, positive, negative, or whatever and base your decision today

solely on the evidence as you hear it from this witness stand?" Doc. 72-3 at 122.

"And you can keep that other problem from entering into your thoughts whatsoever in this matter?" Doc. 72-3 at 123. Juror 48 answered both in the affirmative. Doc. 72-3 at 123.

At that point, the prosecution addressed the other identifying venire members

> The rest of you heard the questions I'm asking and you see what it is. Again, you know, there's nothing wrong if you feel like it would be a problem. Some people have a bad experience in a situation like this that's just hard for them to get over, be it themselves, family member or whatever. Is there anyone of those that raised their numbers that feel like they won't be able to do that. That they won't be able to disregard that previous experience and base their decision solely on the evidence as they hear it from the witness stand today? Anyone?

Tr. 123. There was no response. Doc. 72-3 at 123.

In arguing the prosecution chose not to conduct a thorough voir dire, Knox conflates reasons for exercising a for-cause challenge with reasons for exercising a peremptory strike. They are not the same. A reason for exercising a peremptory strike "'need not rise to the level of justifying exercise of a challenge for cause....'" *Lockett v. State*, 517 So. 2d 1346, 1352 (Miss. 1987) (quoting *Batson*, 476 U.S. at 97. Knox argues the prosecution should have pressed black and female venire members with more questions about their ability to put aside personal biases stemming from past personal or third-party experiences with the District Attorney's Office. He makes this argument even

112

though the record shows the identifying venire members were unequivocal in their silence.

This is a Catch-22 argument. Had the prosecution asked more follow-up questions, as Knox now says it should have, he would almost certainly be arguing those follow-up questions are proof of disparate questioning. In any event, Knox does not rebut the state trial court's factual findings, express and implicit, by demonstrating disparate questioning. Disparate questioning is not a factor that will support an inference of racial discrimination in this case.

### iv. *history of racial discrimination*

Nothing about the prosecutors' conduct or policies of the District Attorney's Office in 1999 raises an inference of racial discrimination. Knox does not offer any evidence to suggest otherwise. He offers what he purports to be the prosecution's list venire members and attempts to bridge several gaps between the facts in this case and those in *Foster v. Chatman*. Doc. 113 at 76–77; 134–35 (citing Doc. 85-55). This is not evidence of a history or racial discrimination in the District Attorney's Office at the time of Knox's capital-murder trial.

Respondents discussed *Foster* above. But it bears repeating the evidence before the Supreme Court in *Foster* included:

> (1)    Four copies of the jury venire list. On each copy, the names of the black prospective jurors were highlighted in green. A legend in the upper right corner of the lists indicated that the green highlighting "represents Blacks." ... The letter "B" also appeared next to each black prospective juror's name.

....

(2)    A draft affidavit that had been prepared by [an investigator] "at [the DA]'s request" for submission to the state trial court in response to Foster motion for a new trial.... The typed draft detailed [the investigator]'s views on ten black prospective jurors....

....

(3)    Three handwritten notes on black prospective jurors Eddie Hood, Louise Wilson, and Corrie Hinds. Annotations denoted those individuals as "B#1," "B#2," and "B#3," respectively.

....

(4)    A typed list of the qualified jurors remaining after voir dire.... It included "Ns" next to ten jurors' names, which ... "signified] the ten jurors that the State had strikes for during jury selection." ... Such an "N" appeared alongside the names of all five qualified black prospective jurors.... The file also included a handwritten version of the same list, with the same markings.

....

(5)    A handwritten document titled "definite NO's," listing six names. The first five were those of the five qualified black prospective jurors.

....

(6)    A handwritten document titled "Church of Christ." A notation on the document read: "NO. No Black Church."

....

(7)    The questionnaires that had been completed by several of the black prospective jurors. On each one, the juror's response indicating his or her race had been circled....

*Foster*, 578 U.S. at 495 (internal citations omitted) (some alterations added). This list of documents does not include the testimony related to the documents above or the Supreme Court's findings from its review of the record in *Foster*. In other words, the documents above represents some of the evidence before the Court in *Foster*.

114

There simply is no comparison between the venire lists in this case, *see* Doc. 85-55, and the four copies of venire list in *Foster*. For example, there is no legend for deciphering abbreviations on the venire lists in this case like the legend found on all four copies of the venire list in *Foster*. *See* Doc. 85-55. This Court will have to rely on Knox's speculation about notations on his venire lists to reach the same conclusion as the Supreme Court's in *Foster*. Two of Knox's four venire lists contain highlighted names, but they are not similar to the highlighted names in *Foster*. *Compare* Doc. 85-55 *with Foster*, 578 U.S. at 493 (noting "the names of the black prospective jurors were highlighted in bright green" and that a "legend in the upper right corner of the lists indicated that the green highlighting 'represents Blacks'" (citation omitted)). In this case, the prosecution highlighted the names of the jurors who were seated. Doc. 85-55 at 001–03, 010–12. His first and third lists indicate the race and gender of all 74 prospective jurors who remained after jury qualifications Doc. 85-55 at 001–05, 010–14, not just black venire members as in *Foster*. *See* 578 U.S. at 495. His second list contains four notations—three notations read, "over 65" and one states, "excused." Doc. 85-55 at 006, 008, 009. All four appear to be in the same handwriting as the "Circuit Clerk's" note that appears on the top of all four lists. All four notations are consistent with facts in the record.

Along with the obvious physical differences, nothing before the Court even slightly suggests the four venire lists in this case are evidence of pretext like those

115

in *Foster*. Unlike *Foster*, there is no evidence that shows Knox's lists were created prior to trial. Unlike *Foster*, there is no evidence that shows the prosecution circulated any list within the Franklin County District Attorney's Office for the purpose of generating reasons supporting strikes. Unlike *Foster*, there is no indication the prosecution solicited third-party opinions for any prospective juror. Unlike *Foster*, the venire lists do not single out black venire members in any way. And unlike *Foster*, the notes appearing on these lists are supported by the facts in the record.

Respondents would also call attention to Knox's fourth venire list. It indicates the race and gender of those prospective jurors who were excused or attempted to be excused before the peremptory-strike phase began. *See* Doc. 85-55 at 015–18. This list tracks the trial court's on-the-record findings and observations during jury selection. Looking to the record, the trial court noted that Isaac Vanderson was "a black male." Doc. 72-3 at 11. The trial court expressly found Johnny D. Lofton was "a white male" and Jackie Calcote was "a white female." Doc. 72-3 at 15. The trial court, at defense counsel's request, confirmed that Rendell Wilson and James Leggett were black males, and Cynthia Richardson and Jeanette Hunt were black females. *See* Doc. 72-3 at 17, 21, 33, 66. The trial court identified Annie Gills, Mildred Lane, and Nancy Collins as black females. Doc. 72-3 at 25, 26, 29. Earl Smith was a "white male," who was excused. Doc. 72-3 at 33.

116

Lexie Miller, Ornsby Jenkins, Jr., Lonnie Priest, and Marshall Smith are the exceptions. As it concerns those venire members, the record contradicts Knox's pretext assertions about the prosecution's venire lists. The record reflects the race (African-American) and gender for Ms. Miller and Mr. Jenkins, Jr. Doc. 72-3 at 7, 10–11, but the prosecution's lists do not, *see* Doc. 85-55 at 015. The opposite is true for Mr. Priest and Mr. Marshall Smith. The record does not identify their race (Caucasian) or gender, *see* Doc. 72-3 at 17, 18–19, but the prosecution's venire lists do, *see* Doc. 85-55 at 015, 018. Knox also seems to suggest the fact that the prosecution accepted three black venire members is insignificant. *See, e.g.*, Doc. 113 at 88, 135. It is not. Knox has no response to or explanation for this fact and does not directly address it, perhaps in hopes of downplaying its significance. Regardless, the fact that the prosecution accepted three black venire members is strong evidence that severely undercuts the racial-discrimination assertions under Claim One.

### b. Knox's gender-discrimination issue has no merit.

Knox also claims the prosecution's strikes exercised against female prospective jurors were based on gender discrimination. Doc. 113 at 125–26. This issue has no merit. Courts use *Batson's* analysis to determine *J.E.B.* claims. *See J.E.B.*, 511 U.S. at 144. Under *Batson's* analysis, Knox must make a *prima facie* showing of gender discrimination with respect to a specific strike the prosecution used against a female venire member.

117

### i. *statistical evidence*

Knox cannot clear *Batson's* first step. The trial court did not find Knox had made a *prima facie* showing of gender discrimination in jury selection because Knox did not make a gender-discrimination objection at trial. He did not (explaining that the *Batson* inquiry ends unless the trial court finds a *prima facie* showing of purposeful discrimination) (citing *J.E.B.*, 511 U.S. at 145). Still, he argues that the prosecution exhibited a clear pattern of striking female venire members. He says the prosecution "wanted to minimize the number of females on the jury." Doc. 113 at 126; *zee* Doc. 113 at 90, 99. Knox believes census data support his expectation that the jury composition should have consisted of approximately one-third fewer males. *See* Doc. 113 at 87–89. And based on that belief, Knox argues the fact that his jury was comprised of 50% males is evidence of gender discrimination because his jury's composition did not accurately reflect the gender demographics of Franklin County around the time of trial and the fact that the state used ten peremptory strikes against female venire members as evidence that establishes his *prima facie* showing. *See* Doc. 113 at 87–89.

The record shows the prosecution removed ten females during voir dire. Doc. 72-3 at 137. On its own (or coupled with statistical data), that fact does not raise an inference of discriminatory intent. It certainly does not when the facts in this case are considered. For example, the prosecution tendered thirteen females

118

during jury selection, and Knox struck five potential jurors and one alternate. Both alternates were female, and the prosecution tendered one of them. As noted above, Knox's jury was comprised of six females and six males. Doc. 72-3 at 137. The facts show his five strikes against female potential jurors directly affected the jury's composition. Had Knox not exercised the five strikes against female potential jurors, his jury would have been comprised of eleven female jurors and a lone male juror.

Statistical data or no, the number of peremptory strikes (10) the prosecution exercised against female venire members at trial is not a fact that raises an inference of purposeful discrimination. This is particularly true considering the facts in this case that have a bearing on the issue of gender animus. Knox does not address these facts because they directly contradict his assertions. And he fails to make a *prima facie* showing of gender discrimination, especially when those facts are considered. Either way, the relative strength of a *prima facie* gender-discrimination case is not a factor that will support an inference of discriminatory intent in this case.

### ii. *retrospective comparative juror analysis*

Knox's gender-based retrospective comparative juror analysis does not show purposeful discrimination against female venire members and is not a factor this Court should find weighs in Knox's favor.

119

***Margaret Palmer, Francis Griffin, and Janet Wright.*** Knox's gender-discrimination issue under Claim One as it concerns female venire members Palmer, Griffin, and Wright must fail. Knox cannot carry his burden to prove purposeful discrimination because he did not object to these strikes at trial. Knox did not clear *Batson's* first step as it concerns these three strikes. He did not make a *prima facie* showing of gender discrimination. The prosecution was not required to clear *Batson's* second step before Knox cleared its first step for each of these three strikes. The reason the prosecution did not give reasons for its strikes against Palmer, Griffin, and Wright is simple: gender-discrimination in jury selection was not an issue at trial.

So now, Knox cannot prove any one of those strikes were exercised with a discriminatory intent. That the prosecution did not give reasons for the strikes against Palmer, Griffin, and Wright, necessarily means that Knox cannot show a *J.E.B.* violation for those strikes. He can only speculate about the reasons the prosecution used them and how each one raises an inference of gender discrimination.

***Cynthia Richardson.*** For the same reasons that Knox's assertions about Ms. Richardson and Lonny Priest are not comparable venire members. According to Knox, the prosecution's reason for striking Ms. Richardson was merely a pretext for gender discrimination because the prosecution did not use a strike against Lonny Priest, even though she and Mr. Priest were similarly situated

members of the venire. *See* Doc. 113 at 104–06. The prosecution had doubts about Ms. Richard's commitment and ability to serve based on in-court observations. *See* Doc. 72-3 at 141. When the trial court mentioned the statutory exception for recent juror service, Ms. Richardson claimed the exception, was adamant that she qualified for it, and asked to be excused under.

Mr. Priest responded, as instructed, to a general question about prior jury service that the prosecution asked during group voir dire. Priest had served on a justice-court jury a few months earlier and qualified for the two-year exception. He easily qualified under the two-year exception. But unlike Ms. Richardson, Priest did not ask to be excused. The record does not suggest, much less show, the prosecution observed the same determination in Mr. Priest that it saw in Ms. Richardson. And Knox does not show the prosecution had the same concerns with Priest's commitment and ability to serve as it had with Ms. Richardson. The two are not comparable jurors.

Respondents incorporate the arguments above concerning the *Miller-El* factors (*e.g.*, comparative juror analysis, disparate questioning, history of racial discrimination) discussed in response race-based discrimination issue above, here by reference and in response to the gender discrimination issue under Claim One. Knox's *J.E.B.* issue does not show deficient performance. Numbers alone are not enough to establish purposeful discrimination in jury selection. And Knox does

not try to show prejudice. Claim One fails under both prongs of *Strickland's* standard. Either way, Knox cannot obtain relief for Claim One.

## V.    Knox cannot obtain relief for Claim Five.

Finally, Knox says he is entitled to extraordinary federal relief for the cumulative effect of the alleged errors and constitutional violations above because, when aggregated, those errors and violations produced an unfair trial. Doc. 85 at 241–43, Doc. 113 at 137–39. Specifically, he says trial counsel failed to: (1) preserve "the *Batson* issues"; (2) conduct an investigation as to "whether some other person committed this murder"; (3) secure funding for "necessary experts" for an "effective defense"; and, (4) conduct a mitigation investigation that would have yield "highly relevant" mitigating evidence and testimony. Doc. 85 at 241–42; Doc. 113 at 137–39. Here too, Knox implicitly asks this Court to consider Claim Five *de novo*. This claim should be denied.

To begin, the Mississippi Supreme Court denied both cumulative-error claims that Knox raised during his state-court proceedings. The state supreme court denied Knox's first cumulative-error claim in the written opinion entered in *Knox II*. The written opinion in *Knox II* reads:

### I.    CUMULATIVE ERROR.

Knox next argues that he is entitled to relief based on cumulative error, though he does not name any specific issues. Considering the issues he has raised previously, along with those not yet discussed, we find no error sufficient to allow him to proceed in the trial court, cumulative or otherwise.

> Knox argues that a reviewing court must also consider the cumulative effect of counsel's deficient performance. This Court did so under discussion of Issues II and VII, and found no cumulative error.

*Knox II*, 901 So. 2d at 1269.[23]

Years later, the Mississippi Supreme Court denied Knox's second cumulative-error claim in *Knox III*. Its unpublished En Banc Order states:

> Lastly, Knox argues that cumulative error warrants that he receive a new sentencing hearing. When individual errors standing alone do not constitute reversible error, there is an avenue to obtain relief through applying the cumulative-error standard. There, we look to whether the cumulative effect of all errors deprived a defendant of a fundamentally fair and impartial trial. *McFee v. State*, 511 So. 2d 130 (Miss. 1987). Knox presented no argument as to why this claim should be excepted from the procedural bars.

Doc. 75-10 at 298–99.

## A.    AEDPA's time bar precludes review of Claim Five.

Knox raised all the newly asserted claims in his Second Amended Petition, including Claim Five, more than seventeen years after filing his original Petition, Doc. 9, and years after October 21, 2005, the last day of his one-year limitations period for filing a habeas petition. There is no question that Claim Five is

---

[23] The claims addressed before Knox's first cumulative-error claim were: (1) sentencing instructions 2 and 12 are vague and overbroad, (2) IATC for failing to make a *Batson* objection, present a defense, investigate and present mitigation evidence, and investigate competency to stand trial; (3) insufficient evidence supports the underlying felony conviction; (4) the State's death penalty statutes are unconstitutional; and, (5) Knox's sentence is disproportionate. *Knox II*, 901 So. 2d at 1261–69. The claims addressed after Knox's cumulative-error claim in *Knox II* were: (1) the indictment is deficient; (2) sentencing instruction 2 permits an improper finding; (3) sentencing instruction 11 does not define "a preponderance of the evidence"; (4) admitting photos of Ms. Spears is error; and (5) Knox's sentence is disproportionate. *Id*. at 1269–71.

123

untimely. It must qualify for relation-back under Rule 15(c)(2) to avoid section 2244(d)(1)'s time bar. *See Mayle*, 545 U.S. at 662–63; *see also* Habeas R. 12.

To qualify for relation-back, Claim Five and a claim in Knox's original Petition must arise out of the same "'conduct, transaction, or occurrence.'" *See id.* at 655 (quoting Fed. R. Civ. P. 15(c)(2)). Claim Five and a claim in Knox's original Petition arise out of the same conduct, transaction, or occurrence only if both claims "are tied to a common core of operative facts." *See id.* at 664. Knox's original Petition does not assert a cumulative-error claim. Doc. 9. Claim Five operates under a different and distinct legal theory from the claims in Knox's original Petition. More importantly, Claim Five operates under a set of operative facts that differs from those supporting the claims in the twenty-seven pages of Knox's original Petition.

For example, the second claim in Knox's original Petition asserts that counsel was ineffective for failing to object to the State's peremptory strikes at trial. Doc. 9 at 11–14. The entire claim appears in just over three pages. Claim Five in Knox's Second Amended Petition alleges a due process violation based on the cumulative effect of trial counsel's errors, including those alleged under Claim One. Claim One, like the second claim in Knox's original Petition, asserts discrimination in jury selection. But unlike the second claim in Knox's original Petition, Claim One spans ninety pages and asserts IATC for failing

to object to the State's use of peremptory strikes against black and female venire members.

Section 2244(d)(1)'s time bar precludes review of Claim Five. Knox first raised Claim Five years after his one-year time limitations period expired. And Claim Five does not qualify for relation-back under Federal Rule of Civil Procedure 15(c)(2). Claim Five and the claims in Knox's original Petition are not tied together by a common core of operative facts and assert different legal theories. So Rule 15(c)(2)'s relation-back provision cannot save Claim Five from section 2244(d)(1)'s time bar. Knox cannot obtain relief for Claim Five because it is untimely.

### B.    The default doctrine bars review of Claim Five.

The default doctrine bars review of Claim Two because Knox did not fairly present this claim in state court consistent with state procedural law. And any "new" evidence that Knox presents to support Claim Two must meet § 2254(e)'s stringent requirements. Claim Two only if Knox shows cause and prejudice, newly discovered evidence, or an intervening decision excuses a procedural default. Knox does not He offers "new" information as evidence that supports Claim Two but does not to try show cause or prejudice to excuse his state-court defaults try to meet § 2254(e)'s requirements or show review is necessary to avoid a fundamental miscarriage of justice.

### 1. Claim Five is "technically" exhausted.

Knox presented Claim Two in *Knox III*, years after exhausting his state-court remedies.. He did not fairly present that claim to the Mississippi Supreme Court. "Fair presentation does not entertain presenting claims 'for the first and only time in a procedural context in which its merits will not be considered unless there are special and important reasons therefor.'" *Carty v. Thaler*, 583 F.3d 244, 254 (5th Cir. 2009) (quoting *Castille v. Peoples*, 489 U.S. 346, 351 (1989)). A claim that would be dismissed in state court for its procedural failures is "'technically exhausted because, in the habeas context, state-court remedies are exhausted when they are no longer available, regardless of the reason for their unavailability.'" *Shinn*, 596 U.S. at 378 (explaining that claims are technically exhausted and procedurally defaulted when state-court remedies are no longer available) (quoting *Ngo*, 548 U.S. at 92–93). Federal courts must apply the procedural default doctrine to technically exhausted claims like Claim Five. *See id.* (quoting *Davila*, 582 U.S. at 528).

"[I]t is not enough that all the facts necessary to support the federal claim were before the state courts or that a somewhat similar state-law claim was made." *Nickleson v. Stephens*, 803 F.3d 748, 753 (5th Cir. 2015) (internal quotation marks omitted) (quoting *Wilder v. Cockrell*, 274 F.3d 255, 259 (5th Cir. 2001) (quoting *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (per curiam))). "The exhaustion doctrine demands more than allusions in state court to facts

126

or legal issues that might be comprehended within a later federal habeas petition." *Id.* "[I]t would be unseemly in our dual system of government for a federal district court to upset a state court conviction without giving an opportunity to the state courts to correct a constitutional violation and to do so *consistent with their own procedures*…." *Shinn*, 596 U.S. at 379 (emphasis added) (internal citations, punctuation, and some brackets omitted). Claim Five is technically exhausted and procedurally defaulted.

Knox raised a cumulative-error claim for the first time in his § 2254 habeas proceedings. *See* Doc. 9. Like Nickleson, Knox largely on federal criminal cases that were decided on direct review by the Fifth Circuit. *See* Doc. 113 at 137 (citing *Delgado*, 672 F.3d at 343–44; *United States v. Delgado*, 631 F.3d 685 (5th Cir. 2011); *United States v. Baker*, 432 F.3d 1189, 1258 (11th Cir. 2005)). Like the state in *Nickleson*, *see id.*, Respondents have maintained throughout these proceedings that Claim One is technically exhausted and procedurally defaulted, *see* Doc. 85 at 116–21. So as the Fifth Circuit did in *Nickleson*, this Court should rule Claim Five is technically exhausted and procedurally defaulted.

### 2. Adequate and independent state-law grounds bar review.

But if not, it will find three adequate and independent state procedural-law grounds bar federal habeas review. "[A] federal court may not review federal claims that were procedurally defaulted in state court—that is, claims that the

state court denied based on an adequate and independent state procedural rule." *Davila*, 582 U.S. at 527; *Sones*, 61 F.3d at 416 (quoting *Coleman*, 501 U.S. at 735 n. 1). State prisoners, like Knox, may not "'avoid the exhaustion requirement by defaulting their federal claims in state court.'" *See Sones*, 61 F.3d at 416, n. 8 (quoting *Coleman*, 501 U.S. at 732).

Knox did not and could not present Claim Five to the state supreme court in a manner consistent with state procedural law after the proceedings in *Knox II* ended. *See* Miss. Code Ann. §§ 99-39-5(2)(b), 99-39-21(1)–(3), 99-39-27(9). So when he raised the cumulative-error claim in *Knox III*, the state supreme court clearly and expressly ruled it was procedurally barred as the UPCCRA required. Doc. 75-10 at 295–99 (citing Miss. Code Ann. § 99-39-27(5)). The state court ruled the UPCCRA's statutory bars precluded review and confirmed that Knox had technically exhausted Claim Five. *See* Doc. 75-10 at 295–99. In particular, the state court expressly relied on the UPCCRA's time, successive-writ, and waiver bars as procedural-law grounds for denying Knox's Second Amended Petition. *See* Doc. 75-10 at 295–99. Mississippi's time, successive-writ, and waiver bars are adequate and independent state procedural-law grounds that will preclude federal habeas review. *See Spicer*, 2021 WL 4465828, at *3 (citing *Johnson*, 176 F.3d at 815 n. 3, and *Moawad*, 143 F.3d at 947); *Stokes*, 123 F.3d at 860.

That said, the Court may review Claim Five if it finds Knox has shown: (a) failing to consider the claim will result in a fundamental miscarriage of justice,

*Coleman*, 501 U.S. at 750; (b) cause and prejudice exist for Knox's failure to properly raise the claim, *Sykes*, 433 U.S. at 87; or (c) the UPCCRA's time, successive-writ, and waiver bars were not "firmly established and regularly followed" in state court, *Ford*, 498 U.S. at 423–24. Knox bears the burden to excuse the procedural default resulting from the state court's reliance on the UPCCRA's statutory bars as grounds in support of its decision in *Knox III*. *See Sones*, 61 F.3d at 416–18.

But Knox does not try to overcome or excuse the procedural defaults that bar federal review. *See* Doc. 113 at 137–39. He does not try to show cause and actual prejudice as it *specifically* relates to Claim Five or that federal review of that claim is necessary to prevent a fundamental miscarriage of justice. *See* Doc. 113 at 137–39. Nor does he try to rebut the presumption that Mississippi's time, waiver, or successive-writ bars are adequate and independent state-law grounds that preclude review of Claim Five. *See* Doc. 113 at 137–39. Thus, the Court should deny Claim Five.

### D.    Claim Five has no merit.

If the Court disagrees, then it should deny Claim Five because it lacks merit. Fifth Circuit precedent holds that

> federal habeas corpus relief may only be granted for cumulative error in the conduct of a state trial where (1) the individual errors involved matters of constitutional dimension rather than mere violations of state law; (2) the errors were not procedurally defaulted for habeas

129

purposes; and (3) the errors "so infected the entire trial that the resulting conviction violates due process."

*Derden v. McNeel*, 978 F.2d 1453, 1454 (5th Cir. 1992) (en banc) (citing *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)). The Court must also "review the record as a whole to determine whether the errors more likely than not caused a suspect verdict." *Id.* at 1458.

A review of the entire record reveals that Knox cannot obtain relief for Claim Five because the cumulative-error doctrine is inapplicable to the claims in the Second Amended Petition. First, the individual errors that Knox complains about involve alleged violations of state law, *e.g.*, the ineffectiveness of post-conviction counsel in *Knox II*. Second, the claims in Knox's Second Amended Petition are procedurally barred as demonstrated under the claims above and in Respondents' Answer to Knox's Second Amended Petition, *see* Doc. 95. *See Hughes v. Dretke*, 412 F.3d 582, 597 (5th Cir. 2005) (affirming district court's conclusion that because the underlying claims to a cumulative-error claim "[we]re procedurally barred from federal habeas review," cumulative-error claim was "likewise barred due to procedural default"). Third, Knox fails to show any error "so infected the entire trial that the resulting conviction violates due process." *See Derden*, 978 F.2d at 1454. And fourth, there were no errors committed at Knox's trial. So there are no errors to cumulate in these proceedings. *See Westley v. Johnson*, 83 F.3d 714, 726 (5th Cir. 1996) ("Meritless claims or claims that are

not prejudicial cannot be cumulated, regardless of the total number raised.")
(citing *Derden*, 978 F.2d at 1461); *Castillo v. Stephens*, 640 F. App'x 283, 297 (5th
Cir. 2016) (denying a COA on a "cumulative ineffective assistance theory [claim]
where no single error by itself rose to the level of ineffectiveness") (citing *Miller
v. Johnson*, 200 F.3d 274, 286, n. 6 (5th Cir. 2000)). Any one of these reason four
reasons, on its own, prevents Knox from obtaining habeas relief for Claim Give.
Knox is not entitled to relief for Claim Five. The Court should deny it.

For the reasons above, Knox cannot obtain relief for Claim Five in his
Second Amended Petition. Claim Five is time-barred, unexhausted, procedurally
defaulted, barred by section 2254(d)'s re-litigation bar, and otherwise without
merit. Therefore, the Court should deny Claim Five.

## CONCLUSION

The Court should deny Knox's Second Amended Petition, the relief Knox
seeks, and a Certificate of Appealability to appeal this matter to the Untied
States Circuit Court of Appeals for the Fifth Circuit. 0

THIS, the 12th day of February 2025.

Respectfully submitted,

LYNN FITCH
Attorney General of Mississippi

by: /s/ *Brad A. Smith*
BRAD A. SMITH
Special Assistant Attorney General
Miss. Bar No. 104321
Office of the Attorney General

Post Office Box 220
Jackson, Mississippi 39205-0220
Telephone: (601) 359-3680
Email:  Brad.Smith@ago.ms.gov

*Counsel for Respondents*

## CERTIFICATE OF SERVICE

This is to certify that, on this day, undersigned electronically filed the

forgoing Memorandum of Authorities using the Court's ECF system, which

sent notification to all counsel of record.

This, the 12th day of February, 2025.

Respectfully submitted,

LYNN FITCH
Attorney General of Mississippi

by: /s/  *Brad A. Smith*

BRAD A. SMITH
Special Assistant Attorney General
Miss. Bar No. 104321
Office of the Attorney General
Post Office Box 220
Jackson, Mississippi 39205-0220
Telephone: (601) 359-3680
Email:  Brad.Smith@ago.ms.gov
*Counsel for Respondents*

133